**BELL ATLANTIC–PENNSYLVANIA, INC., Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

**Sprint Communications Company, L.P. and the United Telephone Company of Pennsylvania, Petitioners,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

**GTE North, Incorporated, Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

**AT & T Communications of Pennsylvania, Inc., Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

**MCI Worldcom, Inc., Petitioner,**

v.

**Pennsylvania Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 17, 2000.

Decided Oct. 25, 2000.

Reargument Denied Jan. 5, 2001.

Julia A. Conover, Philadelphia, for petitioner Bell Atlantic-PA, Inc.

Zsuzanna B. Benedek, Harrisburg, for petitioners, Sprint Communications and United Telephone.

Edward J. Fuhr, Richmond, VA, for petitioner, GTE North, Inc.

Robert C. Barber, Oakton, VA, for petitioner A T & T Communications PA.

Jeffrey A. Rackow, Washington, DC, for petitioner, MCI Worldcom, Inc.

Maryanne R. Martin and Kathryn G. Sophy, Harrisburg, for respondent.

Philip B. McClelland, Harrisburg, for intervenor, Office of Consumer Advocate.

Angela T. Jones, Harrisburg, for intervenor, Office of Small Business Advocate.

Christopher B. Craig, Harrisburg, for intervenor, PA Senators (Fumo, Madigan and White).

Stephen P. Hershey, Philadelphia, for intervenor, ATX Telecommunications Services.

Renardo L. Hicks, Harrisburg, for intervenor, Nextlink, Focal, Hyperion, Rythm and CTSI.

BEFORE: DOYLE, President Judge, and COLINS, Judge, McGINLEY, Judge, FRIEDMAN, Judge, KELLEY, Judge, FLAHERTY, Judge, and LEADBETTER, Judge.

## TABLE OF CONTENTS

OPINION 440
Introductory Statement 2 452

BACKGROUND – THE GLOBAL SETTLEMENT ATTEMPT 453
HISTORY OF THIS CASE – GLOBAL RESOLUTION 454
Pleadings – The Two Petitions 454
Record of the Global Resolution Proceedings 455
Standard of Review 456
Decision of the PUC Here Reviewed 456
*Majority Decision* 456

*Dissent* 457

**THE ISSUES** 457
**Due Process Question as to the Global Resolution Proceedings** 457
**Structural Separation of Bell into Retail and Wholesale Companies** 460
*Present Reviewability of the Structural Separation Order* 460
*Claim of Denial of Due Process as to Structural Separation Decision* 461
*Statutory Authority for Requiring Structural Separation* 462
Structural Separation Dissenting View 462
*Record Support for Structural Separation* 465
*Code of Conduct* 467
Advance Notice as to the Code of Conduct 467
The Code of Conduct – Directive or Regulation 467
Statutory Authority and Factual Basis for the Code of Conduct 468
Code of Conduct First Amendment Issue 469
**Compliance of Global Order with Chapter 30 and Bell's Plan** 470
*Effect of Chapter 30 Plan Previously Approved* 470
*PUC's Power to Issue Subsequent Orders Related to Plan's Content* 471
*Access Charges* 476
*Validity of Order as Establishing UNE Rates* 481
*Access to Network Platforms and Enhanced Extended Loops* 483
The Platform – A Bundle of Elements Otherwise Unbundled 483
The Revenue Threshold on Bell's UNE–P Obligation 485
Time Limitation upon UNE–P 486
*Lifeline Program Rulings in Relation to Chapter 30 and Bell's Plan* 486
Majority Decision on Lifeline 487
Lifeline Dissenting View 488
**Other Global Order Provisions – Compliance with State Law** 488
*Consumer Education Program* 488
Consumer Education Program as Proposed and Ordered 488
Consumer Education Program under Bell's Plan and Chapter 30 Policy 489
Effect of Waiver and Estoppel as to Consumer Education Program 492
*Universal Service Fund* 492
Effect of Pending Prior Appeal on Universal Service Fund Issue 494
Estoppel to Question Statutory Authority for Universal Service Fund 495
Statutory Authority for Universal Service Fund 496
Universal Service Fund and Rulemaking Powers 497
Exclusion of Bell and GTE North as Recipients from USF 498
*Competitive Services Designations* 500
Competitive IntraLATA Toll Services 500
Competitive Business Services 502
*Reciprocal Compensation Agreements and Internet Connections* 505
**Global Order Validity under the Federal Telecommunications Act** 508
*Federal Law and the Rural/Residential Promotion* 508
Wholesale Rates and Federal Law 510
*Unbundled Network Element Rates and the Federal Law* 511
*Unbundled Access to Switching and DSLAMS* 512

**ORDER** 513

**Appendix A – Glossary of Telecommunications Acronyms**
**Appendix B – Outline of Record Evidence**

McGINLEY, Judge.

These appeals are from a decision[1] of the Pennsylvania Public Utility Commis-

sion (PUC) under the Public Utility Code,

---

1. Initial portion of PUC decision, captioned Opinion and Order, referred to as Global Opinion by some parties, is at Reproduced Record (R.R.) 35a–317a, Vol. 1. The next and final portion of PUC decision, following phrase IT IS ORDERED, referred to as Global Order by some parties, is at R.R. 318a–372a, Vol. 1; Dissent R.R. 373a–376a, Vol. 1.

entered September 30, 1999, relating in substantial part to Chapter 30 of the Code, 66 Pa.C.S. §§ 3001–3009, entitled Alternative form of regulation of telecommunications services.

To be informed as to the complete content of the PUC's decision in this case, it is important to note that the latter portion of the decision, after the phrase IT IS ORDERED, R.R. 318a, Vol. 1, by reference incorporates significant provisions stated in the preceding Opinion and Order, R.R. 35a–317a, Vol. 1. Thus, to ascertain the complete content of many elements of the PUC's order, it is necessary to examine not only the provisions that follow the IT IS ORDERED heading, but also the cross-references in those provisions to wording appearing in the preceding Opinion and Order.

Note also two appendices incorporated into this opinion for reference. Appendix A is an alphabetized Glossary of Acronyms commonly used in the telecommunications field for the sake of brevity. Appendix B is an outline of Record Evidence received in this case.

Our Supreme Court and this Court have previously noted the pervasive public significance of the goals of Chapter 30. *Popowsky v. Pennsylvania Public Utility*, 550 Pa. 449, 453, 706 A.2d 1197, 1199 (1997); *See also Popowsky v. Pennsylvania Public Utility Commission*, 669 A.2d 1029, 1032 (Pa.Cmwlth.1995). By Chapter 30 the legislature seeks to encourage further development of state-of-the-art, i.e. broadband,[2] telecommunications networks that will be affordable and universally available in this Commonwealth. To implement that goal, the law authorizes the PUC to depart from traditional concepts of rate regulation of local telephone companies in two ways.

First, the PUC, upon application, may approve an alternative form of regulation for noncompetitive services, subject to price stability controls and assurances that the applicant will convert its networks to broadband capability by the end of the year 2015, under a plan to make such services widely available to a full range of public needs. 66 Pa.C.S. §§ 3003, 3004.

Second, upon petition by a local exchange telecommunications company the PUC may make a determination substantially deregulating rates for certain services identified as competitive, but subject to conditions allowing all competitors nondiscriminatory access to services and facilities they need in order to compete. 66 Pa.C.S. § 3005.

As pointed out in the Main Brief of AT & T Communications of Pennsylvania, Inc. (AT & T), the federal Telecommunications Act of 1996, 47 U.S.C. §§ 251–276 (TA 96), complements Pennsylvania's Chapter 30 and adds a national emphasis to the introduction of competition to all telecommunications markets. Pennsylvania's Chapter 30, although its 1993 enactment antedated the federal law, provides requirements and powers that serve to implement the federal goal.

### BACKGROUND–THE "GLOBAL SETTLEMENT ATTEMPT"

In September 1998, the PUC, by Chairman Quain and Commissioner Rolka, announced[3] that it was opening a Global Settlement Conference, inviting all telecommunications industry parties to engage in discussions to resolve existing proceedings concerning noncompetitive and competitive matters pursuant to Chapter 30 and the federal TA 96.

Many industry parties, including the parties to this appeal, took part in formal discussions and negotiations, continuing

---

2. Broadband is a communication channel capable of simultaneous transmission of video, data and audio signals, having a bandwidth equal to or greater than 1.544 megabits per second. 66 Pa.C.S. § 3002.

3. R.R. 9727a–9728a, Vol. 29; See also R.R. 377a–379a, Vol.2.

until March 1999, when the PUC, also by Chairman Quain and Commissioner Rolka, issued a confidential term sheet, to be considered as a basis for a final industry settlement.[4] When no Global Settlement evolved, the PUC, by the same two members, invited the institution of formal proceedings to resolve the differences.[5]

### HISTORY OF THIS CASE–THE "GLOBAL RESOLUTION PROCEEDINGS"

#### Pleadings – The Two Petitions

Industry parties responded to the announcement of resolution proceedings by filing two substantially different petitions on March 18, 1999, one seeking certain results more commonly favored by the incumbent local exchange carriers (ILECs) and the other seeking some results characteristically sought by competitive local exchange carriers (CLECs—See Appendix A, incorporated herein, for a list of initials used for brevity). ILECs, the incumbents such as Bell Atlantic–Pennsylvania, Inc., are the carriers that formerly had exclusive local telephone service territories. CLECs, the competitive carriers are the carriers now enabled by present law to provide local telephone service in the formerly exclusive territories, in competition with the incumbents.

Hence each of two petitions, reflecting agreement among its own particular group of signers, called upon the PUC, in these Resolution Proceedings, to resolve the many issues of the new competition environment in their favor.

One of the petitions, entitled Joint Petition for Global Resolution of Telecommunications Proceedings, was filed by Bell Atlantic–Pennsylvania, Inc., referred to as Bell by most of the parties and by this opinion, and as BA–PA by the PUC. Also joining in that petition, generally called the 1649 Petition in this case, referring to its docket number, were two other telecommunications companies and a coalition of 32 independent telephone companies.[6]

That 1649 Petition dealt with fifteen pertinent matters, including: (1) toll and access charges; (2) Universal Service Fund (USF); (3) rate cap on local exchange residential service; (4) Lifeline Service; (5) competitive business services; (6) consumer education; (7) availability of unbundled [7] network elements (UNEs), including the local loops and digital facilities of an incumbent local exchange carrier (ILEC) on a platform, i.e. combined, basis; (8) third-party testing of ILEC operations support systems; (9) ILEC performance standards; (10) collocation alternatives reflecting price reductions and flat-rate pricing; (11) availability of digital facilities on an unbundled basis; (12) availability of enhanced extended loops (EELs) for local services; (13) an abbreviated dispute resolution (ADR) process; (14) entry to the in-region interLATA (between Local Access and Transport Areas) market per 47 U.S.C. § 271; and, at R.R. 515a–518a, Vol. 2, (15) functional separation of Bell's wholesale and retail businesses, and Code of Conduct relative thereto.

The 1649 Petition's request for relief asked that the PUC grant the Joint Petition, and enter an Order in each of the Resolved Dockets implementing the resolutions proposed in the Joint Petition.[8]

---

4. R.R. 9746a, Vol. 29.

5. R.R. 629a, Vol. 2

6. R.R. 464a–521a, Vol. 2. In addition to Bell, the petitioners were Network Access Solutions, Conectiv (spelling is correct) Communications, Inc., and the Rural Telephone Company Coalition.

7. To provide a telecommunications purchaser with network elements unbundled has been defined as to give separate prices for equipment and supporting services, Webster's Ninth New Collegiate Dictionary 1283 (1938) as quoted in *AT & T v. Iowa Utilities Board*, 525 U.S. 366, 394, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

8. R.R. 519a, 518a, Vol. 2.

Understandably, the 1649 Petition, representing that all of its parties were in agreement as to all of its requested resolutions, left each party free to pursue its own remedies if the PUC should modify any of the terms and conditions herein, by stating that this settlement, i.e., the terms upon which they agreed, would in that event be of no force and effect.[9]

The significance of this recognition, that the PUC in the Resolution proceeding was empowered to modify the terms proposed, not merely consider each petition on a take-it-or-leave it basis, is considered below, in connection with claims that the resolution proceedings did not constitute administrative litigation proceedings consistent with due process.

Also on March 18, 1999, the other petition, referred to as the 1648 Petition, was filed on behalf of Pennsylvania State Senators Vincent J. Fumo, Roger A. Madigan and Mary Jo White, AT & T, six other telecommunications companies, and a cable and television association.[10] In addition to various rate reductions and rate freeze extensions, the 1648 Petition sought a structural separation of Bell's wholesale and retail services into two separate companies.

This 1648 Petition, containing a disclaimer similar to that in the 1649 Petition, declared that its parties' commitments to each other would be nullified if the PUC's decision modified any of its requests.[11]

By order entered April 2, 1999,[12] the PUC consolidated the 1648 and 1649 Petitions, and expressly provided for (1) a prehearing conference before an administrative law judge to deal with procedure and possible stipulations, (2) the submission of pre-filed testimony, and responsive testimony thereafter, (3) hearings on the record before the PUC members sitting *en banc,* and, after hearings, (4) the filing of briefs and reply briefs. The PUC stated that any final determinations must be supported by record evidence.[13]

During the pre-hearing phase, Bell filed an answer and new matter to the 1648 Petition and also moved to dismiss it. Administrative Law Judge (ALJ) Marlane Chestnut denied the motion,[14] and the PUC, acquiescing in the denial,[15] proceeded to hold *en banc* hearings on three days in late June, 1999 and three days in the first week of July.

When notified of the adjournment of the hearings in view of the absence of any further offer of evidence, no party sought to extend the hearings.[16]

### Record of the Global Resolution Proceedings

The record of the Global Resolution Proceedings now before this Court consists of thirty-two (32) bound volumes, aggregating 9,771 pages. Aside from the PUC's Global Opinion and Order in Vol. 1, the petitions and prehearing orders in Vol. 2 and some listings of docket entries, the evidentiary matter found in Vols. 3–26 occupies 8026 pages of record, consisting of sworn testimony, cross-examination and exhibits.[17] For an outline of the detailed content of the evidence of record, see Appendix B, incorporated herein.

9. R.R. 518a, Vol. 2.

10. Docket No. P–00991648 at R.R. 1a; Petition. at R.R. 386a, Vol. 2. Other parties included MCI WorldCom, Nextlink Pennsylvania, Inc., RCN Telecommunications Services of Pennsylvania, Hyperion Telecommunications, Inc., ATX Telecommunications, CTSI, Inc., and the Pennsylvania Cable and Telecommunications Association.

11. R.R. 438, Vol. 2.

12. R.R. 5582a–5591a, Vol. 17.

13. R.R. 5585a, Vol. 17.

14. R.R. 1835a–1840a, Vol. 6.

15. R.R. 49a,50a, Vol. 1.

16. R.R. 2788a, Vol. 8.

17. R.R. 717a, Vol. 3 through R.R. 8836a, Vol. 26.

## Standard of Review

This Court's standard of review of the administrative agency's decision is to affirm the decision unless the Court finds the adjudication is in violation of constitutional rights, or not in accordance with law, or that the administrative agency procedures, as prescribed by law, have been violated, or that necessary agency findings are not supported by substantial evidence. 2 Pa.C.S. § 704; *Pa. Electric Co. v. Pennsylvania Public Utility Commission*, 78 Pa.Cmwlth. 402, 467 A.2d 1367, 1370 (1983).

## Decision of the Public Utility Commission Here Reviewed

Thereafter, on September 30, 1999, the PUC issued the Global Opinion and Order now on appeal.[18] The PUC members were in agreement as to the decision, with the exception of the dissent of Vice Chairman Robert K. Bloom on two matters, the Lifeline program and structural separation.

### *Majority Decision*

With respect to both petitions, 1648 and 1649, the decision of the PUC, in its first two elements, grants each petition in part and denies each in part, as further specified in the order and the PUC's opinion. The decision next requires all local exchange companies to file tariffs or tariff supplements to implement the order's directives as to access charge levels and rate structure. The remaining paragraphs of the Global Order are here summarized:

*Carrier Charge Pool Reduction:* On or about January 2, 2001, the PUC shall institute an investigation to refine further the reduction of the Carrier Charge Pool and consider a toll line charge to recover any resulting reductions. Par. 4 Global Order. (R.R. 319a, Vol.1)

*Bell Tariff as to UNEs, etc.:* Bell shall, in 30 days, file a tariff or tariff supplement, effective on one day's notice, consistent with the opinion and order as to unbundled network elements (UNEs), UNE Platform, and enhanced extended loops (EELs). After that filing, an expedited proceeding shall be instituted to establish prices for any such elements not priced by the Opinion and Order. Paragraph 5, 6, Global Order; R.R. 319a, Vol. 1.

*Bell Tariffs as to Network Interconnection Services and Wholesale Discount Rates:* Bell shall file tariffs or tariff supplements on these two matters that, as to the first, shall revise its Tariff No. 218 and its Statement of Generally Available Terms to comply with the opinion and order and with the FCC's Advanced Services Order, and, as to the second, shall revise wholesale discount rates consistent with the opinion and order. Paragraphs 7, 9, Global Order; R.R. 319a, 320a, Vol. 1.

Digital and other High Speed Technology Services: All parties shall comply with the directives in the opinion and order concerning the same. Paragraph 8, Global Order; R.R. 320a, Vol. 1.

*Implementation of United Service Fund, Lifeline Program and Consumer Education Program:* In accordance with the opinion and order, such Fund and Programs shall be implemented (1) by rulemaking to establish permanently an independent third party to administer the Fund, (2) by Bell and the Pennsylvania Telephone Association, with the PUC's Bureau of Consumer Services, to effectuate the Lifeline Programs, and (3) as to the Consumer Education Program, by a nonprofit corporation, in compliance with Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), to be named the Council on Utility Choice. Paragraphs 10–12, Global Order; R.R. 320a, Vol. 1.

*Rates for Protected Services:* Such rates of all local exchange companies shall be frozen through December 31, 2003 Paragraph. 13, Global Order; R.R. 321a, Vol. 1.

---

**18.** See n. 1, *supra*

*Internet Calls:* Such calls shall be treated as local calls, as provided by the opinion and order. Paragraph 14, Global Order; R.R. 321a, Vol.1.

*Structural Separation of Bell Functions:* Within 60 days, Bell shall file and serve on the parties a plan creating a structurally separate affiliate to supply retail telecommunications services, operating independently from wholesale operations, followed by a PUC proceeding to address the issues necessary to implement such structural separation within one year from the entry of the order. Paragraph 15, Global Order; R.R. 321a, Vol. 1.

*Code of Conduct:* Bell shall conform to the Code of Conduct regarding fair and non-discriminatory access to its services, as provided in the opinion and order. Paragraph 16, Global Order; R.R. 321a, Vol. 1.

*Competitive Services:* A competitive services designation pursuant to 66 Pa.C.S. § 3005 shall be made, consistent with the directive in the opinion and order. Paragraph 17, Global Order; R.R. 321a, Vol. 1.

*In-region inter LATA Entry:* Bell's entry into that market pursuant to 47 U.S.C. § 271 shall be implemented. Paragraph 18, Global Order; R.R. 321a, Vol. 1.

*Streamlined Tariff Filing Requirements:* Such requirements, regarding regulatory parity among incumbent and competitive local exchange companies shall be adopted as interim guidelines pending the completion of rulemaking. Paragraph 19, Global Order; R.R. 322a, Vol. 1.

*Abbreviated Dispute [Resolution]* [19] *Process:* An Abbreviated Dispute [Resolution] Process shall be implemented. Paragraph 20, Global Order; R.R. 322a, Vol. 1.

Finally, the PUC's order closed fifteen related proceedings on its docket. R.R. 322a, 323a, Vol. 1.

**19.** In the Global Order, Abbreviated Dispute Process necessarily refers to Abbreviated Dispute Resolution Process, the term used in the Global Opinion, R.R. 305a, Vol. 1.

**20.** R.R. 373–376, Vol. 1.

*Dissent*

Vice Chairman Robert K. Bloom's partial dissent is captioned as relating to two issues, the Lifeline Program and Structural Separation of Bell.[20] In connection with the latter of those two, it also deals with the question of whether the approval of Bell's Chapter 30 Plan constrains PUC actions modifying elements within it. This opinion will include consideration of the dissenting views as part of the discussion of those issues.

## THE ISSUES

### Due Process Question as to the Global Resolution Proceedings

In its Summary of Argument, although not in its Statement of Questions Involved, Bell's brief raises a threshold issue that requires initial consideration because it involves the due process validity of the PUC's Global Resolution proceedings, in which this case's record was created. GTE North, Inc. (GTE), who, like Bell, is also an incumbent local exchange carrier (ILEC), raises substantially the same issue, contending that the PUC did not give timely and adequate notice of the procedures to be followed and also changed procedures during the proceeding.[21]

Bell argues that, after the closing of the Global Settlement discussions at the end of March 1999, the ensuing Global Resolution proceedings, commenced by the 1648 and 1649 petitions, actually constituted further settlement proceedings rather than litigation hearings. Bell cites the PUC's April 2, 1999, order as staying twenty underlying contests pending consideration of the settlements proposed by the 1648 and 1649 petitions. However, as MCI points out,[22] the precise wording of the order was to

**21.** GTE Brief at 17–18.

**22.** MCI Brief at 16.

stay those proceedings until resolution of the two Joint Petitions, 1648 and 1649.[23]

Bell contends that, at the end of the Global Resolution proceedings, the PUC announced final adjudications in the twenty stayed proceedings, without reopening them as the PUC, Bell argues, had promised to do. However, as noted above, the underlying proceedings were incorporated into the Global Resolution proceeding so that they could be completed. The April 1999 order clearly stated:

We hereby extend the stay on all dockets identified below pending further order of the Commission. This will allow all parties a full opportunity to present their respective positions on the outstanding issues and will aid in the resolution of these matters in their entirety.[24]

Thus there was no need to reopen the underlying dockets, as Bell contends, because, during the making of the record here, they were merged in this Global Resolution proceeding so that they could be resolved as part of it.

GTE also asserts a denial of due process by the imposition of a settlement upon it without notice, particularly with respect to access charges, rate caps and below-cost rates. GTE also asserts that, because underlying dockets were closed, many issues in those cases remain undecided by the Global Order. However, as the Office of Consumer Advocate (OCA) points out as to those cases, in some of which the records were already complete, the parties were authorized to incorporate evidence from those case records into the Global Resolution proceeding.[25]

The PUC responds that the Global Resolution proceedings gave adequate notice of the issues to be decided, opportunity to present witnesses and evidence, right of cross-examination of witnesses and, thereafter, permission to file briefs on the issues raised. The ultimate closing of underlying dockets represented the PUC's judgment that the issues raised by them were embraced and resolved by the Global Order.[26]

■ The PUC grants that due process is required in administrative proceedings, *Rudolph v. Pennsylvania Blue Shield,* 553 Pa. 9, 14, 717 A.2d 508, 510 (1998), particularly when the administrative action is adjudicative and involves substantial property rights. *Conestoga National Bank v. Patterson,* 442 Pa. 289, 296, 275 A.2d 6, 8 (1971). Reasonable notice is basic, enabling parties to present objections accurately. *Pa. Coal Mining Association v. Insurance Dept.,* 471 Pa. 437, 452, 370 A.2d 685, 692 (1977).

Our Administrative Agency Law reflects the same principles in requiring, as a basis for a valid adjudication, notice of hearing, an opportunity to be hearing, stenographically recorded verbatim testimony, and a full and complete record. 2 Pa.C.S. § 504.

The PUC cites its adoption, at its March 31, 1999 public meeting, of a motion to hold hearings on the 1648 and 1649 petitions, further staying the dockets affected, and directing *en banc* hearings to create a record at the consolidated P-dockets, which could be used to supplement the records at the other dockets that may be concluded, as necessary.[27]

As AT & T points out, there is clear precedent for the administrative litigation conducted here, namely, in *Pennsylvania Public Utility Commission v. PECO Energy Co,*[28] where contested litigation began with partial settlement proposals that were

23. R.R. 5588a, Vol. 17; also R.R. 649a, Vol. 2.

24. R.R. 647a, Vol. 2.

25. OCA Brief at 25; Prehearing Order # 4, R.R. 1078a, Vol.4.

26. R.R. 322–323, Vol. 1.

27. R.R. 630a, 647a, Vol. 2.

28. 1997 Pa. PUC Lexis 51 at *1 (Dec. 23, 1997).

actively opposed by some parties, and the PUC therefore declared:

> Consequently, this Commission's review of the Partial Settlement must be consistent with processes and standards for deciding a contested case.[29]

In this case, the initial Pre-hearing Conference Order of April 1, 1999, by ALJ Michael Schnierle, presiding, gave notice that the parties were to take positions on twenty different issues, including structural separation of ILEC (Incumbent Local Exchange Carrier) business operations, a code of conduct, access charges, rate caps and a Universal Service Fund.[30] Bell acknowledged that commencement of litigation by filing its April 7, 1999 position statement on structural separation as sought by its opponents.[31]

Pre-hearing Order No. 4 set forth a list of issues to be covered.[32] Also, ALJ Chestnut's order denying Bell's motion to dismiss[33] indicated that all issues in the 1648 and 1649 petitions would be addressed and resolved.

The record and hearing dockets here confirm, as noted above, that Bell and GTE presented direct evidence statements by witnesses, pursued cross-examination, submitted exhibits and filed briefs and reply briefs.[34] As the Intervenor State Senators have noted, the PUC's emphasis upon the evidentiary basis here was underscored by the fact that the PUC members did not delegate the reception of the firsthand testimony and cross-examination to an administrative law judge, but instead themselves sat *en banc* to receive the evidence and evaluate the witnesses. During those days Bell raised no objection to the time limits established, and took full advantage of opportunities for cross-examination.[35]

Although, as GTE notes, during the first-phase Settlement Proceedings, the PUC indicated that it would not hesitate to reopen the underlying dockets if settlement failed, when the second-phase Resolution Proceedings were opened, it was clear that this was a litigation forum in which the parties could pursue issues of concern to them, including the underlying dockets.

GTE submits that (1) the Resolution Proceedings were not sufficiently focused upon issues of particular interest to GTE, and (2) also points out that GTE was not a party to either the 1649 Petition or the 1649 Petition.

However, GTE did take part in the Resolution Proceedings as a litigant. Examination of Appendix B incorporated herein, listing all of the record evidence presented by the parties, shows that GTE submitted for the record six direct evidence statements of witnesses and also had nine sessions of cross examination in the hearings. The record thus was amply focused on matters of concern to GTE.

The actual litigation proceedings were indeed (as entitled) Resolution Proceedings, not settlement discussions. A record containing more than 8000 pages of testimony, cross-examination and exhibits[36] certainly is not a record of a settlement conference. As noted above, Appendix B, appended hereto and incorporated herein, provides an outline of the record of evidence supplied in hearings and by sworn statements.

■ Therefore, examination of the record requires this Court to conclude that Bell and GTE were accorded due process in the PUC Global Resolution proceedings,

---

29. PECO, 1977 Pa. PUC, Lexis 51, at *18.

30. R.R. 637a–642a, Vol. 2.

31. R.R. 709a–710a, Vol. 2.

32. R.R. 1080a–1082a, Vol. 4.

33. R.R. 1838a, Vol. 6.

34. R.R. 717a, Vol. 3 through R.R. 8836a, Vol. 26.

35. Pa. State Senators' Brief at 33, n.36.

36. See text and note, supra, at n. 17.

in that there was adequate notice of the issues that concern them, that they had opportunity to respond to those matters, and that they did present substantial evidentiary and legal responses on their behalf.

To be systematic in resolving the many issues pursued by petitioner Bell, other petitioner parties, respondents, intervenors, and amici curiae, this Court will first treat those issues raised by Bell, the largest local carrier involved, in the sequence presented, and will also consider as to each such issue the positions and arguments presented by other parties. Thereafter, issues raised by parties other than Bell will be examined.

### Structural Separation of Bell into Retail and Wholesale Companies

*Present Reviewability of the Structural Separation Order*

For convenience of reference, the essence of the structural separation provision of the Global Order, paragraph 15, is here restated:

> Bell shall, within 60 days of the entry date of this Opinion and Order, file and serve on the parties ... a plan that creates a structurally separate affiliate to supply retail telecommunications services which will operate independently from its wholesale operations ... and that a formal proceeding shall be instituted at that time to address the issues necessary to implement structural separation within one (1) year of the entry date of this order.[37]

Bell attacks the order as to (1) the lack of a basis for it in the PUC's statutory authority, (2) the absence of a record sufficient to support the PUC's fact findings, and also (3) on the ground that the entire process constituted only settlement discussions rather than a litigation proceeding that could produce directive orders from the agency.

However, the PUC's first response to Bell on structural separation is to assert that the matter of structural separation, unlike other aspects of the Global Order, is not subject to final determination upon this appeal because it is interlocutory. Nextlink Pennsylvania, Inc., an intervening CLEC, supports the PUC in this view. The PUC relies upon *T.C.R. Realty, Inc. v. Cox,* 472 Pa. 331, 337, 372 A.2d 721, 724 (1977), for the proposition that, in this setting, a final order is one which disposes of the matter and puts the litigant out of court with respect to the issue in question.

The PUC refers to its order, stated above, which directs that a wholesale-retail breakup process start now, pursuant to a plan which Bell must file in 60 days, so that a proceeding can follow to consider issues necessary to implement structural separation within one year.[38] The PUC emphasizes that the order is definite, not tentative, by stating at R.R. 273a, Vol. 1:

> It is important, however, that we make clear again that structural separation is the alternative we have chosen.

Having thus made up its collective mind that structural separation is the alternative we have chosen, the PUC cannot recast the order as a tentative one, to elude current review, by now belatedly adopting an argument that further proceedings could produce evidence that some aspects of structural separation would be over burdensome or could present alternative plans relating to the separation. PUC Brief at 71

■ Hence this Court agrees with Bell that the separation order, by its very terms, does possess finality sufficient to subject its validity to adjudication now. The order presently does mandate struc-

---

**37.** R.R. 321a, Vol. 1.

**38.** This is the same provision cited by Bell as a concession by the PUC that the present record is insufficient to provide factual support for the separation. Bell's Brief at 32, 33, n. 77, citing the Global Opinion (R.R. 273a–275a, Vol.1).

tural separation. The terms of the order state that the next step is a formal proceeding to address the issues necessary to *implement* structural separation within one (1) year of the entry date of this order. (emphasis added). The order therefore does not set further proceedings to reconsider or vary the corporate split mandate, but to *complete it* within a one-year period measured from the current order's date.

Whether or not structural separation is required should be decided now, before requiring an expenditure of effort, time and money to carry it out.

### Claim of Denial of Due Process as to Structural Separation Decision

With respect to the structural separation decision in particular, Bell reiterates the claim of denial of due process initially levied by Bell against the entire Global Resolution hearing.

Bell urges that the structural separation decision was rendered in violation of due process for an administrative proceeding, which requires (1) due notice of the nature of the accusation,[39] (2) timely opportunity to answer, and (3) fair and impartial proceedings. *Pittsburgh Press Co. v. Commission on Human Relations,* 4 Pa. Cmwlth. 448, 287 A.2d 161, 166 (1972). Bell contends that it was never notified that it faced structural separation, in that the Global Resolution proceeding was initiated by two competing *settlement* proposals—the 1648 and 1649 petitions—and the underlying cases were not consolidated into the Global Resolution proceeding but were stayed.[40]

Bell, by way of reply brief, also argues that the PUC, executed a bait and switch, converting the proceeding from a hearing on two settlement proposals to an adjudication proceeding to impose measures proposed by AT & T and its cohorts. Bell's position is that a denial of due process resulted, citing *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 96 Pa.Cmwlth. 168, 507 A.2d 433, 437 (1986), holding that parties must be afforded a reasonable opportunity to address, on the record, the issues upon which a decision turns.

However, Bell must acknowledge, as noted earlier in this opinion, that the two petitions, each describing a settlement among the parties to it, did not signify the start of a settlement conference. The Global Settlement proceeding, true to its name, had made an exhaustive attempt to reach a total (Global) settlement, but that proceeding had ended in failure. As noted above in this opinion,[41] Bell's own 1649 Petition, expressly pursuing a Resolution, not a Settlement, recognized that the parties were embarking upon an administrative hearing, and both petitions expressly acknowledged that the PUC could modify their proposal, i.e., that the PUC could decide the case, not merely mediate it.[42] The PUC cites its April 2, 1999, Consolidation Order as giving notice that the PUC would consider all issues in both petitions, and that, after the pre-hearing conference, the parties could submit pre-filed testimony and, at the *en banc* hearings, create a record for the consolidated dockets to supplement the other dockets referenced.[43]

*Armour Transportation Co. v. Pennsylvania Public Utility Commission,* 138 Pa.Super. 243, 10 A.2d 86 (1939), cited by Bell, is inapposite. There a PUC decision, which had revoked common carrier rights, was reversed because the sanction was imposed for specific law violations without

---

**39.** Bell Reply Brief at 4; Bell contends that it was never informed of the charges against it, painting the structural separation decision as a punishment which is akin to a summary criminal sentencing where the death penalty is sought for an undisclosed, unproven crime. No citation is given to support the criminal law analogy.

**40.** R.R. 5586a, Vol. 17.

**41.** See *supra,* text at n.6

**42.** R.R. 438a, 518a, Vol. 2.

**43.** R.R. 5582a–5591a, Vol. 17.

notice of the charges being given in accordance with a specific statutory requirement that a written complaint be issued. No such quasi-criminal complaint requirement is present here.

▮ The PUC hence urges that Bell's presentation of evidence and opportunity for cross-examination and filing briefs did provide due process on the separation issue raised by other parties. As a parallel, the PUC cites *LaFarge v. Insurance Department*, 557 Pa. 544, 735 A.2d 74 (1999).

The PUC also notes that Bell itself acknowledged the existence of the separation issue by proposing a *functional* separation approach, although not a structural one, in its 1649 Petition at Paragraph 148 and Appendix VI; R.R. 515a, 627a, Vol. 2, to deal with that problem.

Thus the record was developed in accordance with due process and does provide factual support for the determination that structural separation is the only effective way to prevent unfair competition and ensure nondiscriminatory access to Bell's bottleneck facilities in the present context. Global Opinion at R.R. 263a–273a, Vol. 1.

### Statutory Authority for Requiring Structural Separation

Structural Separation Dissenting View

As to structural separation of Bell, the dissenting member asserts that TA 96, § 272(b) requires only that an operating company must have a separate affiliate for competitive activities involving (1) manufacturing, (2) long distance services, or (3) InterLATA information services such as an ISP (Internet Service Provider) or alarm monitoring activities.

Under state law, in the dissenter's view, the PUC's general powers in 66 Pa.C.S. § 501 are limited to utility regulation matters, not the implementation of public policy exemplified by structural separation.

Chapter 30 also provides no state law authorization for that mandate, according

to the dissent's review of subsections of 66 Pa.C.S. § 3001, as follows:

Subsection (3) empowers the PUC to ensure that rates for noncompetitive services do not subsidize competitive ventures, but rate regulation can insure that noncompetitive revenues do not exceed costs and therefore thwart subsidization.

Subsection (5) seeks to insure the efficient delivery of technological advances and new services, a goal not requiring structural separation.

As to the majority's main statutory support, Section 3005(h), the dissent submits that it authorizes only the provision of a competitive service through a separate subsidiary, which would authorize structural separation if all of Bell's retail services were found to be competitive, but there has been no such finding. Moreover, states the dissent, although the majority anticipates that Bell will be authorized by the FCC to enter the long distance market, that has not yet occurred.

Also, states the dissent, the PUC has previously rejected structural separation in the Competitive Safeguards Investigation.[44]

As noted above, Bell's initial point as to legislative authorization for the structural separation order is that the PUC lacks any statutory power expressly, precisely, and unmistakably conferred to mandate such a corporate division, quoting our Pennsylvania Supreme Court's statement that, with respect to administrative commissions:

The power and authority to be exercised ... must be conferred by legislative language clear and unmistakable. A doubtful power does not exist.

*Process Gas Consumers Group v. Pennsylvania Public Utility Commission*, 511 Pa. 88, 96, 511 A.2d 1315, 1319 (1986).

Bell adds that the PUC is not a super board of directors for public utility compa-

---

**44.** Docket No. 00930715, Order entered August 6, 1996.

nies. *Northern Pennsylvania Power Co. v. Pennsylvania Public Utility Commission*, 333 Pa. 265, 267–268, 5 A.2d 133, 134 (1939) *overruled on other grounds, City of York v. Pennsylvania Public Utility Commission*, 449 Pa. 136, 295 A.2d 825 (1972), and also that the state is not clothed with the general power of management .... *State of Missouri ex rel. Southwestern Bell Tel. Co. v. Missouri Public Service Commission*, 262 U.S. 276, 289, 43 S.Ct. 544, 67 L.Ed. 981 (1923).

Bell also submits that federal law bars mandating a separation of the corporate structure, quoting the Federal Telecommunications Act, 47 U.S.C. § 253(a), providing that:

> No State ... may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

On this point Bell argues that the effect of mandating a corporate split-up of retail vs. wholesale operations is that each resulting corporation is thereby barred from providing the class of service that the order would reserve to the other one.

■ However, when, as here, the state agency mandate is that Bell provide retail services through a structurally separate *affiliate*, albeit operating independently, it cannot be said that Bell as a business organization is being precluded on the whole from providing retail services.

■ Bell acknowledges that a requirement such as separation may conform with the federal law if the state agency meets the burden of showing that it is a competitively neutral requirement needed to ensure the quality of services and safeguard consumers' rights. 47 U.S.C. § 253(b). Indeed, examination of the PUC requirement shows that the wholesale-retail separation is just that—competitively neutral in the practical sense that its intent is to insure neutrality in competition and thereby protect consumers' rights to choice of suppliers without encountering the higher costs which ensue from lack of competition.

■ Bell also contends that the federal law contemplates separate affiliates being required only as to equipment manufacturing and certain long distance and information services, 47 U.S.C. §§ 272(a)(2), 274, and hence that the federal law, by omission, negates separation on a wholesale-retail basis. However, the straightforward terms of those sections describe those services for which the federal law mandates separate affiliates; in no way do those sections constrain a state regulatory body from requiring separated affiliates for other functions.

■ The dissenting member cites the same 47 U.S.C. § 272, but for the distinctly different contention that the PUC majority's order is erroneous in that it requires separate companies, not affiliates.[45] Yet the majority's order does require, in its literal terms, a structurally separate affiliate.[46] The federal title defines affiliate as a person—which would include a corporation—having ownership or control in common with another. 47 U.S.C. § 153(1). In section 3005(h) of Pennsylvania's Chapter 30, 66 Pa.C.S. § 3005(h), quoted below, a service, when required to be separated to foster competition, is to be performed by a subsidiary. Thus, the word affiliate, in the context of our state law and in the PUC order, does refer to a subsidiary corporation, in the legal and business meaning, and apparently also in the sense it is used by Congress and understood by Bell.

Bell, however, objects further and cites the federal requirement that incumbent telephone companies must offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers (47 U.S.C. § 251(c)(4)(A)). Bell asserts that they reflect a Congressional expectation that an incumbent com-

**45.** R.R. 374—375, Vol. 1.

**46.** R.R. 321, Vol. 1.

pany's wholesale obligation would include provision of retail services to resellers at a discount.

■ However, that federal section clearly does not require Pennsylvania to share a Congressional expectation (which may be overly optimistic) that an integrated wholesale/retail business will sell to competing suppliers at a reasonable wholesale discount, particularly in the telecommunications field where alternative access is often limited by technological factors.

In addition, as AT & T notes,[47] the federal law provides that states may impose additional requirements which further competition in the provision of telephone exchange service or exchange access ... where not inconsistent with federal law. 47 U.S.C. § 261(c). The federal law also provides that it is not to be understood as superseding state laws by implication. 47 U.S.C. § 601(c).

■ With respect to its statutory authority to require the wholesale-retail separation, the PUC first cites, from the Public Utility Code, 66 Pa.C.S. § 501, the power and duty to carry out the various mandates of the Code, *Pennsylvania Public Utility Commission v. Philadelphia Electric Co.* 501 Pa. 153, 460 A.2d 734 (1983), including the Chapter 30 goal of promoting competition in telecommunications by a variety of providers on equal terms. 66 Pa.C.S. § 3001(7). Chapter 30 accordingly prohibits the use of revenues earned, or expenses incurred, in connection with noncompetitive services to subsidize competitive services. 66 Pa.C.S. § 3005(b) and (g).

Implementing those purposes, Section 3005(h) provides specific statutory authority for ordering structural separation. That subsection states:

(h) Subsidiary.—For local exchange telecommunications companies serving over 1,000,000 access lines, the commission may require that a competitive ser-

vice be provided *through a subsidiary which is fully separated* from the local exchange telecommunications company if the commission finds that there is a substantial possibility that the provision of the service on a nonseparated basis will result in unfair competition. (emphasis added).

By way of reply brief, Bell places stress on the point that the above subsection states competitive service in singular, rather than plural form, contending that the statute thus indicates that there must be a separate finding of competitive nature with respect to each retail service which Bell might market to competitors as a wholesaler. However, the grammatical analysis overlooks the reality that each and every service that a competitive local exchange carrier is compelled to purchase from Bell, the incumbent, is functionally related to the competitive activity; otherwise the CLEC would not need to purchase it.

Contrary to Bell's claim that Pennsylvania law does not authorize structural separation, as distinct from mere functional separation within the same entity, Section 3005(h) expressly authorizes structural separation to the extent of confining the wholesale activity to a subsidiary, a separate corporate entity in common parlance, which is how the PUC's order must be understood.

As intervenor MCI notes, our Supreme Court has held that the PUC's expert interpretation of an aspect of utility law is entitled to great deference and will not be reversed unless clearly erroneous. *Popowsky*, 550 Pa. 449, 462, 706 A.2d 1197, 1203.

Because Bell is a local exchange telecommunications company serving over a million access lines,[48] it clearly is subject to Subsection 3005(h). Hence, the conclusion must be that the PUC has indeed been vested with explicit statutory authority to require structural corporate separation.

---

**47.** AT & T Intervenor Brief at 25.

**48.** R.R. 265a, Vol. 1.

The record certainly supports the requisite findings.

### Record Support for Structural Separation

Bell also submits that the separation order is not supported by substantial evidence and therefore was arbitrary and capricious and an abuse of discretion.

In its reply brief, Bell complains that it was never informed of the charges against it, and that its adversary AT & T never identified any legal basis or alleged misconduct by Bell to warrant the remedy of structural separation.[49] However, the fact that Bell's own 1649 Petition stated that Bell agrees to functionally separate the wholesale and retail aspects of its business as provided in the Code of Conduct[50] reflects an unavoidable acknowledgment that separation makes sense simply because an incumbent local exchange carrier will be loathe to wholesale its elements to equip a competitor upon a wholly nondiscriminatory basis, not because there is misconduct to be punished by a separation of roles.

Bell confronts the PUC's determinations that structural separation is essential in view of:

Bell's continuing dominant market share, the lack of entry in the residential market, and substantial evidence of discriminatory access being provided to competitors (R.R. 270a, Vol.1);

Bell's control over 90% of the access lines in its territory. (R.R. 263a–264a, 269a, Vol.1); and

Bell's abuse of its market power by providing competitors with less than comparable access to its network, together with other discriminatory conduct that prevents customers from switching to a competitor. (R.R. 269a, Vol.1).

On the above matters, Bell argues that much of the supporting evidence was received over Bell's hearsay objections, and consisted only of isolated anecdotes. However, an ALJ's findings in one of the related proceedings included evidence of Bell providing potential competitors, CLECs (Competitive Local Exchange Carriers), with insufficient information for constructing the needed electronic interfaces, engaging in protracted revision of those interfaces, and omitting competitors' customers from directories—all indications of delays being interposed by Bell.[51]

As to collocation—the sharing of physical equipment sites by two or more carriers—the PUC also identified problems.[52] However, Bell suggests that they are unrelated to structural separation because the PUC has directed that they be resolved in a separate proceeding.[53] As to any possible problems with Bell's earlier OSS (Operation Support Systems) interfaces with competitors[54], Bell argues that any such matters antedated an independent third-party test of Bell's OSS interfaces[55] and the setting of performance standards in a separate proceeding.[56]

Bell contends further that the PUC, in the Global Order itself, has acknowledged the insufficiency of the foundation for separation by directing a new proceeding to involve studies of the costs and harms of structural separation.[57] However, the PUC's willingness to monitor the continuing impact of separate marketing is evidence of a responsible approach to super-

49. Bell Reply Brief at 3.

50. R.R. 515a, Vol. 2. The Code of Conduct reference here relates to the Code of Conduct proposed by Bell in the 1649 Petition, Appendix IV, R.R. 627a, Vol.2, not to the Code ordered by the PUC.

51. R.R. 7263a–7264a, Vol. 22.

52. R.R. 137a, 270a. Vol. 1.

53. R.R. 146a–147a, Vol. 1.

54. R.R. 270a, Vol. 1.

55. R.R. 9852, Vol. 29.

56. R.R. 5615a, 5626a–5628a, Vol. 18.

57. R.R. 273a–276a, Vol. 1.

vision rather than of a lack of confidence in the basic decision.

 With respect to the factual support for the PUC's key findings that Bell continues to control over 90% of the local business market and nearly 100% of the local residential market, the evidentiary source is PUC access-line reports based on industry data.[58] The PUC position as to the admissibility of such source is supported by the Records of Regularly Conducted Activity hearsay exception. Pa. R.E. No. 803(6) defines that hearsay exception as follows:

A ... report, record or data compilation, in any form, of acts, events or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity ... unless the sources of information or other circumstances indicate a lack of trustworthiness ...

The factual sources do fall within that description and comply with the further criteria of Rule 803(6) in that its concept of business certainly includes the telecommunications industry, and the record presents no indication of lack of trustworthiness.

The prehearing orders, providing for the filing of testimony, discovery and cross-examination, did extend to Bell the opportunity to make an informed response to evidence of that sort.[59]

Although the access-line data is not perfect, in that interpretation of it involves a reverse-time projection of AT & T access-line figures, along with the inclusion of MCI data for comparison purposes, the PUC must be accorded the power to weigh credibility in this specialized technical area—for example, by rejecting national data in favor of Pennsylvania data.

Understandably, without evidence, the PUC had no logical basis upon which to accept Bell's argument that its CLECs (Competitive Local Exchange Carriers) could be underreporting their access-line numbers to inflate Bell's comparative position. Similarly, arguments on both sides as to New York State's treatment of a Bell affiliate there provide no substitute for evidence warranting the PUC's conclusions as to Bell's Pennsylvania status.

The PUC's overall findings on this factual issue, summarized, were as follows:

1. Bell has a virtual monopoly in Pennsylvania's local exchange market, controlling over 90% of the local business market.

2. Bell controls almost 100% of the local residential market.

3. Bell has abused its market power by providing competitors with less than comparable access to its network or engaged in other discriminatory conduct that prevented its customers from switching to a competitor.

In the Global Opinion and Order, the PUC stated:

Indeed, *the Commission finds on this record* that absent structural separation of BA–PA's [Bell's] wholesale and retail operations to prevent cross-subsidization and discriminatory access to other telecommunications carriers, we cannot fulfill our Section 501 duty to enforce, execute and carry out our mandate under Chapter 30 to promote and encourage the provision of competitive services on equal terms throughout the Commonwealth. *See* 66 Pa.C.S. §§ 3001(2), (3), (7) and (8).[60] (emphasis added).

Accordingly, the PUC concluded rightly that the goal of promoting competition will not be achieved without structural separation of Bell's wholesale and retail operations.[61] Here there is no lack of substantial evidence to support the findings of the

**58.** R.R. 3039a–3056a, Vol. 9.

**59.** R.R. 660a–662a, Vol. 2; 1308a–1311a, Vol. 4.

**60.** R.R. 265a, Vol. 1.

**61.** R.R. 270a, Vol. 1.

PUC on matters such as this, within the PUC's field of expertise. *W.C. McQuaide, Inc. v. Pennsylvania Public Utility Commission,* 137 Pa.Cmwlth. 282, 585 A.2d 1151, 1154 (1991)

Our conclusion is that the PUC's factual basis for its structural separation decision was, on this record, wholly adequate.

### *Code of Conduct*

#### Advance Notice as to the Code of Conduct

To Bell's claim that the proceedings gave insufficient notice that a Code of Conduct could be applied to Bell's operations, the PUC responds that, in view of the fact that Bell itself proposed a like Code of Conduct in its 1649 Petition,[62] with a similar code concept also in the 1648 Petition,[63] Bell was demonstrably already aware of the matter, general notice of which was also given to Bell in the Prehearing Conference Order. Item XIV; R.R. 640a, Vol. 2.

#### The Code of Conduct—Directive or Regulation

The Global Order, in connection with the structural separation, requires Bell to follow a Code of Conduct[64] to ensure fair and nondiscriminatory access to its services (Global Order par. 16).[65] The PUC states:

> We also adopt the Code of Conduct contained in the 1648 Petition, as modified by this Order relating to structural separation as to BA–PA only, as a further aid to prevent discrimination and other market power abuses by BA–PA in its local exchange markets.[66]

The Code forbids Bell's wholesale unit from giving preferential treatment in supplying goods and services to Bell's retail unit, as compared to other customers providing retail services. It also forbids sharing of employees, offices or direct management between Bell's retail and wholesale units. In addition, it forbids employees of Bell's wholesale company from promoting the retail unit's services or describing those services as superior to those of competitors.

Bell argues that the Code is actually a regulation applicable generally, that it hence is a binding norm legislative in nature, and therefore it is illegal because it was not promulgated as a regulation under the Regulatory Review Act, Act of June 25, 1982, P.L. 633, *as amended,* 71 P.S. §§ 745.1–745.15, and the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1208, citing *D.E.R. v. Rushton Mining Co.* 139 Pa.Cmwlth. 648, 591 A.2d 1168, 1173 (1991).

As to the Commonwealth Documents Law, the PUC acknowledges that it governs the promulgation of regulations but points out that it does not embrace all directives as constituting regulations. The PUC also submits that, although the Regulatory Review Act authorizes the Independent Regulatory Review Commission to require that a document be promulgated as a regulation, it does not stay the effect of documentary directives in general. Section 7a of the Regulatory Review Act, 71 P.S. § 745.7a.

So long as the Code of Conduct constitutes solely an adjudication of Bell's status, as it does in this case, it does not amount to a regulation, the PUC asserts, acknowledging that it has initiated a proposed rulemaking to create, in the future, a Code of Conduct applicable to all local exchange companies.[67]

---

**62.** R.R. 515a, Vol. 2; 627a, Vol. 2.

**63.** R.R. 445a–446a, Vol.2.

**64.** Appendix C to the Global Order, R.R. 351a–352a, Vol. 1.

**65.** R.R. 321a, Vol. 1, ¶ 16.

**66.** R.R. 276a, Vol. 1, adopting 1648 Petition, Exh. B, R.R. 445a–446a, Vol. 2.

**67.** Rulemaking Re: Generic Competitive Safeguards under 60 Pa.C.S. §§ 3005(b), 3005(g)(2), Docket No. L–00990141 (Nov. 20, 1999); 39 Pa. B. 539.

■ Therefore, in this case, the Code of Conduct order affects only a party to the proceeding, Bell, and when only a party to a proceeding is governed, as here, the result is an adjudication, not a rulemaking. *Redmond v. Milk Marketing Board,* 26 Pa.Cmwlth. 368, 363 A.2d 840, 843 (1976).

As quoted above, at R.R. 276, Vol. 1, the PUC expressly adopted the Code of Conduct as to BA–PA [Bell] only.... Within the Code itself, its terms apply to BA–PA's operations in Pennsylvania.[68] *Rushton Mining Company,* where the Department of Environmental Resources comprehensively regulated mining operations and a large number of permit holders, is therefore distinguishable.[69]

■ Directives with guidelines to implement competition in electricity supply services do not constitute regulations subject to the regulatory review process. *Mid–Atlantic Power Supply Association v. Pennsylvania Public Utility Commission,* 746 A.2d 1196, 1201 (Pa.Cmwlth. 2000).

Even more clearly here, the nature of the Code of Conduct is that of a directive, not a regulation, because it was issued only in the context of an adjudication by the PUC and made applicable to Bell *alone,* to mitigate Bell's unique market power in its telecommunications field. It is an exercise of quasi-judicial authority by the PUC, not a quasi-legislative action. *Redmond,* 363 A.2d at 842, 844.

The Commonwealth Documents Law and the Regulatory Review Act are not applicable. They do not relate to the Code of Conduct in any way.

### Statutory Authority and Factual Basis for the Code of Conduct

■ Bell submits that the PUC has no statutory authority for such internal controls as are applied to Bell by the Code of Conduct. Bell also questions whether the facts support the PUC's conclusion that the code would help to prevent discrimination and other power abuses by Bell in its local exchange markets. R.R. 276a, Vol. 1.

Chapter 30 declares that it is the policy of this Commonwealth to "[p]romote and encourage the provisions of competitive services by a variety of service providers on equal terms throughout all geographic areas...." 66 Pa.C.S. § 3001(7). TA 96, at 47 U.S.C. § 261(c), states that nothing in that section precludes a state from imposing requirements on telecommunications carriers necessary to further competition.

Although Chapter 30 does provide that the PUC shall establish regulations to prevent local exchange telecommunications companies from engaging in unfair competition and to require nondiscriminatory access to competitors, 66 Pa.C.S. § 3005(b), Chapter 30's § 3009(b)(2) also provides that nothing in Chapter 30 limits the power of the PUC to ensure that such companies do not make or impose unjust preferences, discriminations or classifications for protected telephone service and other noncompetitive services.

That provision clearly empowers the PUC to apply the Code of Conduct as a directive to Bell to ensure that the regulated operations of Bell do not give undue advantage to the competitive side of Bell.

■ Record portions cited by the PUC provide factual support for the Code's directives. The PUC was convinced by evidence given by MCI witness Sherry Lichtenberg who testified about: (a) disparagement of MCI for problem attributable to Bell resulting in customer loss by MCI[70]; (b) information shared between Bell's wholesale and retail operations that disadvantaged a competitor's provision of services[71]; (c) Bell's treat-

---

**68.** R.R. 351a, Vol. 1.

**69.** *Rushton Mining Co.* 591 A.2d at 1173, 1174.

**70.** R.R. 719a, Vol. 3.

**71.** R.R. 722a, Vol. 3.

ment of CLEC customers different from large retail customers[72]; and (d) Bell's discontinuance of services to customers who switched to a competitor.[73]

The PUC also relied upon findings of ALJ Schnierle based upon a record of Bell's actions disadvantageous to CLECs (competing local exchange companies) and their customers.[74]

Code of Conduct First Amendment Issue

■ Bell's position also is that the Code's limitation on sales promotion violates the First Amendment by prohibiting sales promotion statements even when true, citing *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), holding the free flow of commercial information to be indispensable, and *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), upholding restriction of commercial speech only when it is no more extensive than is necessary to serve a substantial state interest.

Bell notes that Pennsylvania statutes already prohibit false advertising, 18 Pa.C.S. § 4107(a)(5), and empower the Attorney General to adopt and enforce regulations against unfair trade practices, false advertising and wrongful disparagement. Section 2 of the Unfair Trade Practices and Consumer Protection Act, Act of Dec. 17, 1968, P.L. 1224, reenacted Nov. 24, 1976, P.L. 1166, *as amended*, 73 P.S. § 201–2(4)(vii), (viii), (ix).

An examination of the practical essence of the commercial speech provisions of the Code of Conduct is therefore warranted, as they pertain to Bell as the ILEC (incumbent local exchange company), and its CLEC affiliates or divisions in relation to other CLECs. Those four Code provisions can be fairly summarized as follows:

5. No employee or agent of an ILEC shall promote any service of its CLEC affiliate or division.

6. No employee or agent of an ILEC shall represent that any repair or restoration of service would have occurred earlier if the customer had obtained service from its CLEC affiliate or division.

7. No ILEC shall condition the provision of any regulated service on the purchase of service from its CLEC affiliate or division.

8. No ILEC shall represent that the services of its CLEC affiliate or division are superior, the services of other competitors are not reliable, or that the continuation of certain services from the ILEC are contingent upon purchase of the full range of services from a CLEC affiliate or division.[75]

The PUC also refers to a case cited by Bell, *Virginia State Board of Pharmacy*, 425 U.S. 748 at 772, n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346, for the proposition that commercial speech is subject to reasonable regulations, and also relies upon *Central Hudson Gas & Electric Corp.*, 447 U.S. 557 at 564, 100 S.Ct. 2343, 65 L.Ed.2d 341, as holding that false or misleading advertising is not protected, so that government may ban communications more likely to deceive than inform. Moreover, statements that are literally true can be deceptive, *American Home Products Corp. v. Federal Trade Commission*, 695 F.2d 681 (3rd Cir.1983); *Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir.1992).

As MCI and the Intervenor State Senators note, *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), held that governmental interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities are engaged in expressive activity

---

72. R.R. 723a, Vol. 3.

73. R.R. 724a, 725a, Vol. 3.

74. R.R. 7262–7264, Vol. 22.

75. R.R. 445a, Vol.2.

protected by the First Amendment, such as cable television broadcasting. That U.S. Supreme Court decision was followed by *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), reiterating that the promotion of fair competition justifies restrictions on commercial speech to negate abuse of market power.

■ With respect to commercial speech, the agency must consider, in addition to (1) whether the expression is protected by the First Amendment, also (2) whether there is a substantial government, i.e., public, interest, (3) whether the regulation advances that interest, and (4) whether the regulation is not more extensive than is necessary to serve that interest. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343.

Here the public interest, with respect to regulated public utilities, is served by allocating the market so as to encourage, pursuant to Chapter 30, the development of advanced telecommunications in a context of equitable competition. The PUC found that the record showed that market entry was impaired, and that Bell disparaged competitors, so that reasonable control of commercial speech was essential to keep the competitive market area open. The state government has a clear and substantial interest in protecting the public from the dissemination of potentially misleading information. *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 461, 329 A.2d 812, 817 (1974).

To control disparagement of a competing CLEC by employees related to the ILEC, the only feasible approach is to negate the disparaging communications. After-the-fact evaluation of the content of such communications, as to their invalidity or validity, is obviously not workable. Prohibition of the communications is reasonable, in view of the public interest in fostering competition based on actual performance, rather than upon subjective conversations.

The Code of Conduct provisions are supported by the law and the record, and they do not contravene First Amendment constraints.

### Compliance of Global Order with Chapter 30 and Bell's Chapter 30 Plan

*Effect of Chapter 30 Plan Previously Approved*

A regulatory reform plan of Bell under Chapter 30 [76] was approved in 1994.[77] Bell contends that certain Global Order provisions breach Bell's Chapter 30 Plan and actually defeat the goals of Chapter 30. Bell characterizes the 1994 approval as a regulatory bargain struck between the PUC and Bell, whereby the stability of the rate incentives in the Plan was the quid pro quo for Bell's costly commitment to upgrade Pennsylvania's telecommunications network.

Bell refers to *Popowsky,* 550 Pa. at 454, 706 A.2d at 1199, where our Supreme Court stated that the legislature intended to induce local phone companies to commit to the considerable investment necessary to achieve ... extensive modernization in the telecommunications infrastructure and to permit the PUC to approve an alternative form of regulation other than the traditional rate base-rate form of regulation.

Bell submits that, in reliance on the Plan as approved, it has invested over $4 billion in its Pennsylvania network and reduced rates by $120 million over the 1994–1999 period.[78] Bell stresses that the Price Sta-

---

**76.** Bell Atlantic–Pennsylvania, Inc.'s Modified Alternative Plan of Regulation; R.R. 8916a, Vol. 27.

**77.** In re Bell Atlantic–Pennsylvania, Inc.'s Petition and Plan for Alternative Form of Regulation under Chapter 30, Pa. PUC Docket Nos. P–930715 et al., 82 Pa. PUC 194, 1995 WL 526548 (Opinion and Order entered June 28, 1994).

**78.** R.R. 8877a, 8896a, 8902, in Vol. 27, and also PCO order at Docket R–00974221.

bility Mechanism in the Plan [79] (1) provides the *exclusive* means of adjusting Bell's overall rate levels during the Plan's 10-year term, (2) prohibits the reduction of rates below cost, (3) caps rates for certain services, but only through December 31, 1999, and (4) requires that Bell shall institute a revenue neutral Lifeline program to subsidize low-income customers.

Bell contends that the PUC's Global Order could not (1) require access rate reductions beyond those permitted by the Price Stability Mechanism, (2) reduce Bell's UNE rates outside of the Plan's rate setting mechanism and below calculated incremental costs, (3) require Lifeline program funding beyond the Plan's revenue-neutral basis for that program, (4) mandate a consumer education program while banning recovery of expenditures for it, nor (5) require Bell to contribute to a USF (Universal Service Fund) without a means of recovery.

In short, Bell claims that Chapter 30, at 66 Pa.C.S. § 3004(a),(b) expressly provides that Bell's rates are to be governed by its approved Plan.

Hence, a concise summary of § 3004, as applied to Bell, is necessary.

Subsection (a) provides that the PUC, in determining reasonable rates, may authorize a local exchange company to set rates based on an alternative form of regulation pursuant to a plan approved by the PUC under Chapter 30. Subsection (b) permits the PUC to approve a proposed plan, modify it or deny it, stating reasons. Inaction by the PUC for nine months results in a deemed approval. Subsection (c) permits the PUC to require comprehensive inclusion of joint venture opportunities and assurance that universal broadband capability be provided.

Subsection (d) lists fifteen (15) criteria for review and approval, including affordability of protected telephone service, a price stability mechanism (discussed further below), deregulation of competitive services, no disadvantage to any customer class or competitor, promotion of the public interest, enhancement of economic development with affordable rates, quality service standards, consistency with section 3007 determination of access charges, assurance of new services availability to rural as well as urban and suburban areas, matching local calling areas to local communities of interest, assurance of low-income persons' ability to maintain in-home access to protected services, provision of services to persons with disabilities, assurance that economic risks of competitive services are not borne by customers not purchasing such services, and lawful provision of aggregate customer and network information to other providers.

Subsection 3004(e) concludes the section by placing the burden of proof of compliance with the section upon the local exchange company requesting the alternative form of regulation.

Bell's plan proposed a life of ten years, effective through December 31, 2003. The PUC's approval date was June 28, 1994. The Consumer Advocate, various telecommunication companies, and the City of Pittsburgh appealed that approval to this Court in *Popowsky*, where this Court approved the plan subject to revision of three items by the PUC, and the Supreme Court, reversing this Court's order only as to price stability mechanism revision and certain competitive classifications, affirmed the approval. The duration of the plan, and the PUC's power to issue subsequent decisions affecting elements of the plan, were not at issue in that case.

### PUC's Power to Issue Subsequent Orders Related to Plan's Content

Hence Bell's Chapter 30 Plan now brings us to an important issue in this case. After approval of a Chapter 30 plan under § 3004, may the PUC, during the plan's stated life, proceed pursuant to notice and hearing to issue subsequent

---

79. Bell Chapter 30 Plan, Part I, at. 5–13 (R.R. 8922a–8930a, Vol.27).

orders that modify a plan's content or affect any of its outcomes?

The dissent by Vice–Chairman Bloom, in connection with stating his disagreement with the structural separation order, briefly describes that decision as effecting an amendment of Bell's Plan that could possibly void all of Bell's obligation under Chapter 30.[80]

Although Bell, stressing the incentive aspect of plans, contends that section 3004 expressly constrains the PUC's ability to modify a Chapter 30 Plan after it has been approved and the company has committed to network modernization, no portion of the chapter expresses any such total constraint.

As to this issue, the roles of certain other parties should be identified. United Telephone Company of Pennsylvania conducts the ILEC operations of Sprint Communications Company, L.P.; those ILEC interests are referred to as Sprint/United. Sprint Communications Company, L.P. functions as an IXC (interexchange carrier), and also is a CLEC providing competitive local exchange services in Bell's service area. (The interests of a different entity, Sprint Communications, LTD, as a local exchange carrier in certain rural areas, are also considered below, in connection with the Universal Service Fund.)

Sprint Communications Company, L.P. and United Telephone Company of Pennsylvania, as Intervenors (referred to as Sprint/United), each of whom also has an approved Chapter 30 Plan, support Bell's view that the PUC cannot change a substantive provision of an approved Plan, but nevertheless agree that the PUC's decision here should be affirmed because it maintains revenue neutrality. As competing carriers particularly dependent on access to the local loop, Sprint/United supports the validity of the PUC's post-plan-adoption action reducing Bell's access rates on a revenue-neutral basis through the appli-

cation of PCO values, present and future. Sprint/United's brief does not dispute that Bell Atlantic should have the opportunity to recover any revenue shortfall to the extent that Bell Atlantic's Chapter 30 Plan requires revenue neutrality.[81]

The law's wording expressly labels its subject as a plan for an alternative form of *regulation*, § 3004(b), (emphasis added), not as a compact or contract or by any such label indicating an irrevocable bargain. Chapter 30 concludes with Section 3009, Additional powers and duties of the PUC. Subsection (a) of § 3009, implicitly related to the overall Chapter 30 purpose of fostering competition, states the general rule that the PUC may certify more than one local exchange telecommunications company to provide local service. Subsection (b) then states that the commission shall retain the following powers and duties relating to the regulation of all local exchange telecommunications companies and interexchange telecommunications carriers. The list that follows is:

(1) The commission shall have the power to audit the accounting and reporting systems of LETCs and their *transactions with affiliates* in accordance with this title and the commission's *present or future rules and regulations* to provide a proper allocation of investments, costs or expenses for services or business activities, competitive or noncompetitive (emphasis added);

(2) *Nothing in this chapter shall limit the commission's authority to ensure that LETCs do not make unjust preferences, discriminations or classifications for protected telephone service and other noncompetitive services* (emphasis added);

(3) The commission shall establish such *additional requirements* and regulations as it determines to be necessary to ensure the protection of consumers (emphasis added);

**80.** R.R. 376, Vol. 1.

**81.** Sprint/United Intervenor Brief at 21.

(4) *Notwithstanding any other provisions of this chapter,* all services provided by a LETC or interexchange telecommunications carrier shall remain subject to all provisions of this title and other laws regarding the safety, adequacy, reliability and privacy of telecommunication services. All new services or changes must be reviewed to assure compliance with such matters. The commission shall have the authority to reject or modify any such service if, after notice and hearing, it is found not in compliance. *Nothing in this chapter* shall affect the commission's authority to regulate the ordering, installation, suspension, termination and restoration of such service. (emphasis added)

Subsection (d) of § 3009 empowers the PUC to promulgate rules and regulations to administer and enforce this chapter.

The last subsection, (f), as to methods for fixing rates of competitive services, states as follows:

The commission shall not fix or prescribe the rates, tolls, charges, rate structures, rate base, rate of return or earnings of competitive services or otherwise regulate *competitive* services except as set forth in this chapter. The commission may require that the local telephone exchange telecommunications company file and maintain tariffs or price lists for competitive telecommunications service. (emphasis added).

In considering that last subsection, (f), Chapter 30's declaration of policy should be kept in mind. That declaration, § 3001(1), seeks to maintain affordable rates while encouraging state-of-the-art modernization, such as broadband. It also is committed to ensuring that customers pay only reasonable charges for services. § 3001(2). With indication of emphasis added, other goals of that policy declaration are here quoted, namely, to:

(3) Ensure that rates for *noncompetitive* services do not subsidize the *competitive* ventures of providers;

(4) Provide diversity in services and products by ensuring that rates, terms and conditions for *noncompetitive services, including access services,* are reasonable and do not impede the development of competition;

(5), (6) Encourage new services to improve the quality of life for disabled persons and all Pennsylvanians;

(7) Promote the provision of *competitive* services by a variety of providers on equal terms;

(8) Encourage the *competitive* supply of any service in any region where there is market demand; and

(9) Encourage joint ventures between LETCs and other entities where such venture would assist an LETC in carrying out its network modernization implementation plan.

Consideration of the foregoing provisions of Chapter 30 conveys a consistent message: Telecommunication modernization is to be promoted initially by substantial *deregulation* of *competitive* services, within limits, §§ 3005, 3009(f), and secondly by continued regulation of *noncompetitive* services subject to the PUC allowing an alternative or streamlined form of regulation. §§ 3003, 3004, 3006.

The overall scheme of Chapter 30 is clear. To achieve the above goals stated in § 3001, with the defined distinction between *competitive* and *noncompetitive* services made by § 3002, and with the PUC empowered under § 3005 to determine which services are *competitive* as distinguished from noncompetitive, a LETC may obtain an alternative form of regulation of *noncompetitive* services by a Plan submitted under § 3003 and approved by the PUC under § 3004, or a streamlined form of regulation for *noncompetitive* services under § 3006. Access charges are subject to limitation and regulation under § 3007, but with that section's qualifications with respect to the age of an approved plan embracing them. Interexchange carriers' services are declared competitive, with the PUC empowered to

classify a specified list of their services, § 3008.

■ Thus a complete view of the interrelated pattern of Chapter 30 makes clear that the subject matter of a plan approved under § 3004 is not fixed and unchangeable for the life of the plan but remains subject to an alternative form of regulation pursuant to which the PUC may, after notice and hearing, make changes with respect to the noncompetitive matters in the plan. The constraints placed upon the PUC's rate fixing deal chiefly with areas related to competitive services rather than with its powers over noncompetitive ones.

■ Chapter 30 affects, but does not repeal, the PUC's powers under the Public Utility Code to amend its previous orders, 66 Pa.C.S. §§ 703(e), 703(g), pursuant to notice and hearing. Indeed, it did not repeal or amend the Code's vesting of rate regulating power in the PUC. As the brief for ATX Telecommunications Services notes, the Public Utility Code still provides, in 66 Pa.C.S. § 1309(a), that whenever the PUC, upon its own motion or upon complaint, finds that the rates of any public utility are unjust or unreasonable, it shall determine the just and reasonable rates and shall fix the same by order to be served upon the public utility. . . .

■ Also, Bell's 1994 Plan in no way immunizes it from being governed by the federal Telecommunications Act of 1996 and its provisions which, consistent with Chapter 30, seek to promote competition. *SBC Communications, Inc. v. FCC,* 154 F.3d 226 (5 th Cir.1998), *cert. denied, sub nom Bell Atlantic Corp. v. FCC,* 525 U.S. 1113, 119 S.Ct. 889, 142 L.Ed.2d 788 (1999).

■ The argument in Bell's brief, with reference to the effect of the Plan's provisions on access rates, interprets the deemed approval provision in 66 Pa.C.S. § 3004(b) as confining the PUC's power to revise the Plan unilaterally to the first nine months after Bell's filing of the proposed plan. However, a deemed approval provision, presuming an approval of the initial plan proposal in the event of inaction by the PUC during the first nine months thereafter, does not speak at all to the susceptibility of the plan to modification *after* it has taken effect.

■ Bell believes that Section 3004(b) authorizes Bell to withdraw its plan whenever modified by the PUC. However, that section mentions such withdrawal *only in connection with the initial approval.* § 3004(b) states:

> If the commission approves the petition and plan with modifications, the local exchange telecommunications company may, at its option, withdraw its petition and plan and continue to be regulated under its existing form of regulation or a streamlined form of regulation for which it qualifies.

Moreover, the next sentences make clear that withdrawal does not free the carrier from the obligation to resubmit a plan thereafter.

Bell's plan since 1994 has been modified pursuant to Bell's request and the PUC's power. In 1995, Bell's petition, under 66 Pa.C.S. § 703(g), to obtain revenue-neutral adjustment of noncompetitive service, despite a freeze on protected services rates until the end of 1999, was granted. (Docket No. P 00930715). In 1997, reclassification of certain of Bell's toll and business services, as competitive, was sought by Bell and granted by the PUC.[82]

Consistent with the powers safeguarded to the PUC by Chapter 30 as to continuing regulation of noncompetitive services, in the course of the Global Resolution proceedings, Bell's 1649 Petition[83] opened issues relating to access charges, universal service, local loop rates, UNE switch rates, the aforementioned toll and business ser-

---

**82.** R.R. 7217a–7270a, Vol. 22.

**83.** R.R. 464a–520a Vol. 2.

vices, and rate caps. Appendix A to the PUC brief lists seventeen proposals in Bell's 1649 petition, seven of which were granted substantially as requested, with others granted with modifications.[84]

Bell's reply brief characterizes its 1649 Petition for Global Resolution of Telecommunications Proceedings as a petition for settlement, as if the only outcome of the proceeding could be acceptance of Bell's proposal or nothing. However that petition, in addition to stating an agreement settled among its signers and a request that the PUC adopt it, clearly also recognizes that the PUC in the Global Resolution Proceeding could reject it or make a decision in favor of less than all of it, i.e., modify it.[85]

▮ Nothing in Chapter 30 gives Bell's Plan the status of a contract amendable by the PUC only to the extent requested by Bell. The Plan can be revised by the PUC pursuant to a request by Bell, but the law is clear that the PUC can issue a decision that has the effect of modifying the Plan if the law and facts warrant such action.

Statutory provisions which pertain to the same subject matter are, where possible, to be construed as one. *Girard School District v. Pittenger*, 481 Pa. 91, 100 n. 9, 392 A.2d 261, 265 n. 9 (1978) (citing 1 Pa.C.S. § 1932, the Statutory Construction Act.) Of course, this rule has particular effect with respect to provisions within one and the same statute.

As noted and quoted above, Chapter 30 several times reiterates the continued regulatory power of the PUC by emphasizing that nothing in this chapter—and that wording of course embraces the chapter's Plan provisions—impairs the PUC's continuing regulatory responsibilities and powers.

As Intervenor Office of the Consumer Advocate (OCA) states,[86] Chapter 30, and the approval of plans under it, did not repeal by implication the essential regulatory powers and duties of the PUC noted at length above. The OCA notes that the legislature knows how to provide irrevocability when desired. The electricity restructuring law, in connection with providing for recovery of electrical utility transition expenses by a Qualified Rate Order, stated in 66 Pa.C.S. § 2812(b)(3) that the PUC could label such an Order as irrevocable, and if so:

> To the extent so specified, neither the order nor the intangible transition charges authorized to be imposed and collected under the order shall be subject to reduction, postponement, impairment or termination by any subsequent action of the commission.[87]

Nevertheless, viewing Chapter 30 in its entirety, those powers cannot be exercised in any way that would render an approved plan meaningless. The PUC overstates its relationship to a plan when, in the Global Opinion and Order, after agreeing with Sprint as to the effect of a ceiling on noncompetitive rates, it provides:

> However, to the extent its Chapter 30 Plan conflicts with other provisions of the resolutions contained in this Opinion and Order, this Opinion and Order shall govern.[88]

If the PUC thus intends to assert that it can hereafter continue to exercise its regulatory powers without reference to an existing plan, it goes too far.

On the other hand, after thousands of pages of litigation before the PUC in this case, pursuant to two petitions submitted by carriers representing most of the industry affecting this state, Bell cannot claim that its Plan permits it to reject any aspect of the PUC's decision not to its liking. As

---

84. See PUC brief, 5th page after p. 120.

85. R.R. 468a, 469a, and 518a ¶ 157, Vol. 2

86. OCA Brief at 31.

87. OCA Brief at 33.

88. R.R. 244a, Vol. 1.

the OCA also notes,[89] 66 Pa.C.S. § 3006(e) states that, upon PUC approval of a streamlined form of rate regulation under Chapter 30:

> [T]he streamlined form of regulation shall be implemented and shall govern the regulation of a local exchange communications company and shall, *consistent with the provisions of this chapter*, supersede any conflicting provisions of this title or other laws of this Commonwealth. (Emphasis added)

Thus this Court's understanding is that adoption of a plan clearly does not freeze a utility's status into immobility for ten years. No carrier wants to be muzzled from requesting a change in status warranted by changing circumstances. If circumstances change, such as new impacts from technological advances or economic tides, or the emergence of a new breed of competitors resulting in threatened losses from existing tariff rates or present competition rules, we do not expect that Bell, or any carrier with a Chapter 30 Plan, would maintain the position that the Plan makes existing measures unchangeable. To claim that the Commonwealth regulatory body, the PUC, could not touch any of those measures without Bell's consent is equally unthinkable.

The carrier's commitment to competition via the plan does not immunize it from the PUC's oversight for as long as ten years, particularly if changing circumstances, exogenous or otherwise, inflate its revenues from noncompetitive elements.

The latter face of the matter is well illustrated by the issue of noncompetitive access charges, the issue next considered.

### Access Charges

■ The term access charges refers to the compensation paid to Bell, GTE and others, as incumbent local exchange carriers (ILECs), by long distance carriers—interexchange carriers (IXCs)—for using the ILECs' local networks so that long distance calls can be originated and completed. By their very nature, with no feasible alternatives available by which long distance companies can achieve such results for their customers, access charges obviously are non-competitive.[90]

Reference to the Global Opinion in this case[91] provides a glossary of the terms and concepts expressed under the heading of access charges. The PUC lists the access charge elements as follows:

1. Carrier Common Line Charge (CCLC)
2. Local Switching
3. Line Termination
4. Intercept
5. Local Transport

Also, the term local loop is applied to the line that connects an end user to the local telephone company's switch. The local loop is needed to effectuate local calls as well as intrastate long distance calls. Also apparent is the fact that, with respect to the local loop, the ILEC incurs both non-traffic-sensitive (NTS) costs—maintenance costs, for example—and traffic-sensitive (TS) costs, i.e., those expenses that are affected by the number and length of calls, long-distance as well as local.

In this case, in dealing with access charges, the elements above are generally restated as three cost elements, consisting of the carrier common line charge (CCLC), local switching and local transport. Historically, all three have been charged to IXC customers on a per minute of use (MOU) basis. According to the PUC, the CCLC has been the largest contributor to local service rates not directly related to costs.[92]

---

**89.** OCA Brief at 33–34.

**90.** Competitive Telecommunications Association v. FCC, 87 F.3d 522 (D.C.Cir.1996).

**91.** R.R. 52a–55a, Vol. 1.

**92.** R.R. 54a, Vol. 1.

The PUC's view has been that purely local rates have been supported in part by access charges greater than the incremental costs relating to those charges, to permit purely local rates to remain acceptable to the user market. With the breakup of the combined local/long-distance monopolies, the PUC has examined the premise that the user market may not sustain the local-cost supports built into access charges.

AT & T's reply brief sums up the situation. The access rates of incumbent local companies, ILECs like Bell, were established in an earlier era, where the ILECs and IXCs, toll-providers like AT & T, did not compete with each other in retail markets. Moreover, because all IXCs were required to pay the same access rates to those ILECS, the high rates did not effect any discrimination against individual IXCs or their end user customers.

However, now that both federal and state legislative policy has opened up all markets to potential competition among all carriers, maintaining over-cost access rates can have a discriminatory effect upon the long distance carriers and provide local exchange carriers an advantage because they do not have to pay an above-cost levy to use their own access elements.[93]

Hence the PUC, in 1997, pursuant to the legislative mandates, launched a review of intrastate access charges,[94] leading the PUC to confirm that access charges were priced substantially above cost.[95]

The PUC resolved to initiate a generic investigation of the issue,[96] which became part of the Global Settlement discussions.

After the Global Settlement failed to reach any conclusion on the issue, it was entered into the Global Resolution proceedings by both the 1648 Petition [97] and the 1649 Petition.[98]

Out of that proceeding, the results now before this Court are as follows:

1. The PUC's conclusion was to change the Common Carrier Line Charge (CCLC) of the ILEC (Bell) from a per minute charge to a per line charge, on the view that the CCLC is a non-traffic-sensitive charge; [99]

2. The PUC also reduced the traffic-sensitive switched access charges of Bell to foster competition in regional traffic.[100]

According to the PUC, a number of long distance companies indicated that the cost reductions would be passed on to their toll customers. The PUC therefore directed all IXCs to file annual reports indicating how the access charge reductions have flowed through to customers.[101]

Bell's opposition to the access charge rate reductions rests initially on the position that the PUC's reduction of Bell's access rates total $64 million dollars, half of which exceeds reductions allowed by Bell's Chapter 30 Plan, discussed above.

As we stated, the constraints placed upon the PUC by Chapter 30 relate primarily to competitive services, not to noncompetitive services, and switched access service clearly is within the noncompetitive class because long distance carriers have no access to the local loops except through the switched access gateways of the ILEC, e.g., Bell.

**93.** AT & T Reply Brief at 4–5.

**94.** In re Formal Investigation to Examine and Establish Updated Universal Service Principles and Policies for Telecommunications Services, Docket No. 1–00940035, 1995 WL 945316. R.R. 8051–8059, Vol. 25.

**95.** R.R. 7970a, Vol. 25.

**96.** R.R. 8056a–8057a, Vol. 25; R.R. 7288a–7296a, Vol. 23.

**97.** R.R. 426a–432a, Vol. 2.

**98.** R.R. 489a–493a, Vol.2.

**99.** R.R. 64a, ¶ 6,Vol. 1.

**100.** R.R. 63a,¶¶ 1–4, Vol. 1, as to Bell.

**101.** R.R. 64a, ¶ 7, Vol. 1.

Also, as held above, Bell's Plan does not constitute a binding compact for ten years, amendable only by further agreement between Bell and the PUC, but can be affected by PUC decisions that are supported by the record and in accordance with the Chapter 30 powers described above. Bell, as to the access charge issue, repeats its position that 66 Pa.C.S. § 3004(b) authorizes PUC modifications of a plan only within the first nine months of its existence, but we have consistently pointed out that the nine-month provision is a deemed approval rule, mandating that PUC inaction for that period results in an initial approval of a proposed Plan. However, this does not bar PUC orders thereafter which effectuate revisions in accordance with other provisions of the Chapter 30 sections.

Section 3007 of Chapter 30 deals at some length with Determination of access charges. It governs local exchange companies that provide more than 250,000 access lines in Pennsylvania, a grouping which clearly applies to Bell. Under that section, Bell's *total* per-minute switched-access rate shall not exceed 12 cents for the first five years of a Plan. § 3007(1).

Bell notes that, when the PUC approved Bell's plan, it found Bell's then-existing total access charges, at about 7 cents per minute, were just and reasonable, and below the statutory maximum of 12 cents per minute.[102] Bell also relies upon the Price Stability Mechanism in the Plan, contending that it confines access rate reductions, during the life of the Plan, to accomplishment through either of just two means:

1. By applying a negative Price Change Opportunity (PCO) to the access rates, i.e., whenever the annual rate of inflation for the preceding year is less than 2.93%, there must be an access rate reduction accordingly; or

2. By applying a revenue-neutral rate change, making access charge reductions that are balanced by increased revenues from other rates sufficient to make up for the reductions.[103]

As indicated, access rate reductions primarily benefit long distance users and carriers. Bell contends that the PUC erred in looking to PCOs to justify access rate reductions.

The PUC, in its decision here, has required Bell initially to reduce its *local switching traffic-sensitive* access rates by $32.185 million dollars, based upon the negative PCO scheduled to be implemented in January 1999.[104] Bell has not contested that part of the decision because Bell has acknowledged the $32.185 million dollar amount of that negative PCO,[105] and thereby presumably recognized that the Price Stability Mechanism in Bell's Plan provides that access rate reductions can be triggered by a negative PCO resulting from a low annual inflation rate, the first of the two means listed immediately above which can mandate that result under the Plan.

However, in Bell's view, the PUC erred and went too far when it assumed that an additional $32 million dollars for access charge reduction would become available from PCOs effective January 2000, 2001 and 2002 as a basis for an order directing that Bell make additional access rate reductions, reducing its *traffic sensitive local switching* charges to $0.009 per minute for originating local switching and to $0.009 per minute for terminating local switching.[106] Bell therefore challenges that direction for further access rate reduction, to be made when the Federal Communications Commission has approved Bell's section 271 application, but in no event later

102. Bell Brief at n. 114, citing Bell Atlantic Chapter 30 Order, 82 Pa.P.U.C. 194 at 224, 1995 WL 526548.

103. R.R. 8921a–8925a, Vol. 27; negative PCO provision at R.R. 8923, Vol. 27.

104. R.R. 63a, ¶ 1, Vol. 1.

105. R.R. 69a, n. 19, Vol. 1.

106. R.R. 63a, ¶ 2, Vol. 1.

than one year after the entry date of the PUC's order in this case.[107]

Bell's position is that the Plan does not authorize the acceleration of PCO due dates for the implementation of reductions, thus raising, with respect to PCOs effective in 2000, 2001, and 2002, the question of applying PCOs in advance of the date on which the previous year's inflation data is known. Our decisions have held that, in making economic determinations, incomplete results must be disregarded if not based upon proper quantification. *Popowsky*, 550 Pa. at 459, 706 A.2d at 1201.

However, the PUC correctly points out that the order does not give final determinative effect to mere projections, referring to the next paragraph of its decision, which states:

> 3. If BA–PA's total projected PCOs do not equal $32 million, the discrepancy will be reconciled as would typically be done in a 66 Pa.C.S. § 1307(a) proceeding, consistent with BA–PA's Chapter 30 obligations.[108]

We note that 66 Pa.C.S. § 1307(a) permits:

> [A] method for the automatic adjustment of the rates of the public utility as shall provide a just and reasonable return ... to be determined upon such equitable or reasonable basis as shall provide such fair return.... The commission may revoke its approval at any time and fix other rates for any such public utility if, after notice and hearing, the commission finds the existing rates unjust or unreasonable.

As a foundation for the decision's future-looking provisions, the PUC goes on to assert that there is substantial evidence [109] to support the PUC's determination to use the revenue from Bell's future PCOs to reduce Bell's access charges closer to incremental cost.[110] The PUC cites evidence in the record of the fact that Bell's access charges have been substantially above cost.[111]

■ Thus, the record here and the statutory powers of the PUC support the PUC's decision to reduce Bell's access charges at present to an extent justified by current information, and to define a future proceeding to consider further access charge reductions.

AT & T, on the other hand, as a long distance carrier, takes the position that the $.009 per minute switching benchmark is excessively high and not supported anywhere in the record, despite the huge size of the record in this proceeding.[112] AT & T contends that Bell's current access rates are 14 times Bell's incremental cost, citing AT & T's statement in the record,[113] and that a cost-based rate for Bell's originating and terminating access is at most $.003 per minute, citing another record statement by AT & T.[114] ATX's brief, although captioned as that of a respondent, joins in AT & T's position on this point.[115]

The Office of Consumer Advocate responds to AT & T by submitting that there is no legal authority requiring the PUC to reduce access rates to the incremental cost of access service. OCA witnesses testified that such a reduction could require customers other than the long distance carriers to pay all of the joint and common costs of the network and therefore should be rejected.[116] The logic of that analysis commends it.

---

107. Bell Brief at 44; R.R. 63a, ¶ 2, Vol.1.

108. R.R. 63a, ¶ 3.

109. Global Opinion at 18–33; R.R. 59a–74a, Vol. 1.

110. PUC Brief at 62.

111. Generic Access Charge Investigation, Bell St. 3.0; R.R. 7459a–7472a, Vol. 23.

112. AT & T Main Brief at 20–24

113. R.R. 7335a–7336a, Vol. 23.

114. R.R. 1155a–1162a, Vol. 4.

115. Brief of Respondent ATX Telecommunications Services at 25–26.

116. R.R. 1017a–1018a. Vol. 3.

On the other side of the matter, GTE, as an ILEC like Bell, objects to the PUC's access charge decisions on two grounds: (1) the position that access charges should be shifted from a minutes-of-use (MOU) basis to flat rate pools; and (2) that such transition should move on a dollar-for-dollar basis to a permanent universal service fund (USF, considered below) that benefits all ILECs and is supported by all telecommunications providers on a competitively neutral basis. According to GTE's expert evidence,[117] for incumbent local carriers, access charges contribute to the maintenance of affordable basic rates; in other words, part of the access charges paid help to keep basic local telephone bills affordably low. Thus, argues GTE, any reduction in access charges must be related to the distribution of offsetting revenue from a universal service fund, or from a more general rate rebalancing, or both.

AT & T, although not calling for an immediate reduction of access rates to incremental costs but urging change from a per-minute rate to a flat rate, has submitted testimony that, even with the unit-cost reductions, Bell's total revenue from this source will grow as Bell's access lines grow.[118]

However, the record and the PUC's action in the case confirm that the PUC, unable to satisfy both of these far-apart competing views simultaneously, has embarked upon a direction that neither side in this business battle can fault. As the brief of Intervenor CLECs states,[119] the PUC's Global Order has developed a complex mechanism of reform of the access charges that the IXCs and the CLECs pay to the incumbents, such as Bell, for the calls that transit the local incumbents' networks.

The record and the law support the PUC's decision to reduce the above-cost access charges in phases, to a degree now, and then further, pursuant to a future proceeding.[120] This Court's decisions have supported the exercise of sound discretion by the PUC in these matters. *U.S. Steel Corp. v. Pennsylvania Public Utility Commission*, 37 Pa.Cmwlth. 195, 390 A.2d 849, 857 (1978). The PUC must be credited with having expertise in specialized areas, *Bell Telephone v. Pennsylvania Public Utility Commission*, 47 Pa.Cmwlth. 614, 408 A.2d 917, 925 (1979), provided that the decision is, as here, supported by competent evidence. *Zucker v. Pennsylvania Public Utility Commission*, 43 Pa.Cmwlth. 207, 401 A.2d 1377, 1381 (1979).

One of the lessons of this proceeding is that the cost of excessively priced elements must be reduced to a point nearer to actual incremental cost, but not so greatly as to eliminate the support such revenue provides to other areas of the system that need that support.

The record here confirms the soundness of the PUC's view, based on evidence from consumer witnesses, that users of all services, including access, should share in the payment of total network costs,[121] with the cost of the local loop included as an element of that total network.[122] Initiating a gradual transition in improving the placement of cost burdens is a valid approach in establishing rate structure. *Sharon Steel Corp. v. Pennsylvania Public Utility Commission*, 78 Pa.Cmwlth. 447, 468 A.2d 860, 866 (1983).

With respect to the role of a universal service fund in the relocation of cost burdens, as urged by GTE, the PUC's action on that element follows.[123]

---

**117.** R.R. 1059a–1060a, Vol. 4.

**118.** R.R. 1159a–1160a, Vol. 4.

**119.** Brief of Intervenors Nextlink Pa. Inc., Focal Communications, Hyperion and Rhythms Links, Inc. at 26–27.

**120.** Global Opinion, at n. 71.

**121.** R 1017a, Vol. 3.

**122.** R. 2817a, Vol. 8.

**123.** See *infra*, text at n.184

*Validity of Order as Establishing
UNE Rates*

In reliance upon a provision of its Chapter 30 Plan providing that Bell shall not be required to decrease a tariff rate to a point which is at or below cost,[124] Bell claims on this appeal that the PUC's order reduces Bell's unbundled network element (UNE) rate to a level 10% to 16.5% below incremental cost. Both Bell and the PUC cite the federal law as requiring incumbent local exchange carriers such as Bell to lease to competitors unbundled (i.e. separately treated) network elements, such as local loops, in order to promote equality of market entry opportunity. 47 U.S.C. § 251(c)(3). Bell adds that the same act provides that UNE prices shall be … based on the cost … of providing the … network element and may include a reasonable profit. 47 U.S.C. § 252(d)(1).

In a 1997 proceeding, *MFS III*, the PUC set rates for Bell's UNEs, adopting proposed rates, with modifications.[125] Bell here complains that the order on appeal arbitrarily requires Bell to reduce its UNE rates by 10% to 16.5 % below the cost-based rates set in *MFS III*.[126] Bell contends that the PUC's reductions were unsupported by cost studies, and that the PUC explained only one reduction, the new local loop rate, by reliance upon inputs and a pricing scenario claimed by Bell to have been rejected by the PUC in *MFS III*.[127]

In responding to Bell's view that the new rates are too low and AT & T's view that the new rates are too high, the PUC answers that it relied upon the cost study submitted by Bell in the earlier *MFS III*

proceeding, modified by a series of scenarios, each involving a different series of inputs with respect to cost of capital and fill factor.

The PUC states that, in the 1997 proceeding, *MFS III*, pursuant to setting UNE rates for Bell, the PUC expressly recognized its prerogative[128] to institute an investigation one year later as to those UNE rates, to ascertain their viability.[129] The PUC's view is that it did institute that further investigation, at the same docket numbers, as part of the Global Resolution proceedings.[130]

The PUC agrees with Bell that the federal law calls for UNEs to be priced at cost, plus provision for a reasonable profit. 47 U.S.C. § 252(d)(1)(A). There is also agreement that the FCC's mandated pricing methodology in the *Local Competition Order* is TELRIC (Total Element Long Run Incremental Cost).[131]

The PUC states that it did rely upon a cost study when it here ordered lower UNE rates, identifying that cost study as the one that Bell submitted in *MFS III* but acknowledging that the PUC changed two input factors, drawn from Scenario No. 9, which was rejected at that earlier time, but revisited in the Global Resolution Proceeding.[132] Upon that re-examination in this case, the PUC modified cost of capital and fill factors consistent with Scenario No. 9.

The change in the cost of capital was from 11.9% to 9.83%, made, according to the PUC, in reliance upon representations made by Bell's parent, Bell Atlantic, to the U.S. Securities and Exchange Commission

**124.** Bell Chapter 30 Plan, Part I, Sec. A(5), p.7; R.R. 8924, Vol. 27.

**125.** R.R. 8754a-R.R. 8770, Vol. 26 (Appealed by a party, MCI Telecommunications Corp., to the U.S. District Court, Middle District Pa., at 34 MD Pa. Sept. 16, 1999).

**126.** R.R. 112a–125a, Vol. 1.

**127.** R.R.8754a, Vol. 26.

**128.** PUC Brief at 103.

**129.** R.R. 8763a, Vol. 26.

**130.** Global Opinion and Order at 4–5, 281; R.R. 45a–46a, 322a, Vol. 1

**131.** FCC 96–325, 1996 WL 452885(1996) at ¶¶ 698, 699; PUC Brief at Appendix F.

**132.** R.R. 114a–117a, Vol. 1.

and a PUC staff report on quarterly jurisdictional utilities earnings for the quarter ending March 31, 1999.[133]

The change to the fill factor was made, according to the PUC, from 70 percent to 85 percent, to correct an earlier inconsistency identified after further investigation.[134] Fill factor is the ratio of facilities that are in use to facilities that are spare, i.e. in standby status; e.g., if 100 loops have been deployed but only 60 are in use, the fill factor is 60 percent. A lower fill factor produces higher costs because the cost of the spare facilities must be incorporated in the cost of those that are in use.[135]

The PUC relies upon 66 Pa.C.S. § 703(g) for its authority to reconsider previous decisions after notice and opportunity to be heard, asserting that there is no evidence in the record that the resulting access rates are below Bell's costs. The PUC claims that the changes do not affect the parameters of the PUC's cost model following the FCC's pricing rules in the Local Competition Order ¶ 699.

AT & T's position as to the UNE loop rate, supported by ATX as well as by CTSI in an amicus brief and also by Intervenor Nextlink, is that the two-step rate reduction process adopted by in the Global Order does not comply with law, to which the PUC responds that a gradual adjustment is acceptable rate-making. The first phase-down, reduction by 13.59%, is stated to take effect within thirty days of the Order's date, and the concluding second phase reduction, by 2.918%, is to take effect upon approval of Bell's Section 271 application or one year after the Order's date, whichever comes first. See R.R. 118a–119a, Vol. 1. In support of that phased approach, the PUC relies upon *Barasch v. Pennsylvania Public Utility Commission,* 101 Pa.Cmwlth. 76, 515 A.2d 651, 656 n. 12 (1986) as well as *Sharon*

*Steel,* 78 Pa.Cmwlth. 447, 468 A.2d 860, 864 (1983).

AT & T also challenges the initial $14.50 average loop rate,[136] resulting from the 13.59% reduction of the initial average of $16.78 statewide, noting that such rate, as well as the two-step rate reduction process, was proposed by Bell in the 1649 Petition.

MCI challenges the UNE rate decision on the ground that the cost study approach (MFSIII/Scenario 9) used by the PUC does not comply with federal law, i.e., for application in connection with the federal TELRIC methodology, the methodology which, MCI and the PUC agree, is prescribed by federal law. MCI urges the application of the HAI 5.1 Model (Hatfield Model). The PUC accepted that approach only insofar as it confirmed that the then-effective Bell UNE rates were too high, citing *Rockwell International v. Workers' Compensation Appeal Board (Sutton),* 736 A.2d 742, 743 n. 1 (Pa.Cmwlth.1999) for the longstanding rule that the administrative fact finder is empowered to evaluate the evidence and accordingly to accept or reject it entirely or in part.

Relying on the *Local Competition Order,* the PUC contends that determining UNE incremental costs, based on existing wire centers and the most efficient technology, should be done on a forward-looking long-run basis, that is, over a period of time sufficient to treat all costs as variable or avoidable.[137] The PUC represents the cost components to be:

(a) the forward-looking costs attributable to each network element,

(b) the forward-looking costs of capital (i.e. reasonable profit) of the associated investment, and

**133.** R.R. 115a, Vol. 1; R.R. 8428a, Vol. 26

**134.** R.R. 116a–117a, Vol. 1.

**135.** Global Opinion; R.R. 116a, Vol. 1.

**136.** R.R. 118a, Vol. 1.

**137.** FCC 96–325, 1996 WL 452885 (1996) at ¶¶ 677, 698, 699; PUC Brief at 107 and Appendix F.

(c) an allocation of forward-looking common/joint costs associated with each network element.[138]

The PUC refers to the rates determined for Bell's UNEs in the *MFS III* proceeding as based upon the foregoing principles of the FCC's TELRIC pricing methodology.[139]

The PUC disputes the assertion of MCI that the model employed in *MFS III* has been declared illegal. According to the PUC, a federal magistrate has proposed rejection of the model, but the district court has not made a final decision, and the PUC has lodged a challenge to jurisdiction, an appealable issue. MCI agrees that the district court has not yet issued a decision.[140]

■ MCI's request for relief is that this Court should remand as to the UNE rates, with instructions that such rates be recalculated in accordance with the lawful TELRIC-based cost model and evidence in the record.[141] With the record confirming that the PUC has followed state and federal law in establishing UNE rates in accordance with the TELRIC methodology recognized by MCI, this Court, recognizing the PUC's administrative expertise, has no basis for specifying the use of a particular cost model for this UNE pricing application. *W.C. McQuaide, Inc. v. Pennsylvania Public Utility Commission*, 137 Pa. Cmwlth. 282, 585 A.2d 1151, 1154 (1991); *Bell Telephone Co. v. Pennsylvania Public Utility Commission*, 47 Pa.Cmwlth. 614, 408 A.2d 917, 925 (1979). No remand is warranted, particularly not one in the specific technical vein proposed.

*Access to Network Platforms (UNE–Ps) and Enhanced Extended Loops (EELs)*

The Platform—A Bundle of Elements Otherwise Unbundled

As the PUC points out, UNE platform (UNE–P) refers to the *combined* group of network elements required to provide local service to an end user, in general an interrelated group of elements consisting of local loop, switch port, switch usage and local transport. In dealing with the UNE–P, the PUC includes in the same portion of its opinion and order another combination of network elements, namely, the EEL, an acronym referring to the Enhanced Extended Loop, which, in its most basic form, is a combination of loop and switch port.[142]

The UNE–P label, from a strict view, may seem to embody an inconsistency. Although UNE alone (without the P) refers to *Unbundled* Network Elements, the full combined term, UNE–P, has a distinct meaning, referring to Network Elements (no longer wholly Unbundled) that have been combined, one could say bundled, into a Platform.

Thus the availability of an UNE–P enables a competing local exchange (CLEC) to lease a pre-assembled network component, rather than just individual unbundled network elements.[143] The record indicates that making an UNE–P's crucial combination of elements available to a CLEC allows that CLEC to reach smaller residential and business customers sooner, particularly in rural areas.[144]

The PUC submits that it is therefore desirable to have the UNE–P available in the market, but also notes that a UNE–P

138. FCC 96-325(1996) at ¶¶ 690–695, 1996 WL 452885; PUC Brief at 107.

139. R.R. 8574a–8575a, Vol. 26

140. MCI Petitioner Brief at 14, n. 6.

141. MCI Petitioner Brief at 39.

142. Global Opinion; R.R. 126a, Vol. 1.

143. The EEL, the enhanced extended loop, being a combination of the loop and switch port, also represents a bundling of elements, labeled by an abbreviation that does not suggest otherwise.

144. Global Opinion/Order R.R. 128a, Vol. 1; R.R. 897a–898a, Vol. 3; R.R. 920a–921a, Vol. 3.

offering allows a new carrier to avoid investing in its own facilities,[145] an investment which could be of benefit to the system overall.

The PUC, in its view seeking to balance the goal of widespread service with the goal of incentive to invest, here issued an order directing Bell to file:

> [A] tariff supplement ... offering UNE–P for POTS, BRI–ISDN, and PRI–ISDN,[146] including vertical services, and a tariff supplement ... offering EELs. These UNE–P and EEL offerings will be available for any CLEC residential customers as well as for business customers with total billed revenue from local services and intraLATA [within a Local Access and Transport Area] toll services at or below $80,000 annually from the effective date of the Tariff Supplement through December 31, 2003.[147]

The PUC's order further directed that, after December 31, 2003, Bell could be free from that requirement as to any CLEC to whom Bell could timely make collocation space available, by an evidentiary showing that considerations of the number of customers and revenues from the customers served by the CLEC from a collocation in that central office represents a valid reasonable economic alternative to the provision of UNE–P and/or EELs to that CLEC.[148]

Petitioners Sprint Communications Company, L.P. and United Telephone Co. of Pa. (Sprint/United), as CLECs, oppose the UNE–P order because it provides that Bell's offering of UNE–Ps may be limited in three respects: (1) by the type of services (i.e., to POTS and ISDNs, including vertical services); (2) by a revenue maxi-

mum as to business customers (i.e., $80,000 in annual revenue); and (3) by duration (i.e. the December 31, 2003, date.)

UNE–P—Types of Services Embraced in Platforms Made Available to CLECs

With respect to the PUC's type-of-services limitation as to the UNE–Ps that Bell must offer to competitors, the difference in the views of the PUC and Sprint/United is clear. The PUC's view is that a UNE–P subject to its order consists of that combination of (formerly *un*-bundled) elements that Bell, the incumbent LEC, has combined into a platform for its own operations. The PUC's Global Opinion states:

> Whatever means BA–PA [Bell] uses to combine elements for itself, whether manual or electronic, should be made available to CLECs. Only in circumstances involving a request that BA–PA manually combine uncombined elements would it be appropriate for the commission to consider the application of a fee for such a service.[149]

Hence for an already-combined UNE–P, i.e., an existing Platform, the PUC states that Bell cannot demand a glue charge for the combination action that Bell, as the incumbent local exchange carrier (ILEC) has already completed for its own sake.[150]

To a point, Sprint/United appears to agree, stating in its brief that the UNE–P principle entitles it, as a CLEC, to lease an entire *pre* assembled network (emphasis added) rather than individual UNEs, and, for these already combined facilities should not have to pay a glue charge for keeping the elements bundled.[151] Sprint/United also states: The issue is ... what services

---

**145.** R.R. 757a, Vol. 3.

**146.** POTS = Plain Old Telephone Service, R.R. 898a, Vol. 3; BRI–ISDN and PRI–ISDN = basic and primary forms of integrated services digital network, Sprint/United Initial Brief at 44, n. 46.

**147.** Global Opinion Order R.R. 131a, Vol., 1.

**148.** Ibid.

**149.** R.R. 131a, Vol. 1.

**150.** Ibid.

**151.** Sprint/United Brief at 37.

Bell Atlantic currently combines when providing local telecommunications services.[152]

Sprint/United turns to the federal Telecommunications Act of 1996, quoting 47 U.S.C. § 251(c)(3), correctly, to the effect that it requires Bell to provide to any requesting telecommunications carrier . . . *nondiscriminatory* access to network elements on an *unbundled* basis . . . on rates, terms and conditions that are just, reasonable and nondiscriminatory. . . . (emphasis added, the first by Sprint/United). Sprint/United also emphasizes, from that same section, the following:

> An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.

The PUC and Sprint/United agree that the federal act overrides any state action that would prohibit any entity from providing interstate or intrastate service. 47 U.S.C. § 253(a).

■■■ However, the federal statute, 47 U.S.C. § 251(c)(3), to the extent that it was quoted, as recited above, from Sprint/United's brief, speaks only to the ILEC's duty to make unbundled network elements available to competitors, a duty that the PUC here did properly impose upon Bell, as affirmed in the preceding portion of this opinion, dealing with UNEs as such. It does not deal with, nor establish a general obligation to create, an UNE–Platform for the competitor except where Bell has effectuated for itself such a combination, as distinct from one or more unbundled network elements.

■■■ With respect to requiring Bell to provide UNE–Ps without a glue charge to compensate for the assembly, the PUC is correct in directing that Bell be required to provide UNE–P access, but without assembly charge only to the extent that Bell is already providing such a combination for

itself. That conclusion rests upon 47 C.F.R. § 51.315(b), the subsection that states:

> Except upon request, an incumbent LEC shall not separate requested network elements that the incumbent LEC currently combines.

As the PUC and the parties have recognized, the U.S. Supreme Court upheld that regulation subsection in *AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 393–394, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

Therefore, as to types of services, the PUC's order as to UNE–Ps and EELs cannot be faulted. It obligates Bell to offer these combined network elements to CLECs, and, as to those already combined by Bell for itself, without any extra charge for assembling them.

### The Revenue Threshold on Bell's UNE–P Obligation

■■■ The Global Opinion terms incorporated into the UNE–P and EEL portion of the PUC's order with respect to revenue threshold are as follows:

> These UNE–P and EEL offerings will be available for any CLEC residential customers as well as for business customers with total billed revenue from local services and intraLATA toll services *at or below $80,000 annually* from the effective date of the Tariff Supplement through December 31, 2003.[153] (emphasis added).

The PUC argues that the initial revenue ceiling means that Bell was required to give UNE–P access to requesting CLECs for any residential customer and for small business customers, defining the latter by the $80,000 revenue ceiling. This temporary limitation, until the end of 2003, apparently implements the PUC's policy of not initially extending the glue-charge-free use of a UNE–P to CLECs in a revenue position to effectuate such a combination for themselves.

**152.** Sprint/United Brief at 45.

**153.** R.R. 131a, Vol. 1.

On this point, Bell argues by analogy in support of the PUC's small business revenue ceiling—excluding from Bell's UNE–P obligation to CLECs the means to serve customers producing more than $80,000 annual revenue—by referring to the FCC's exclusion of certain types of multi-line business customers in the top 50 Metropolitan Statistical Areas (MSAs) from the class of customers for whom ILECs have the obligation to supply switching, an essential component of the UNE–P. Bell contends that the PUC's revenue ceiling as to smaller businesses is thus partly consistent with the FCC's ceiling over businesses in areas that fall below the top 50 MSAs. However, Bell must acknowledge that, if there is a mismatch between the FCC and PUC boundaries, the state classification would be illegal. 47 U.S.C. §§ 251(d)(3), 261.

However, Sprint/United has not pointed to any record support to show that the revenue limitation—intended by the PUC to benefit small business in particular—puts it at a disadvantage. Nor is there anything that either side has found in this record that establishes that the PUC's classification violates federal law.

### Time Limitation upon UNE–P

█ Finally, Sprint/United complains that the UNE–P availability policy is, by the PUC's order, mandated to disappear, in a sunset, immediately after the date of December 31, 2003, arguing that, in the light of the PUC order, CLECs must assume that on January 1, 2004, Bell Atlantic will withdraw its UNE–P offering.[154]

However, the PUC expressly states that it rejects Bell's proposal to cancel the UNE–P availability at the end of 2003.[155] In addition the PUC ruled that, after December 31, 2003, UNE–Ps and EELs will continue to be offered to CLECs, except where Bell can demonstrate by a preponderance of evidence, that a collocation is available in circumstances that represent a valid reasonable economic alternative to the provision of UNE–P and/or EELs....[156]

Accordingly the PUC's rulings with respect to UNE–P and EEL access are affirmed.

### Lifeline Program Rulings in Relation to Chapter 30 and Bell's Chapter 30 Plan

The Lifeline program provides reduced-cost telephone service for low-income subscribers. Federal universal service funds are used to reduce the charge for basic local service by $5.25 per month, and additional federal funds are available to match contributions from other sources. 47 C.F.R. §§ 54.400–54.409.

Bell's preexisting Lifeline program, dating from 1994, provides a $9.00 per month discount for customers with incomes up to 100% of federal poverty level guidelines, without optional services other than call trace (i.e. call waiting, answer call, or caller identification).[157] In 1997, the PUC directed the remaining local exchange companies to commence a Lifeline program from the first day of 1998.[158]

The petitioners in the 1649 Petition, including Bell, proposed to expand Lifeline from 100% to 150% of federal poverty guidelines upon FCC Section 271 approval, to be funded by the first year value of the

154. Sprint Brief at 44.

155. R.R. 128a, 129a, Vol. 1.

156. R.R. 131a, Vol. 1

157. Docket No. P–00930715, June 28, 1994; revised Docket No. R–00974153, Nov. 21, 1997. The $9 discount is funded by a $2.50 per-month contribution from Bell and $6.50 of federal funds under the matching formula of 47 C.F.R. § 54.400.

158. Docket No. I–00940035, July 31, 1997.

1998 Price Change Opportunity, with $8.5 million guaranteed by Bell, and any residual amount going into Bell's UTAP program.[159]

The 1648 Petition also proposed expanding Lifeline to include customers with incomes up to 150% of federal poverty level.

### Majority Decision on Lifeline

In response to the substantial common ground shared by those two petitions, the PUC order directed the implementation of three Lifeline options:

Option 1: Bell customers with incomes at or below 100% of federal poverty level amount, choosing no optional service, will receive the $9.00 monthly discount;

Option 2: Bell customers with incomes at or below 150% of federal poverty level amount, choosing not more than one optional service, will receive the $5.25 monthly discount; and

Option 3: Non–Bell customers with incomes at or below 150% of the federal poverty level amount shall receive the $5.25 discount and up to one optional service.

Eligibility for Lifeline customers under Options 2 and 3, in addition to requiring incomes within the above limits, also requires enrollment in Medicaid, food stamps, SSI, federal public housing assistance or LIHEAP.[160]

To fund Bell's Lifeline program thus expanded, the order directed that Bell apply funds (1) from its Lifeline reserve, which was at $1.5 million as of April 1999, derived from the CPCD (Coin Paid Customer Dialed Surcharge) applied to toll calls from Bell coin telephones, plus (2) the first year value of the 1998 Price Change Opportunity, guaranteed by Bell in the 1649 Petition in the amount of $8.5 million. The order adds that, if Bell needs additional funds for the Lifeline program, Bell may seek cost recovery by a proceeding before the PUC.[161]

In urging reversal of the order with respect to the Lifeline program, Bell states that the Lifeline program was not at issue in any of the dockets under the Global Settlement proceedings. However, as the PUC's decision noted, the 1649 Petition, to which Bell was a party, proposed not only retention of the Lifeline program as originally established but also its expansion to customers at or below the 150% of poverty income level.[162] There is no question but that Lifeline retention and expansion was on the table during the Global Resolution proceedings.

■■■ Bell's next position is that the revenue-neutral status of the Lifeline program contemplated by Bell's Chapter 30 program is not preserved, citing Bell's administrative costs[163] and installation cost of $20 per customer that remains if that program is grandfathered as it is by the terms of the current order. However, in connection with the continuation of the existing Lifeline and its expansion, the PUC's decision clearly continues assurance of revenue neutrality by stating:

As such, if BA–PA finds itself in the position to need additional funds to cover the costs of the Lifeline program, subsequent to the above thresholds, BA–PA may seek cost recovery via an appropriate action before the Commission, in accordance with the terms of the Settlement Agreement.[164]

As Intervenor Irwin A. Popowsky, Consumer Advocate, points out, the PUC has statutory authority to maintain universal service at affordable rates. . . . 66 Pa.C.S. § 3001(1), and, in implementing a Chapter 30 plan, to see that it ensures the continued affordability of protected telephone service and assures that low-income indi-

---

**159.** R.R. 506a, Vol. 2.

**160.** R.R. 213a–215a, Vol. 1.

**161.** R.R. 216a, Vol. 1.

**162.** R.R. 506–507, Vol. 2.

**163.** Bell Statement No. 2; R.R. 2181a, Vol. 7.

**164.** R.R. 216a, Vol. 1.

viduals are able to connect to and maintain at-home access to protected telephone service. 66 Pa.C.S. § 3004(d)(1),(12).

### Lifeline Dissenting View

 The dissenting member of the PUC, Vice Chairman Robert K. Bloom, differed from the majority only on one aspect of the Lifeline program expansion, i.e., making one non-basic service, such as Call Waiting, available to purchase by Lifeline subscribers. The dissent states that inclusion of such an option constitutes an unreasonable expansion of a social program that will be funded by other ratepayers.[165]

Referring to the origins of the Lifeline program, the dissent states the key goal of the program as the provision of *basic* service at an affordable rate to persons with low incomes. That premise was founded, he records, upon the motion of former PUC member John Hanger, which included a statement that families that can afford non-basic service, other than Call Trace for its safety benefit, do not need the Lifeline discount. Thus, the dissent submits, the inclusion of the Call Waiting option unwisely departs from those principles.

This dissenting view clearly represents a policy difference within the PUC, as distinguished from a question of legality. The substantive policy position of an agency of state government is not within the purview of the courts to review.

In view of the foregoing analysis of the PUC's statutory powers, the Lifeline provisions of the order must be affirmed.

### Other Global Order Provisions— Compliance with State Law

*Consumer Education Program*

Consumer Education Program as Proposed and Ordered

To make consumers aware of telecommunications matters that could be advantageous to them, the 1648 Petition proposed a two-year long education campaign to begin within 90 days and continue for two years. The campaign would be competitively neutral. It would be financed by contributions from carriers, made once in each of two years, namely on the 30th business day from date of the PUC's order and one year thereafter. The amount of each year's contribution would be $.50 for each access line to which the carrier provides local, interLATA and intraLATA service, but $.17 for each access line that is split among more than one carrier. The burden of the contribution is not to be passed on through any surcharge upon end users. The campaign would be directed by a nine-member board chaired by a representative of the PUC, consisting of official consumer and small business advocates, representatives of Governor's Advisory Committees, and executive directors of rural development, chamber of commerce, and community action agencies. In addition it would have telecommunications industry representatives as a non-voting advisory panel.[166]

The 1649 Petition, with Bell as one of the petitioners, agreed with the 1648 Petition's concept of the campaign and its two-year duration, but proposed that it begin no later than the completion date of Bell's Operations Support testing. In each of the two years, every ILEC and CLEC would contribute $.50 per access line, with the first payment due 10 business days after the PUC order and the second payment due one year thereafter. That expense would not be passed on to end-users. The board directing the campaign would have the same membership composition as proposed by the 1648 Petition, and would also have industry representatives forming a non-voting advisory body.[167]

The PUC order pursuant to those petitions directed the establishment of a non-

---

165. R.R. 373a–374a, Vol. 1.

166. R.R. 224a–225a, Vol. 1; R.R. 416a–418a, Vol. 2.

167. R.R. 226a, Vol. 1; R.R. 509a–511a, Vol. 2.

profit corporation, qualified for federal tax exemption under 26 U.S.C. § 501(c)(3) and named the Council on Utility Choice, consisting of ten members serving at the pleasure of the PUC,[168] for implementing the Consumer Education Program, to be funded by all telecommunications carriers.[169]

As to funding, the order incorporates Global Opinion provisions directing contributions totaling $8.8 million dollars over a three-year period, to be recovered from all carriers on a proportional minutes-of-use (MOU) basis, such costs not to be passed on to end users, and not to constitute an exogenous event for Chapter 30 companies. The PUC described that $8.8 million dollar budget as approximately the same amount as that proposed by both Petitions.[170] The first MOU report would be due upon the establishment of the nonprofit corporation and the remaining five reports would follow at six-month intervals thereafter. Each of the six contributions would total one-sixth of the $8.8 million dollar budget, i.e., $1,466,667.

All originating and terminating intrastate MOUs, for intraLATA and interLATA toll calls, are to be reported by all ILECs, CLECs and IXCs operating in Pennsylvania. For each period, the grand total of MOUs would be divided into $1,466,667 and the ratio derived would then be applied to the MOU total for each carrier to determine the carrier's proportionate semi-annual contribution. The PUC's Bureau of Audits would conduct an annual audit of the Consumer Education Program Fund so derived.[171]

In the Global Opinion, the PUC notes that this source of funding would be similar to the Carrier Charge allocated to toll carriers, as proposed in the Small Company Universal Service Fund Settlement, Appendix II in the 1649 Petition.[172]

The Global Opinion also states the PUC's conclusion that the foregoing funding formula is the most equitable method because it would reflect the proportionate size of each carrier's revenue stream from the market involved, and semi-annual recalculation would maintain that proportionality more accurately over time.[173]

As the Consumer Advocate points out, statutory authority for the PUC's establishment of the Consumer Education Fund exists in 66 Pa.C.S. § 3009(b)(3), which grants, among the powers and duties of the PUC that are significant as telecommunications in the state move toward competition, the following:

> (3) The commission shall establish such additional requirements as it determines to be necessary to ensure the protection of consumers.

### Consumer Education Program under Bell's Plan and Chapter 30 Policy

■ Bell refers to its Chapter 30 Plan to support its position that the Consumer Education Program order, creating an $8.8 million dollar fund and directing the incorporation of the nonprofit Council on Utility Choice, violates Chapter 30 because the order prohibits passing any portion of Bell's contribution on to end users, arguing that such a requirement impacts Bell as a revenue reduction outside of the mechanisms of the Price Stability Mechanism in its approved Plan.

---

168. The Council membership is ordered to be similar to that proposed by the 1648 and 1649 Petitions, except that the President of the Pa. Telecommunications Association and two professional educators would be included, while the small business advocate and chamber of commerce representatives would not be included. R.R. 228a–229a, Vol. 1.

169. Global Order ¶ 12, R.R. 320a, Vol. 1; R.R. 227a–230a, Vol. 1.

170. Global Opinion, R.R. 229a, n.185, n. 186, Vol. 1.

171. R.R. 229a–230a, Vol. 1.

172. R.R. 229a, n. 187, Vol. 1.

173. R.R. 230a, Vol. 1.

Furthermore, Bell contends that the PUC's ruling that such contributions do not qualify as an exogenous event, i.e. as an externally generated factor, is also a violation of Chapter 30. Bell states, without any citation of authority or reference to a provision of its Chapter 30 Plan, that exogenous events include changes in costs by action of law (i.e. changes in tax rates) or other changes beyond the control of the company. Bell submits that the prohibition against passing the cost of the Consumer Education Program on to the consumer essentially serves as a revenue reduction upon Bell outside of the mechanisms contained in the Price Stability Mechanism, claimed by Bell to be its Plan's exclusive mechanism to raise or lower Bell's rates and revenues.[174]

However, the contribution source cannot be regarded as externally originated when the source of such contributions to the Consumer Education Program is the same source as that proposed in Bell's own 1649 Petition.[175] In that Petition, at paragraph 130, Bell and its co-petitioners proposed:

130. All incumbent local exchange carriers and competitive local exchange carriers will *contribute* to support the education campaign . . . . (emphasis added)

As to Bell's complaint against the PUC's prohibition of passing the cost on to end users, the same paragraph 130 in Bell's 1649 Petition concluded:

The carriers will not pass this charge through to their end users.

The fact the Bell and its co-petitioners proposed that there be a consumer education program, supported by their contributions, establishes the essential nature of the program's support as being internal, not external, in origin and therefore not at all the equivalent of a tax.

The non-tax nature of the financial input for the Consumer Education Program is supported by the Consumer Advocate's citation of *Alabama Power Co. v. Federal Power Commission,* 134 F.2d 602, 608 (5 th Cir.1943), to the effect that a tax is compensation paid for the support of government.

The PUC further detailed the concept by setting a total fund limit and by using a measure of contributions—per minutes of use rather than per access line—from all carriers rather than just local exchange carriers such as Bell, designed to reflect the respective carriers' revenues and to remain proportional over time.

The PUC, in response to the Chapter 30 argument, submits that the Consumer Education Program and its implementation comply with the rules and policies of Chapter 30. Citing the statement of legislative policy in 66 Pa.C.S. § 3001(2) that Chapter 30 seeks to ensure that customers pay only reasonable charges for local exchange telecommunications services, the PUC's view is that the advent of a newly competitive market of telephone service presents a need for consumer education to avoid confusion and permit consumers to make knowledgeable choices in order to obtain service at reasonable charges.

Also pertinent here is 66 Pa.C.S. § 3009(b)(3), where one of the additional powers and duties of the PUC is stated as follows:

(3) The commission shall establish such additional requirements and regulations as it determines to be necessary to ensure the protection of consumers.

Action by a public agency that implements a broad legislative grant of regulatory power should be affirmed. *Gilligan v. Pennsylvania Horse Racing Commission,* 492 Pa. 92, 422 A.2d 487 (1980).

Bell's next issue is directed to the order's provisions establishing the consumer education body as the Council on Utility Choice (CUC). From the agreed proposition that the PUC has only the powers delegated by the legislature, Bell argues

---

**174.** Bell Brief at 51 and at 51, n. 154.

**175.** 1649 Petition, part O. Consumer Education, 509a–511a, Vol. 2.

that the order's establishment of the CUC was an attempt to create a new Commonwealth agency and to fund its activities with an administrative tax.[176]

Bell argues that the Public Utility Code authorizes the creation of internal bureaus rather than separate corporate entities,[177] and, with only one member of the CUC being a PUC representative, Bell contends that the CUC cannot be regarded as an internal bureau under the control of the PUC.

Bell also asserts that the expenditures of the CUC would be outside of the legislative budgetary control of PUC assessments for regulatory expenses as prescribed by 66 Pa.C.S. § 510. Finally, as to the CUC, Bell contends that the establishment of its program constitutes a rulemaking not promulgated in accordance with the Regulatory Review Act[178] and the Commonwealth Documents Law,[179] and therefore legally invalid.[180]

■ However, the institution of a program to aid consumers and the industry itself is plainly not a rulemaking. Moreover, on the record is the 1649 Petition of Bell and others, along with the 1648 Petition, both proposing a body to carry out a consumer education program. Although the PUC gave the body a name, Council on Utility Choice, different from the Consumer Education Board title proposed by the petitioners, that nominal difference is immaterial (although perhaps more palatable to consumers). Although the membership composition adopted by the PUC differed from the proposals of the two petitions by including the president of petitioners' own industry group, the Pa. Telecommunications Association, and also by including twò professional educators, in

place of two general business representatives (Small Business Advocate and chamber of commerce), the essence of the CUC's composition came from the petitioners, not from the PUC.[181] The PUC was careful to embody the CUC as a nonprofit corporation, which characterizes it as a charitable agency and thus clearly distinguishes it from being a Commonwealth Agency, and also insures that any financial support donated by other sources will be eligible for federal tax exemption and perhaps encouraged by the applicability of that exemption.

■ With respect to the Consumer Education Fund, Bell also takes the position that the PUC established the total amount arbitrarily, without any record support for its determinations, contending that it had no opportunity to present evidence on the matter. However, in the Global Resolution proceedings, the two petitions, 1648 and 1649, put the whole matter on the agenda by proposing the consumer education program, the $0.50 unit contribution amount, and, in Bell's own 1649 petition, the proposition that the costs should not be passed on to the end users. The *Popowsky* decision, cited by Bell, stands for the proposition that the PUC, in making financial and economic determinations should disregard proposed incomplete adjustments...if the advocates fail to quantify their adjustments properly.[182] The burden was on the petitioners to adduce further evidence, and they clearly had opportunity to do so, as they did on many other issues.

■ Bell also refers to *Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa.Cmwlth. 285, 433 A.2d 610 (1981) for the proposition that a number selected by

**176.** Bell Brief at 58.

**177.** 66 Pa.C.S. § 308(f)

**178.** Act of June 25, 1982, P.L. 633 *as amended,* 71 P.S. §§ 745.1–745.15.

**179.** Act of July 31, 1968, P.L. 769 *as amended,* 45 P.S. §§ 1102–1208.

**180.** 45 P.S. § 1208; 71 P.S. § 745.5.

**181.** R.R. 416a–418a, 509a–511a, Vol. 2

**182.** Popowsky v. Pennsylvania Public Utility, 550 Pa. at 459, 706 A.2d at 1201 (1997).

the PUC must be quantifiable and supported by a specific calculation.[183] Here the numbers settled upon by the PUC were certainly quantified and calculated on the basis of specific facts.

### Effect of Waiver and Estoppel as to Consumer Education Program

The PUC submits that Pa. R.A.P. 1551(a), as to review of quasi-judicial administrative orders, provides that the appellate court shall not consider any matter not raised before the agency except (1) questions involving the validity of a statute, (2) questions involving the jurisdiction of the agency, and (3) questions which could not have been raised below by the exercise of due diligence.

Here Bell seeks to oppose the existence of the Consumer Education Fund and a body to administer it on grounds of lack of legislative authority, specific conflict with Chapter 30, and abuse of rulemaking power, but the existence of the Fund, the concept of quasi-independent administration of it, and the source of its financial support were all embodied in Bell's own 1649 Petition submitted to the PUC in these proceedings.

 . In addition to the positive statutory authority possessed by the commission, the record attests to the fact that, in addition to failing to pursue objections or present evidence opposing the consumer program before the agency, Bell affirmatively proposed the concept and is therefore barred from seeking reversal of that outcome here. *Gross v. Pittsburgh,* 686 A.2d 864 (Pa.Cmwlth.1996).

### Universal Service Fund

In 1997, the PUC launched a formal investigation to establish Updated Universal Service Principles and Policies for telecommunications in Pennsylvania.[184] The concern has always been to provide public service in telecommunications with affordability and reasonable uniformity in services and costs. Before the increase of competition, as encouraged by Chapter 30, the PUC describes itself as using a system of implicit and explicit supports to keep local telephone rates universally affordable.[185]

The PUC in the Global Opinion and Order defines a Universal Service fund as follows:

> The USF is a means to reduce access and toll rates for the ultimate benefit of the end-user and to encourage greater toll competition, while enabling carriers to continue to preserve the affordability of local service rates.... [I]t is actually a passthrough mechanism to facilitate the transition from a monopoly environment to a competitive environment—an exchange of revenue between telephone companies which attempts to equalize the revenue deficits occasioned by mandated decreases in their toll and access charges.[186]

Here paragraph 10 of the PUC order [187] states that a Universal Service Fund, consistent with the directives contained in this Opinion and Order [188] shall be implemented.... The remainder of that sentence states that the PUC will initiate an appropriate rulemaking proceeding to establish permanently an independent third party to administer the fund.

A significant cross-reference in the PUC's decision states:

> We direct the Universal Service Fund shall be sized in accordance with the Small Company Plan attached to the

---

183. Bell Brief at 49, n. 142; at 51, n. 152.

184. Docket No. I–0094035, Order entered January 28, 1997.

185. PUC Brief at 41.

186. R.R. 183a. Vol. 1.

187. R.R. 320a, Vol. 1.

188. R.R. 183a–196a, Vol.1; Note the we direct paragraphs at R.R. 185a and R.R. 195a–196a, Vol. 1.

1649 Petition as Appendix A, as altered by Sprint/United's inclusion in the plan.[189]

That cross-reference to the sizing of the Universal Service Fund, incorporating Appendix A under Appendix II of the 1649 Petition [190] thus provides the specific content of the PUC's decision as to the Universal Service Fund. Paraphrased and summarized for brevity, Appendix A under Appendix II indicates that the basic content of the PUC's USF decision is as follows:

I. Size and Assessment of Universal Service Fund Contribution

A. All telecommunications service providers, excluding wireless carriers, will contribute to the Fund.

B. Bell's contribution share shall be capped at $12 million per year to support the funding requirements of the participants.

C. The total size of the Fund and the contributions of other telecommunications providers shall be calculated as follows:

1. Fund total on an annual basis shall equal $12 million divided by Bell's percentage of total Pennsylvania end-user telecommunications revenues for the preceding calendar year [191] (i.e. Bell's assessment percentage) as follows:

1999 Fund = $12 million/Bell assessment percentage

= $12 million/ 56.6% [192]

= $21.2 million

2. Each year of later calendar years, beginning with 2000, the total fund amount shall be increased by first calculating as above, and then by increasing the total for such year by the average annual access line growth rate for the fund participants, compounded annually. Each fund recipient's share shall be adjusted annually to reflect its annual access line growth.

3. The contributing share of each telecommunications service provider except Bell (whose share is capped at $12M) will be based on its respective pro-rata share of total intrastate end-user telecommunications revenues.[193]

4. All telecommunications providers will be required to file statements annually specifying their respective total end-user revenues.

D. No credits or offsets to the respective contribution shall be based upon access charge amounts paid.

E. Bell will not implement a customer surcharge to recover its contribution, but may use any negative PCOs from its plan to support its contribution.

F. No small ILEC may request an end-user surcharge to recover its contribution.

G. The size of the Fund will be recalculated annually.

II. Distribution of the Fund

A. All ILECs in Pennsylvania shall be fund recipients except Bell and GTE.[194]

---

189. R.R. 185a, Vol. 1.

190. R.R. 578a–595a, Vol. 2.

191. Until total intrastate telecommunications revenues are determined by the fund administrator, total gross intrastate revenues as reported under 66 Pa.C.S. § 510 will be used to determine Bell's assessment percentage and all providers' contributions to the Fund.

192. This is Bell's 1998 PUC assessment percentage, used for illustrative purposes.

193. End-user revenues do not include wholesale revenues, e.g., from access charges, UNEs etc.

194. In Appendix A as proposed, Sprint was also listed as excluded from being a recipient. See R.R. 580a, Vol.2. As a final matter, Sprint/United is included as a USF contributor. See text at n. 189 supra. Sprint LTD, a small ILEC, is included as a recipient. See R.R. 189a–191a, Vol. 1. As to Sprint LTD's draw, see R.R. 190a, Vol. 1.

B. All receipts from the Fund, after deduction of any contribution made by the respective fund recipient, shall be used to rebalance, on a revenue-neutral basis, the rates/revenues derived from access and/or other services.

C. Fund recipients will implement tariff changes as follows:

1. Each one will lower toll rates to an average level of $.11 per minute. Local residential rates will be increased to an average of $10.83 per line. Any residual shortage will be recovered from the Fund.

2. Companies with R–1 rates above $16 will reduce them to $16, with business rates being reduced proportionately by monthly credit on customer bills, such reduction to be covered by the Fund. If the Fund is dissolved with no alternative established, residential and business Universal Service Credits will be eliminated, and toll and access rates will return, at the company's option, to their pre-funded levels pursuant to a compliance filing.

3. Each company will develop its current intrastate carrier common line (CCL) revenue amount, which shall include CCL revenue for IXC billed interLATA and intraLATA minutes, terminating ITORP minutes and the imputation of CCL revenues associated with the company's originating toll minutes of use.

4. Each company will mirror its interstate traffic sensitive rates and structure (including local transport restructure) that were effective as of July 1, 1998 for intrastate purposes. If that causes an increase in rates, then the CCL revenue amount from the previous step shall be reduced accordingly.

5. Each company will reduce the current CCL revenue amount (reduced by the traffic-sensitive increase if applicable) to approximately $7 per month per access line.

6. Each company will convert recovery of the CCL component to a flat-rate Carrier Charge recovered from all toll carriers on a proportional minutes-of-use basis.[195]

7. Each company will flow through the benefits from the Fund and ITORP expense decreases by lowering interLATA rates. An average floor price of $.09 per minute will be established.

8. Benefits that remain after lowering toll rates will first be applied to any shortfall in the size of the Fund. Remaining benefits, at company's option, will either reduce the CC or reduce the amount to be received from the Fund.

Bell questions the legality of the Universal Service Fund provisions of the Global Order on the following grounds: (1) action on USF is barred by the presence of the issue in an appeal pending before this Court; (2) no law authorizes subjecting Bell and its customers, by means of a concept labeled a tax by Bell, to pay to reduce rates of other telephone companies, and (3) the USF is an invalid rulemaking.

Other parties have questioned the USF provisions upon those grounds and additional ones.

### Effect of Pending Prior Appeal on Universal Service Fund Issue

 Despite the fact that Bell filed in this case the 1649 Petition requesting PUC action on a Universal Service Fund,[196] Bell now argues that the PUC is barred from dealing with any such matter, contending that a different appeal as to a USF, already pending before this Court[197] means

---

**195.** Further computation details at ¶ 6, R.R. 582a, Vol. 2.

**196.** R.R. 498a, Vol. 2, ¶ 81; R.R. 568a, Vol. 2, Appendix II, Small Company Universal Service Fund Settlement.

**197.** Bell Atlantic–Pennsylvania, Inc. v. Pennsylvania P.U.C., at No. 2420 C.D.1997 Commonwealth Court of Pennsylvania.

that, under Pa. R.A.P. 1701, a government unit, such as the PUC, may no longer proceed further in the matter.

However, as the PUC points out, the pending previous appeal involved a January 28, 1997, order as to a specific USF scheme involving a different basic universal service rate and a different costing methodology. The present appeal deals with issues wholly separate from those in the prior appeal. Bell here, by its presentation of the 1649 petition, sought a USF result quite different from the previous concept from which it had sought to pursue an appeal. Thus both Bell and the PUC have confirmed of record in this case that their mutual aim here is *not* to proceed further in the matter of the previous appeal. Hence, the PUC's action on the current USF issue, now before this Court, is not barred by Pa. R.A.P. 1701.

### Estoppel to Question Statutory Authority for Universal Service Fund

■■■ The doctrine of judicial estoppel bars a party from switching positions in the course of litigation if that party's initial position was successfully maintained. *Associated Hospital Service v. Pustilnik,* 497 Pa. 221, 439 A.2d 1149 (1981). It negates changes of position, not only as to facts but also as to legal conclusions, such as jurisdiction, *Buehler v. Philadelphia & Reading Ry. Co.,* 280 Pa. 92, 124 A. 325 (1924), and immunity status, *Ligon v. Middletown Area School District,* 136 Pa.Cmwlth. 566, 584 A.2d 376, 380 (1990).

The PUC accordingly points out that Bell and other ILECs—namely TDS and Frontier [198]—are barred at the outset under judicial estoppel principles from questioning the PUC's statutory power to employ the USF concept by their on-record advocacy of the above-described $20.5 million dollar USF proposal, expressly stated

by them in the 1649 Petition as designed to address universal service issues in a pragmatic, but equitable, manner that provides benefits to all involved parties and promotes the public interest.[199]

That petition to the PUC necessarily reflected their legal position that the PUC did possess statutory authority to effectuate a Universal Service Fund. Although they did not receive the particular formulation they preferred, their assumption of the PUC's statutory power and jurisdiction to act in the premises was fulfilled and confirmed by the PUC's affirmation of those legal powers in its decision.

■■ Bell, as a 1649 petitioner, cannot logically propose new action on its version of a Universal Service Fund and then, when the PUC takes action to create a Universal Service Fund differing from Bell's desires, claim that the PUC has no power to deal with the very subject matter that Bell has pursued to obtain its version of a Universal Service Fund.

Moreover, because Bell and its co-petitioners affirmatively recognized the PUC as having statutory power to effectuate the USF concept, we also note that Pa. R.A.P. 1551(a) states that no question shall be heard or considered by the court which was not raised before the government unit except questions involving (1) the validity of a statute, (2) jurisdiction of the government unit, or (3) issues that could not by the exercise of due diligence been raised below.

Those parties raised before the PUC no claim of the invalidity of any statute, nor did they urge any lack of PUC jurisdiction, but they did indeed raise the USF issue below, in an affirmative vein necessarily importing that their position was that the PUC did have jurisdiction and statutory authority to establish a Universal Service

---

**198.** Their co-petitioner, Commonwealth Telephone Company, not having filed a brief before the PUC, failed to preserve any issues for review.

**199.** 1649 Petition at R.R. 570a–571a Vol. 2.

Fund. They now are estopped from seeking a contrary conclusion.

 Bell's attempt to avoid the doctrine of estoppel, by claiming that its petition was no more than an offer of settlement, is not supported by the petition itself, which was captioned as one for Global Resolution of the proceedings. Clearly the only settlement described in the petition was simply the settlement reached among the co-petitioners, permitting them to agree with each other on what their pleading sought from the PUC. Thus, as joint petitioners, they together asked that the PUC:

> After considering the records in the Resolved Dockets, comments and reply comments of the parties, *grant the Joint Petition, and enter an Order in each of the Resolved Dockets implementing the resolutions proposed in the Joint Petition.* (R.R. 519, Vol. 2; emphasis added)

Clearly this Court cannot conclude that Bell's advocacy of a USF proposal binds Bell by estoppel to accept the PUC-ordered version of a USF. However, having proposed PUC action to establish a USF preferred by Bell, Bell cannot be heard to insist that the PUC entirely lacks power to act within that area.

### Statutory Authority for Universal Service Fund

Bell nevertheless submits that there is no statutory authority empowering the PUC to require that intrastate carriers must contribute to a Universal Service Fund for the purpose of subsidizing other carriers' provision of service to customers of those other carriers. Bell also pursues a related claim that the USF process actually constitutes the imposition of a tax without any basis in the statutory law.

Bell relies upon *Process Gas Consumers Group v. Pennsylvania Public Utility Commission*, 511 Pa. 88, 511 A.2d 1315 (1986). There, under the federal Natural Gas Policy Act, 15 U.S.C. § 3301 et seq., surcharges imposed on industrial consumers were shifted to interstate pipelines, to reduce rates to eligible consumers served by those pipelines. The PUC ordered utilities under its jurisdiction to impose a state Boiler Fuel Rider (BFR) surcharge on industrial consumers, ultimately to be applied to conservation programs under the Public Utility Code, 66 Pa.C.S. § 308(c). However, the Pennsylvania Supreme Court held that the Public Utility Code section empowered the PUC only to carry out research on conservation, not to create a fund to support that work.

The PUC's position is to distinguish the *Process Gas* decision by reliance upon Chapter 30's declaration of policy to maintain telecommunication services at affordable rates, and to ensure that customers pay only reasonable charges for local exchange telecommunications services.[200] As authority for specific implementation of those policies, the PUC cites 66 Pa.C.S. § 3009(b) and subsection (3) thereof, providing that the PUC retains the following powers and duties relating to the regulation of all local exchange telecommunications companies and interexchange carriers and listing among those powers:

> (3) The commission shall establish such additional requirements and regulations as it determines to be necessary to insure the protection of consumers

Bell asks that we deem that language to be too general to authorize the Universal Service Fund and a requirement of contributions to it, arguing that it appears to refer only to protection against fraud and unfair practices, rather than the protection of rate costs through a universal service fund process. The PUC in response quotes the Pennsylvania Supreme Court in *Process Gas*, 511 A.2d at 1320 for the proposition that the court is not limited to the mere letter of the law, but must look to the underlying purpose of the statute and its

---

**200.** 66 Pa.C.S. §§ 3001(1), 3001(2).

reasonable effect, citing *Gilligan*, 492 Pa. at 97, 422 A.2d at 490.

The PUC also contends that the federal law is very clear in supporting its position to mandate a universal service fund, and contributions to it, citing Section 254(f) of TA 96,[201] which states:

STATE AUTHORITY—A State may adopt regulations not inconsistent with the commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications service shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State.

The federal section concludes with a sentence negating any state regulations which rely on or burden federal universal support systems, an aspect that has not been raised here.

To Bell's view that the term State in TA 96 refers only to state legislative action, not to state regulatory commission actions, the PUC cites the comprehensive grant of general powers to the commission in 66 Pa.C.S. § 501 as constituting an effective legislative delegation of the requisite powers to the PUC.

■ The conclusion here must be that the state and federal statutes do confer upon the PUC the power to establish a Universal Service Fund, as Bell and other 1649 Petition signers requested the PUC to do.

■ The claim that the USF involves the imposition of an unauthorized tax must also be rejected. As the Consumer Advocate also pointed out as to the Consumer Education Program, a tax is a measure which generates revenue for the support of government, citing BLACK'S

LAW DICTIONARY, 1457 (6th ed.1991), based upon judicial authority, e.g., *Alabama Power Co. v. Federal Power Commission*, 134 F.2d 602, 608 (5th Cir.1943). Accord, *Philadelphia v. Pennsylvania Public Utility Commission*, 676 A.2d 1298, 1307 (Pa.Cmwlth.1996) *appeal denied*, 546 Pa. 657, 684 A.2d 558.

Whether or not the USF process amounts to a tax can be determined by examining its essential nature as officially defined in the PUC's Proposed Rulemaking (discussed below in connection with the rulemaking compliance issue raised by Bell.) The notice of Proposed Rulemaking, as it appears in the Pennsylvania Bulletin,[202] repeats the PUC's concept of the essential nature of the USF as follows:

Although it [the USF] is referred to as a fund, it is actually a pass-through mechanism to facilitate the transition from a monopoly environment to a competitive environment—an *exchange of revenue between telephone companies* which attempts to equalize the revenue deficits occasioned by mandated decreases in toll and access charges receipts. (emphasis added).

Thus it is clear that the USF process has nothing to do with raising revenue for the support of government. It therefore does not constitute an unauthorized tax.

### Universal Service Fund and Rulemaking Powers

■ On the ground that the establishment of a Universal Service Fund involves the institution of binding norms, Bell contends that failure to subject that program to the notice, comment and promulgation process required by the Regulatory Review Act[203] and the Commonwealth Documents Law[204] necessarily makes the program null and void.[205]

---

**201.** 47 U.S.C. § 254(f).

**202.** 30 Pa. B. 1549–1555, at 1549 (March 18, 2000). See also at n. 186, supra.

**203.** Act of June 25, 1982, P.L. 633 *as amended*, 71 P.S. §§ 745.1–745.15.

**204.** Act of July 31, 1968, P.L. 769 *as amended*, 45 P.S. §§ 1102–1208.

However, the PUC responds that this claim by Bell has no basis, in that the PUC has indeed complied fully with the laws that require promulgation of the required regulations. In accordance with Section 201 of the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769 *as amended,* 45 P.S. § 1201, requiring notice and provision for comments, the PUC adopted USF Rulemaking Order,[206] giving notice and making provision for comments. In accordance with the Regulatory Review Act, 71 P.S. § 745.5, on March 7, 2000, the PUC submitted the USF Rulemaking Order to the *Pennsylvania Bulletin* for publication, to the legislative standing committees and the Independent Regulatory Review Commission. As noted above,[207] that order was published on March 18, 2000, 30 Pa. B. 1549–1555, pursuant to which Bell filed comments on April 17, 2000.

The record thus indicates that Bell's position as to rulemaking compliance is without merit.

### Exclusion of Bell and GTE North as Recipients from USF

As noted above, the USF, as adopted by the PUC from appendices of the 1649 Petition, excludes Bell and GTE—the two largest ILECs—from receiving funds from the USF. Bell, aside from its opposition to the USF order generally on the grounds discussed above, does not oppose its exclusion from recipient status.

However, GTE attacks the USF order as arbitrary and capricious, not supported by law or evidence and void for vagueness.[208] GTE begins with an explanation of the USF theory, as follows:

[T]he USF is a mechanism through which telecommunications companies may replace implicit support lost through mandated decreases in toll and access charges with an explicit, sufficient and competitively neutral source of funding. Each participating telecommunications company is required to pay into the USF based on its revenues. The LEC fund recipients are then able to withdraw funds in order to offset revenue lost as a result of reduced access charges and rates imposed by the PUC. The USF is an important tool in allowing those LECs serving primarily high-cost areas to compete with other LECs able to gain a competitive advantage by subsidizing their service in high-cost areas with profits earned in low-cost service areas.[209]

Subsidy of high-cost area service with profits earned in low-cost service areas, i.e., implicit support, assumes the existence of a stable monopoly environment under traditional rate regulation. The introduction of competition, driving all rates down toward cost, would, without more, eliminate that implicit support of high-cost areas by low-cost areas. The USF, accompanying the introduction of competition in place of regulated rates, thus replaces implicit support by explicit support, in order to maintain—or achieve—universal service, i.e., universal availability of lowest cost service to consumers across a broad spectrum.[210]

GTE, as an ILEC in its areas, cites 47 U.S.C. § 252(d)(1) as requiring GTE's competitors to purchase GTE's services and UNEs at GTE's current rates less its avoided retailing expenses. Thus GTE

---

205. 45 P.S. § 1208; 71 P.S. §§ 745.5a[c], 745.3.

206. R.R. 192a, Vol. 1 Rulemaking Re Establishing Universal Service Fund regulations at 52 Pa.Code §§ 63.141–63.152, Docket No. L–00000148 (Order enter February 4, 2000) (USF Rulemaking Order) Appendix D.

207. See *supra* n. 202

208. GTE Petitioner's Main Brief at 21–22.

209. Ibid.

210. See 47 U.S.C. §§ 254(b)(5), (e) and (f), and Congressional Conference Report No. 104–458, at 131 (Jan. 31, 1996).

contends that it is entitled by the statute and the U.S. Constitution to recover its actual costs plus a reasonable profit. However, GTE complains, the PUC requires GTE to convert its CCLC, Common Carrier Line Charge, from a per-minutes-of-use basis to a flat rate, and along with other ILECs other than Bell, to reduce its residential per line per month rate to $16.00.

Yet, GTE argues, the USF order, expressly made subject to future revision, does not allow GTE to receive that explicit support from the Fund. GTE also contends that the order is void for vagueness because GTE does not know if it is subject to the reporting requirement and because the order has conflicting terms as to the rate cap. Finally GTE complains that the PUC does not subject wireless carriers to the USF order, citing *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir.1999), in support of a claim that federal law requires states to include wireless carriers.

The PUC responds that it made a reasonable classification in excluding the two largest ILECs from the recipient entitlement category. Bell, as previously noted, is the largest, with more than 6 million access lines, heavily in the Philadelphia and Pittsburgh areas. GTE is next, serving densely populated areas such as Erie, York, Johnstown and Hershey, and previously determined as not entitled to Rural Telephone Company status.[211] Sprint/United, the third largest, serves less densely populated areas, not including any city.

GTE, because excluded as a recipient, claims discrimination against it on the ground that Sprint/United is permitted to receive funds from the USF to offset revenues lost due to the $16.00 cap. Sprint/United answers that it has no basic residential rates above the $16.00 cap and therefore cannot draw from the USF to make up any revenues lost above the $16.00 cap.

■ Accordingly, we agree that the PUC, in drawing the line between GTE and Sprint/United, thus grouping larger companies serving low cost areas separately from smaller companies serving higher cost areas, thereby made a reasonable classification under the familiar rational basis doctrine, as in *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), *on remand* at 10 F.3d 811 (D.C.Cir.1993); *United States v. Maryland Savings–Share Ins. Corp.*, 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970); *Paz v. Pennsylvania Housing Finance Agency*, 722 A.2d 762 (Pa.Cmwlth.1999).

■ With respect to GTE's opposition here to the exclusion of wireless carriers from the USF, Sprint/United, not opposing that exclusion, contends that GTE failed to preserve that question on the record for appellate review. The exclusion of wireless carriers came upon the record and before the PUC as part of the 1649 Petition's proposal,[212] and GTE did not go on record in opposition to that aspect, as required by Pa. R.A.P. 1551(a) to preserve the issue for appeal.

■ Moreover, as Sprint/United calls to our attention, an entity engaged in wireless communications exclusively, i.e. any person not otherwise a public utility, who or which furnishes mobile domestic cellular radio telecommunications service is not within the definition of public utility subject to PUC jurisdiction. 66 Pa.C.S. § 102(2)(iv).

With respect to GTE's reliance upon *Texas Office of Public Utility Counsel v. FCC*, 183 F.3d 393 (5th Cir.1999), Sprint/United correctly reports that the federal court perceived no mandate that wireless carriers be included in a USF, leaving that decision as optional with state

---

**211.** In re: Implementation of the Telecommunications Act of 1996, Dkt. No. M–00960799.

**212.** R.R. 571a, Vol. 2.

commissions. This Court agrees with that reading of the case's result.

The USF decision, as programmed by the PUC, merits affirmation.

### Competitive Services Designations

Bell, as the predominant ILEC, has previously filed applications to have two aspects of its functions designated and regulated as competitive, pursuant to Chapter 30, 66 Pa.C.S. § 3005, namely (1) its regional toll services, and (2) its business services. The business services category, for this purpose, consists of retail sales to the business community outside of the telecommunications field. It does not include wholesale business consisting of sales to other telecommunications providers.

Review of the PUC decisions on those matters in this case requires this Court to consider, initially, the official designation of the functions as competitive—secondly, selection of one of two imputation tests to assure fair competition in each function between Bell and others—and, finally, determination of the timing or effective date of the toll and business services respectively.

The PUC's decision here granted competitive designation to Bell with respect to both regional toll and business services, applying an aggregate total service imputation test to both of those services categories.[213] As to the toll services designation, the decision deferred its effective date until the FCC permits Bell to provide long distance services in Pennsylvania, pursuant to Section 271 of TA 96.[214]

With respect to the business services designation, the elements of the approval are more complex.[215] Business customers are classified into three groups, depending on the annual revenue amounts each customer generates to Bell, consisting of

those generating over $80,000, those generating between $40,000 and $80,000, and those generating revenue amounts between $10,000 and $40,000. The specific details of conditions placed upon those groupings are stated and considered below.

Another factor applied by the PUC in the business services designation is local number portability (LNP), which refers to the existence of a customer's option to change local service providers without changing telephone numbers. LNP is obviously an advantage to any business. With it, telecommunications competition is fostered because the business benefit of retaining the same telephone number confers freedom to choose providers solely on the basis of the nature, quality and price of a competing service.[216]

AT & T, Sprint/United and others challenge the competitive services designations or the PUC's employment of the aggregate/total-service imputation test to those designations. Bell, although welcoming the designations and supporting the imputation test applied to each, objects to the deferral of effective dates and a rate cap applied to the business services category, despite the inclusion of such conditions in its 1649 Petition, as noted below. The Office of Small Business Advocate, as intervenor, fully supports the PUC's business services designation and its specific terms.

No party appears to object to the local-number-portability (LNP) condition.

### Competitive IntraLATA Toll Services

The first of the two competitive services matters involves whether Bell's intraLATA (within a Local Access and Transport Area) toll service should be designated as competitive under Chapter 30's Section 3005, 66 Pa.C.S. § 3005. Under 66 Pa.C.S. § 3009(f), that designation

---

**213.** R.R. 279a–290a, Vol. 1.

**214.** R.R. 283a, Vol. 1.

**215.** R.R. 283a–290a, Vol. 1.

**216.** R.R. 287a, n. 218, Vol. 1.

would eliminate direct regulation of rates for that service. The PUC decision in this case serves also to resolve the underlying docket matter initiated by Bell's original request for competitive designation,[217] in which a full record was developed and the PUC, in July 1998, ordered that the matter be deferred pending review of Bell's access charges and the effect of presubscription charges on IXCs, interexchange carriers.

In the PUC's view, certain decisions in this case, to wit (1) lowering Bell's access charges to $.009 per minute at each end, (2) adopting a presubscription cost recovery method that allocates such costs to all carriers rather than IXCs only, and (3) conditioning the competitive designation on Bell's securing federal Section 271 approval for entry into long distance service, have left only one more aspect to be resolved, namely, the appropriate imputation test under 66 Pa.C.S. § 3005(e)(2). On this point, the PUC rejected the proposal of the 1648 petitioners and accepted the proposal of Bell itself in the 1649 Petition.[218]

Subsection (e)(2) of 66 Pa.C.S. § 3005 states:

(2) The price which a local exchange telecommunications company charges for a competitive service shall not be less than the rates charged to others for any basic service functions used by the local exchange telecommunications company or its affiliates to provide the competitive service. Revenues from the rates for access services reflected in the price of competitive services shall be included in the total revenues produced by the noncompetitive services.

The purpose of this imputation requirement is to preclude Bell, when competing in toll business, from lowering its toll prices charged to its customers below the level of access charges it seeks from toll competitors who must use Bell's local telephone service to complete long distance calls for their customers.

AT & T, in its intervenor brief, and Nextlink joined with other companies[219] on an amicus brief, object to the PUC's adoption of an aggregated toll services level approach, i.e., approving Bell access charges so long as the total of Bell's toll revenues exceeds the total sum that Bell's toll competitors would pay for access to provide the same service volume. This approach is also called, by some parties, the total service level imputation test. AT & T, as well as others in the 1648 Petition, argue that this imputation test, in effect involving an averaging of Bell's access charges, permits Bell to impose varied access charges, lower in areas where Bell faces competition, but higher in areas where no competition is faced.

Under this total service level approach, Bell had to convince the PUC that the total of all its IntraLATA toll service revenues would exceed the total revenues received by Bell for all access charges received by Bell from competitors for the use of Bell's network.

The objecting parties sought to have the PUC apply instead the service offering test, also called the price plan test, under which Bell would have to pass the Section 3005(e)(2) test for each service offering, i.e., per price plan. Under this latter test, Bell's revenues from charges to business customers in a competitive area would have to be not less than what a toll competitor would have to pay Bell for access to the same price-plan group of customers. The price plan test, AT & T argues, has been applied by the PUC in the past.

The PUC applied the aggregate service-level (total service) test in its decision, referring to ALJ Michael Schnierle's comment favorable to that test, founded upon

---

**217.** Docket No. P–00971307, Record incorporated to this case per 52 Pa.Code § 1.33(a).

**218.** R.R. 281a–283a, Vol.1.

**219.** Focal Comm. Corp. of Pa., Hyperion Telecommunications and Rhythms Links, Inc.

the basis that the PUC is requiring reductions in Bell access charges generally and therefore giving Bell significantly less room in which to carry out a price squeeze and less incentive to do so.[220] The ALJ's Recommended Decision comment was clear in favoring such a test for Bell only when Bell's access charges have been subjected to reduction by the PUC. The PUC therefore justified its preference for the total service-level test, rather than the service offering price-plan test, on the basis that its order here has launched a reduction of Bell's access charges.

As noted above as to access charges, AT & T contends that the access charge reductions are not sufficient in size to meet the ALJ's view. Also, AT & T contends that the statute itself, quoted above, has been interpreted by the PUC in the past to call for the service offering price-plan test.[221]

The wording of the Chapter 30 subsection does not afford this Court a ready answer. The subsection, applied here, states that the price that Bell charges for a competitive [toll] service shall not be less than the rates charged to others [e.g., access charges] for any basic service functions used by Bell to provide the competitive service. 66 Pa.C.S. § 3005(e)(2).

■ It is difficult to say that those terms necessarily require the service offering test, per price plan, in that the statute does not necessarily relate the access rates charged to others to the incumbent's charges on a specific service-offering by service-offering basis. In the present context of Bell's access charges as mandated by the related decisions in this case, and the declared power of the PUC, always aided by the watchful conduct of competitors, this Court must defer to the PUC's expertise in applying the general terms of the statute to a changing price environment.

### Competitive Business Services

The second competitiveness matter involves Bell's business services. In this case, the PUC subjected the designation for competition to seven numbered conditions,[222] which are summarized below. In the listing here, within parentheses after each condition, is a reference to paragraph numbers of the 1649 Petition in which Bell proposed substantially the same condition:

(1) Bell's retail business services to be competitive under Chapter 30 for customers generating $80,000 or more in annual total billed revenue (TBR) where local number portability (LNP) is available[223] (G84, R.R. 499a, Vol.2);

(2) Business services to remain available to customers at current tariff rates until December 31, 2003 (G85, R.R. 499a, Vol.2);

(3) Customers generating less than the $80,000 threshold shall be governed by present tariffs. (G86, R.R. 499a, Vol.2). However, for customers generating between $40,000 and $80,000 in annual TBR, Bell may offer Individual Case Basis (ICB) contracts where the customer has service or a bid from a competing local exchange carrier (CLEC). One year after LNP is available for customers generating between $10,000 and $40,000 in annual TBR, Bell, under the same conditions as to competing service or bids, may offer ICB contracts to such customers (G87, R.R. 499a–500a, Vol.2) ICB offerings shall not be below Bell's costs. Bell must file all such ICB contracts or proposals with the PUC under proprietary seal for confidentiality.

---

**220.** R.R. 6048a–6049a, Vol. 19.

**221.** Investigation to Establish Standards and Safeguards for Competitive Services, Dkt. No. M–00940507, August 6, 1996.

**222.** R.R. 287a–290a, Vol. 1.

**223.** LNP refers to the ability of a customer to retain its local telephone number when switching local carriers.

Bell's support for the above terms, numbered (1) through (3), was presented by Bell's company president as witness.[224]

Other numbered terms of the decision—here followed by a reference to the like proposal in Bell's 1649 Petition—were as follows: The decision also: (4) subjected multi-year business contracts to PUC review if claimed to be anticompetitive (G88, R.R. 500a, Vol. 2); (5) regulated waivers of termination liability (G89, R.R. 500a, Vol. 2); (6) subjected business services to imputation on a total services/total business activity basis (G90, R.R. 500a–501a, Vol. 2), and (7) set one-year and two-year schedules for reducing the $80,000 threshold, measured from the date of LNP availability, for, respectively, the $40,000–or–more customers and the $10,000–or–more customers. (G91, 92, R.R. 501a, Vol. 2).

The PUC considers the business services decision to be in conformity with the Chapter 30 mandates for encouraging competition on equal terms, 66 Pa.C.S. § 3001(7), where there is market demand, 66 Pa.C.S. § 3001(8).

Bell, however, charges that the conditions specified in the decision as to competitive services—despite their substantial conformity to Bell's own proposals—violate 66 Pa.C.S. § 3009(f) which states that:

The commission shall not fix or prescribe the rates, tolls, .charges, rate structures, rate base, rate of return or earnings of competitive services except as set forth in this chapter.

The next sentence of the same subsection states:

The commission may require that the local exchange telephone company file and maintain tariffs or price lists for competitive telecommunications services.

Bell acknowledges that there are provisions of Chapter 30 in 66 Pa.C.S. allowing regulation of competitive services to: prevent unfair competition and require non-discriminatory access to facilities by competitors, § 3005(b); require verification of pricing of components, § 3005(e)(3); pro-

hibit restriction of resale, § 3005(g)(1); prohibit cross-subsidization of competitive services; and regulate cost allocation, § 3005(g)(2).

Bell, however, states that postponement of effective dates, and also using tariff rates in part, violates Chapter 30 policy, while expedited competitive classification furthers the statute's purpose. *Popowsky*, 550 Pa. at 462, 706 A.2d at 1203.

Seeking to negate the weight of its own proposals, Bell also argues that its assent, in its 1649 Petition, to letting competitive classification await Section 271 approval was expressly conditioned on the remainder of its proposal being accepted without modification.[225] Similarly, Bell argues that its assent to letting competitive business service approval await a date after LNP availability was also conditioned upon full approval of its proposed comprehensive settlement.

The PUC responds that the Supreme Court has cloaked it with power to make necessary findings under Chapter 30 by adopting as findings the positions of one party or another, or by adopting the findings made by an ALJ. *Popowsky*, 550 Pa. at 464, 706 A.2d at 1204.

■ Conclusive upon this Court is the fact that, as to business services, the PUC's conditions upon competitive classification closely follow the conditions proposed by Bell itself in the 1649 Petition, as has been pointed out above by following each provision adopted by the PUC with a reference to the like provision proposed by Bell. The PUC correctly quotes our Supreme Court, from *Popowsky*, that the PUC can make findings by adopting as its findings the detailed positions of particular parties. Id. at 464, 706 A.2d at 1204.

Certainly the fact that a party's proposed positions have not gained universal acceptance in a settlement proceeding does not weaken their valid import within a

---

**224.** R.R. 782a–785a, Vol. 3.

**225.** R.R. 517a–518a, Vol. 2.

litigation proceeding. This result is especially warranted when the decision elements are supported in litigation by the party's evidence of record [226] as well as by the party's positions matching that evidence.[227]

■■■ Thus, when the adopted provisions are those proposed by the objecting party itself, the objections must be rejected, and the PUC decision may be affirmed as to the matters thereby expressed provided that other grounds support it.

AT & T, Sprint/United, as well as CTSI as amicus curiae, plus Nextlink and its co-amici, oppose the PUC's foregoing designation of Bell business services as competitive on various grounds: (1) failure to make specific findings required by Chapter 30; (2) lack of substantial evidence support for awarding the competitive classifications; and (3) as with respect to the toll service competition, applying an aggregated-basis imputation test rather than a service-specific one.

As to the findings required in proceedings to designate a service as competitive, 66 Pa.C.S. § 3005(a)(1), cited by AT & T, CTSI and others, states that:

(1) The commission shall make findings which, at a minimum, shall include . . . .

The subsection proceeds to spell out a number of matters included in the subsection. For example, it recites: ease of market entry, the existence of competitors able to offer competition in the area involved, effect on protected services, impact of proposed regulatory changes, identification of consumer benefit from competition, and the degree of regulation necessary to prevent abuses.

AT & T cites *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 164 Pa.Cmwlth. 88, 642 A.2d 541, 543–544 (1994), holding that, when findings are required by law in an administrative adjudication, that adjudication must include all findings necessary to resolve the issues raised by the evidence and which are relevant to the decision.

However, as noted above with respect to the same objection by Bell, and as argued on this issue by the Office of Small Business Advocate (OSBA), our Pennsylvania Supreme Court subsequently interpreted the duty to make findings under 66 Pa.C.S. § 3005 as allowing the PUC to adopt as findings the detailed positions of one party or another, as well as allowing the PUC to adopt findings made by an ALJ. *Popowsky*, 550 Pa. at 464, 706 A.2d at 1204.

The Supreme Court, at the same point in *Popowsky*, in addition to rejecting this Court's rigid view in *Greene*, supra, associated its more rational and feasible standard, in part, with this Court's earlier statements in *Barasch v. Pennsylvania Public Utility Commission*, 101 Pa. Cmwlth. 76, 515 A.2d 651, 655 (1986), where the PUC's choice on each issue was rightly deemed to be an implicit acceptance of one party's thesis and rejection of the opposing party's contention.

■■■ Accordingly, in view of the Supreme Court's clear-cut rejection, *Popowsky*, 550 Pa. at 464, 706 A.2d at 1204, of this Court's view in *Popowsky* and *Greene*, we must take it that the format of the PUC decision here was adequate as to findings.

AT & T next challenges the competitive classification decision as lacking substantial evidence support, noting that the ALJ recommended denial of Bell's competitive classification request, while the PUC granted it, relying, in AT & T's view, on the ALJ's statements that the record suggested that large business customers in the metropolitan areas had a choice of competitors to Bell, and that a plausible demarcation line for competitive classification might be customers generating more than $40,000 in annual telecommunications

---

**226.** Bell Statement, R.R. 782a–785a Vol. 3.

**227.** R.R. 499a–501a, Vol. 2

revenue.[228] AT & T adds that the PUC's decision moreover varied from these statements initially allowing competition as to customers producing $80,000 or more in revenue, but also allowing that number to be reduced to as low as $10,000 in the future, depending upon the availability of Local Number Portability (LNP).[229]

AT & T also reiterates, as to the competitiveness designation, its objection, discussed above as to access charges, to the aggregate revenues imputation test chosen by the PUC over the service offering test.

The PUC answers that AT & T, as a party to the 1648 petition, joined in acquiescing to classification of Bell's IntraLATA toll services and business services as competitive, albeit on the differing terms stated therein. That petition, we note, agreed to the IntraLATA competitive classification when Bell achieved Section 271 approval and the business services competitive classification for customers providing annual revenues of $100,000 or more.[230]

■ With respect to the question of substantial evidence support for its decisions on competition, the PUC relies in part upon the record made before ALJ Schnierle on Bell's petition for competitive services designation, a record included in the record for this case,[231] a record in which fourteen parties filed answers and motions to intervene, and which includes 1708 pages of testimony and 83 exhibits.

Although the ALJ in that case denied Bell's request for competitive designations at that time, as the Office of Small Business Advocate points out, Bell's request there was to have all of its business services designated competitive, a very different result from the limited designation by the PUC here.

The PUC's expertise entitles its findings to be accorded substantial weight. Its conclusions are moderate, as well as rational, in that they fall between the claims of the market opponent parties here, as presented by Bell on the one hand and AT & T, Sprint, CTSI and Nextlink on the other hand.

### Reciprocal Compensation Agreements and Internet Connections

Reciprocal compensation agreements involve ILECs and CLECs—incumbent and competitor local carriers respectively— each paying the other for the *termination* of *local calls* other the other's local network.[232] Thus with ILECs and CLECs now sharing local calling areas, plus the advent of many telephone calls being made to reach the Internet, an important reciprocal compensation issue has arisen: Is a call to the local number of an ISP (Internet Service Provider) to be treated as a local call, or is its nature not local but interstate because it is immediately switched across state lines to the Internet? The FCC treats ISP calls as interstate for its jurisdictional purposes, but has not purported to make any decision classifying ISP calls for state reciprocal compensation cases.[233]

Hence ILECs and CLECs typically differ on whether traffic to ISPs should be treated as local traffic subject to the reciprocal compensation provisions of the Communications Act of 1934 as amended by TA 96,[234] or as interstate traffic. The Office of Consumer Advocate states that the ability of consumers to reach an ISP through a local call is a significant benefit.... [235]

**228.** R.R. 286a, Vol. 1.

**229.** R.R. 287a–290a, Vol. 1.

**230.** R.R. 435a–437a, Vol. 2

**231.** R.R. 7217a—R.R.7270a, Vol. 22.

**232.** R.R. 245a Vol. 1, at n. 192

**233.** FCC Inter–Carrier Compensation Order, CC Docket No. 99–68

**234.** 47 U.S.C. § 251(b)(5).

**235.** OCA Intervenor Brief at 91.

That consumer view apparently reflects the reality that internet users, when given a choice among ISP numbers, as is the case at least in populous areas, naturally prefer calling an ISP number which is a local number rather than a regional toll or interstate toll number at a higher cost.

Also apparent from the nature of internet usage is the fact that ISPs proportionately receive more local calls and originate fewer local calls than the average telephone subscriber. As GTE points out,[236] such calls to link up with the internet tend to be above-average in duration, and reciprocal compensation is commonly paid on a per-minutes-of-use basis. Hence, when the ISP is a CLEC customer, and the greater number of internet users are located in the larger area of the ILEC, the CLEC in those particular situations may receive a relatively higher amount of compensation under the reciprocal agreement than the ILEC, as far as internet calls are concerned. Of course, the opposite result would prevail wherever the ISP is an ILEC customer and the internet seeker is a customer of the CLEC.

Nevertheless, the positions and briefs here indicate that CLECs tend to take the view that calls to ISPs entitle them to compensation under the reciprocal agreement because each such call terminates as local traffic within the CLECs network. The ILECs in this case, such as Bell and GTE, take the opposing position, that ILEC-originated calls to a local CLEC number to be connected to the internet are interstate traffic, not terminated at the ISP but there merely re-routed to the web.

After that recent decision of the Federal Communications Commission (FCC), where federal jurisdiction was the question, treated internet calls as interstate,[237]

CLECs have tended to regard that holding to be applicable only for FCC jurisdictional purposes, while ILECs have taken the view that the FCC thereby negated the treatment of ISP calls in Pennsylvania as local. The PUC heretofore has expressed its own view of the federal decision as being limited to the jurisdictional issue only. That was one of the PUC's premises in its TCG Order,[238] holding that local traffic included ISP calls from Bell end-users to ISPs who are TCG's end-user customers, and that Bell should pay the termination rate for such local calls under the reciprocal compensation provisions.

Thus, the FCC's view is that ISP calls are interstate for federal jurisdictional purposes because their purpose is not just to reach the ISP's server but thereby to communicate with internet, but the FCC also acknowledged that its own treatment of calls to ISPs as local for purposes of interstate access charges would suggest that compensation could also be due in the reciprocal compensation context.[239]

In this present case, the 1648 Petitioners, reading the FCC decision as letting the states decide whether calls to ISPs are local or interstate in nature, therefore urge that ISP calls continue to be treated as local calls to maintain the current cost structure.[240] The 1649 Petition, apparently on the basis that the FCC has reopened the issue, seeks to leave all parties the right to argue prospectively the issue of reciprocal compensation under the then applicable law.[241]

In the Global Opinion and Order [242] the PUC held to its previous view that ISPs are local calls for the purpose of intercarrier compensation. As to contractual effect, the PUC stated that current contracts requiring reciprocal compensation for calls to

---

**236.** GTE North Reply Brief at 10.

**237.** Supra, n. 233.

**238.** Order June 16, 1998, Docket No. P–00971256.

**239.** See n. 233 supra.

**240.** R.R. 418a, 419a, ¶¶ 69, 70.

**241.** R.R. 511a, ¶ 136.

**242.** R.R. 252a, Vol. 1.

ISPs—i.e., treating them as local calls—shall continue to be enforceable, and that the PUC will apply the same policy to future interconnection agreements. The PUC relied upon the FCC's clear statement, in its 1999 decision, that:

A state commission's decision to impose reciprocal compensation obligations in an arbitration proceeding—or a subsequent state commission decision that those obligations encompass ISP-bound traffic—does not conflict with any commission rule regarding ISP-bound traffic.[243]

The FCC, in the same order, noted that state commissions are also free to take the contrary view, i.e., treat ISP calls as interstate rather than local.

Moreover, as MCI points out in its brief, the federal courts have confirmed that state commissions do not violate federal law when they interpret interconnection agreements to require payment of reciprocal compensation by treating calls to ISPs as local calls. *Southwestern Bell Tel. Co. v. Public Utilities Commission of Texas*, 208 F.3d 475 (5 th Cir.2000); *Illinois Bell Telephone Co. v. Worldcom Techs. Inc.*, 179 F.3d 566, 574 (7 th Cir.1999).

On appeal here, Bell attacks the Global Opinion and Order relating to reciprocal compensation, described above, as arbitrary and capricious and not based on substantial evidence because it was made without reference to the terms of the interconnection agreements it purports to modify.[244] Bell and GTE contend that the PUC action retroactively purports to change the content of their reciprocal compensation agreements, is contrary to the federal determination of ISP calls as interstate in nature, and constitutes invalid rulemaking.

■ Of course, as Sprint/United notes, the PUC did not change the terms of any agreements but merely interpreted local call consistently with its previous actions. It must be noted that the PUC determination here is consistent with its existing decision issued June 16, 1998, in the TCG/Bell Atlantic Interconnection Agreement.[245]

■ As to the record basis for its determination, the PUC states that it considered the expert testimony submitted by Bell [246] and GTE,[247] as well as by the witnesses for the opposing view, including evidence that thirty states agree with the result here.[248] As to the absence of a national legal mandate, the PUC also relied upon the FCC statement in its Inter–Carrier Compensation Order, as quoted above, that state decisions that reciprocal compensation obligations encompass ISP-bound traffic do not conflict with any FCC rule regarding ISP-bound traffic, as well as upon *Bell Atlantic Telephone Cos. v. FCC*, 340 U.S.App.D.C. 328, 206 F.3d 1 (C.A.D.C.2000), declaring the states free from the FCC concept.

Moreover, the PUC notes, and the order confirms, that the PUC has issued no order purporting to modify the terms of an existing interconnection agreement as reciprocal compensation. On the contrary, the order is clear that existing agreements are not modified. The order states that Carriers must continue to abide by the *current* interconnection agreements regarding reciprocal compensation for the local treatment of ISP calls, consistent with the FCC Order and this determination. (emphasis added). Beyond

**243.** R.R. 253a, Vol. 1.

**244.** Bell Brief at 66.

**245.** Re: Petition for Declaratory Order of TCG Delaware Valley, Inc. for Clarification of Section 5.7.2 of Interconnection Agreement with Bell Atlantic Pa., Inc., Docket No. P–00971256.

**246.** R.R. 1399–1403, Vol. 4.

**247.** R.R. 1350a–1354a, Vol. 4.

**248.** R.R. 249a–253a, Vol. 1.

that, it directs only that ISP calls shall be considered local and reciprocal compensation applied on ISP traffic for all *future* interconnection agreements.[249] Those terms obviously do not purport to change the terms of any interconnection agreements in existence.

As to the straightforward factual nature of calls to ISPs, treating them as local calls, when the actual number called by the initiating end-user is a local number rather than the number of an internet site across a state line, provides a rational basis for the record evidence on which the PUC has relied. Also, as Sprint/United argues, whether a telephone call to a local number is electronic-data-based or voice-based, its content as such is logically irrelevant to its status in the local/interstate dichotomy.[250]

■■■ Bell and GTE also claim that this PUC statement, allegedly directing that all reciprocal compensation arrangements in interconnection agreements must be treated a specific way constitutes a 'binding norm' issued in violation of the Regulatory Review Act and the Commonwealth Documents Law.[251]

However, the PUC is correct in its view that its decision on this point in that this case simply constitutes an adjudication of a specific contested issue before it. The import of its direction that the decision shall be applicable to future agreements is simply the PUC's confirmation of an intent to follow a uniform policy, i.e., that this affirmance of Pennsylvania's view on ISP calls and reciprocal compensation continues to have effect as a precedent.

■■■ An administrative adjudication of a specific case, such as the decision here, has effect as a precedent, but is clearly not a binding norm' such as must be embodied in a regulation under the Commonwealth Documents Law. As previously noted herein, even a policy statement in the context of an adjudication, announcing an agency's

tentative intention to act consistently in the future, does not constitute a *binding* norm required to be embodied in a regulation. *Mid–Atlantic Power Supply Association v. Pennsylvania Public Utility Commission,* 746 A.2d 1196 (Pa.Cmwlth.2000), *citing Department of Environmental Resources v. Rushton Mining Co.,* 139 Pa. Cmwlth. 648, 591 A.2d 1168, *petition for allowance of appeal denied,* 529 Pa. 626, 600 A.2d 541 (1991).

The PUC's adjudication of the reciprocal compensation issue, as to ISP calls, is affirmed.

### Global Order Validity under the Federal Telecommunications Act

The Telecommunications Act of 1996 (TA 96) has as its purpose the further development of competition in telecommunications. *See* 47 U.S.C. § 251, particularly 47 U.S.C. § 251(d)(1), and *AT & T Corp. v. Iowa Utilities Board,* 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). That purpose is consistent with the competition furthering aims of Pennsylvania's Chapter 30, previously discussed.

Under the federal law, Bell, as an ILEC, is required to share its network with competitors on terms that are just, reasonable and nondiscriminatory. 47 U.S.C. § 251(c). Federal administrative regulations have been adopted. 47 C.F.R. §§ 51.1–51.809.

In this case, Bell and other parties have raised questions under the federal law, dealing with wholesale rates for services, UNEs and unbundled access to switching in Pennsylvania.

### *Federal Law and the Rural/Residential Promotion*

Bell relies upon the federal provisions that entitle it, as a local exchange carrier, to sell services at wholesale to carriers on

---

**249.** R.R. 252a, Vol. 1.

**250.** Sprint/United Intervenor Brief at 3.

**251.** Bell Brief at 66.

the basis of retail rates charged to subscribers for the telecommunications services requested, excluding costs that will be avoided by the local exchange carrier. 47 U.S.C. § 252(d)(3). *See also* 47 U.S.C. §§ 251(b)(1), 252(c)(4). Bell complains that the PUC order here sets the wholesale discount from its retail rates at more than five percent greater than the discount previously determined by the PUC.

In this case, the 1648 Petitioners challenged the existing rates previously set, as our case law allows. *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 715 A.2d 540 (Pa.Cmwlth.1998); *Schellhammer v. Pennsylvania Public Utility Commission,* 157 Pa.Cmwlth. 86, 629 A.2d 189 (1993). In this state, Bell has a uniform wholesale discount rate pair, which is 20.69% when the reseller provides its own operator services, and 18.43% when Bell provides operator services. The 1648 Petitioners, seeking a more equal entry opportunity into rural and residential markets, proposed a 5% increase in the discount for residential lines in rural areas and up to a 10% increase in the discount for areas most rural in nature, labeling the request as the Rural/Residential Promotion.[252]

Upon consideration of the record here, the PUC declined to change Bell's wholesale discount rates across the board, holding that Bell's wholesale discounts should remain unaffected except for the Rural/Residential Promotion, described by the PUC as designed to allow residential rural customers to share in varied and advanced services at lower rates stimulated by competition.[253]

The PUC's order directed Bell to file tariffs to implement the Promotion, to remain in effect until Bell receives its Section 271 approval to enter the long distance market, but in any event, not less than one year. Implementing the Promotion terms increased the resale discount from 20.69 percent to 25.69 percent without operator services, and from 18.43 percent to 23.43 percent with operator services, for CLEC residential resale lines in subregions known as density cells DC3, suburban, and DC4, rural.[254]

According to the PUC's opinion discussion, the density cell is a group of wire centers whose customers share a common population density range, with density cell one (DC1) being the most dense and density cell four (DC4) being the least dense.[255]

The order also increased Bell's resale discount for residential lines in DC4 by two percent for each ten percent share of a given CLEC's total resold lines serving residential customers in DC4, with a maximum of ten percent incremental discount for DC4 residential lines.[256] A CLEC which qualifies for that incremental DC4 discount will qualify for an additional one percent discount in DC1, DC2, and DC3 for each five percent share of the CLEC's total resold lines serving residential customers there, with a maximum incremental discount of five percent.[257]

Each carrier that qualifies for those incremental discounts is required to submit a monthly report to the PUC to document eligibility for the incremental discount.[258]

Bell's objection is that the PUC had no cost studies supporting the foregoing discount rates. Bell cites 47 U.S.C. § 252(d)(3) for its right as wholesaler to charge on the basis of retail rates charged to subscribers for the telecommunications service requested ... excluding costs that will be avoided by the local exchange carrier.

---

**252.** 1648 Petition, R.R. 409a–410a, Vol. 2.

**253.** R.R. 168a, 169a, Vol. 1.

**254.** R.R. 176a, Vol. 1, ¶ (b).

**255.** R.R. 169a.

**256.** R.R.176a, Vol. 1, ¶ (c).

**257.** R.R. 176a, Vol. 1, ¶ (d).

**258.** R.R. 176a, Vol.1, ¶ (e).

Bell also complains that the PUC required Bell to reduce its rates for its UNEs by between 10 and 16.5 percent below the cost-based rates that the PUC had approved in the *MFS III* proceeding. That, urges Bell, violates its right, under the federal law, to charge rates based on the cost ... of providing the ... network element. 47 U.S.C. § 252(d)(1).

In response, the PUC argues that the federal law, dovetailing with the competition-supporting aims of Pennsylvania's Chapter 30, requires incumbents such as Bell to facilitate the entry of competitors into local telecommunications markets by means of (1) resold services, (2) leased unbundled network elements, and (3) construction of facilities. *AT & T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

The federal act, the PUC contends, imposes a duty on Bell to offer its telecommunications services to other carriers for resale to end-user customers, 47 U.S.C. §§ 251(b)(1), 251(c)(4) and those offers to other carriers must be based on wholesale rates. 47 U.S.C. § 251(c)(4).

MCI, in its brief, also provides support for the Global Order on this point by noting that Bell's existing interconnection agreements have promised competitors that they may have unbundled access to local switching throughout Pennsylvania, citing *MCI v. GTE Northwest, Inc.* 41 F.Supp.2d 1157, 1180 (D.Or.1999). Accordingly, the PUC soundly refused to allow Bell to unilaterally open up contracts and create additional uncertainty that will stall any progress in developing open local markets.[259]

Because true competition in Pennsylvania markets has remained limited to serving large business customers in urban areas,[260] CLECs have not had a foundation on which to expand into serving the residential and rural areas of the state. Thus

the PUC says that it is seeking to implement the goal of 47 U.S.C. § 254 to all people.

That goal and the agency's decisions with respect to UNEs here is in accordance with the applicable law.

## Wholesale Rates and Federal Law

Because a utility's existing rate always remains subject to challenge before the PUC, including situations where the benefits of competition are being sought, *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 715 A.2d 540, 546–548 (Pa.Cmwlth.1998), the 1648 Petitioners pursued the Rural/Residential Promotion, seeking the above-noted increases in Bell's wholesale discounts for DC3 and DC4. The PUC, declining to cut the discounts generally, has ordered the above-described discount increases that are time-limited and area-limited.

The PUC points out that Bell's Petition for Review, ¶ 49, to this Court on this appeal limits Bell's complaint only to whether the PUC's action on this matter violates the federal law at 47 U.S.C. § 252(d)(3). However, that provision does not dispense with concern for costs. The PUC grants that the federal statute not only refers to an incumbent's duty to offer services at wholesale, 47 U.S.C. § 251(c)(4), but also to determining wholesale prices on the basis of retail rates less the costs that the incumbent is able to avoid as a consequence of the resale.

Bell's reply brief contends that the PUC's responsive brief admits that Bell's pre-existing wholesale rates complied with federal standards at 47 U.S.C § 252(d)(3) and hence that the PUC has admitted that the added rural discount results in a rate unlawfully low.[261] However, the fact that pre-existing general discounts allowed adequate cost recovery does not logically pro-

---

**259.** R.R. 109a, Vol. 1.

**260.** R.R. 104a, Vol. 1.

**261.** Bell Reply Brief at 36, referring to PUC Brief at 101.

vide proof that a limited additional discount crosses the lawful discount limit.

 Under the basic rules governing the concept of a rate structure—a concept which characteristically assumes variations rather than a flat uniformity within the structure—Bell must grant that mere differences in rates between classes of customers is not unlawful in itself. *Peoples Natural Gas v. Pennsylvania Public Utility Commission,* 47 Pa.Cmwlth. 512, 409 A.2d 446, 455 (1979). Rates for different classes of service are not required to be equal or equally profitable. *Philadelphia Suburban Transportation Co. v. Pennsylvania Public Utility Commission,* 3 Pa. Cmwlth. 184, 281 A.2d 179, 186 (1971). The PUC, in pursuing the goal of extending the public benefits of competition, as mandated by both the federal law and Pennsylvania's own Chapter 30, has taken a prudent approach in defining the target areas to which competition needs to be extended and has kept open further scrutiny of the specific costs factors thereby setting a time limit on the new wholesale discounts.

Thus, after a short period, not beyond September 30, 2000, either Bell or the CLECs, or both, are required (and entitled) by this aspect of the Global Order to have a re-examination of this matter, at a point when experience with this diversification can be further measured and, if necessary, re-evaluated. The approach is consistent, also, with our state law mandate, that rates, terms and conditions for noncompetitive services, including access services, are reasonable and do not impede the development of competition. 66 Pa. C.S. § 3001(4).

The PUC's temporary test-period approach to bringing competition into suburban and rural markets is logically necessary and therefore lawfully sound.

*Unbundled Network Element (UNE) Rates and the Federal Law*

 Bell also opposes the UNE rate determinations by citing 47 U.S.C. § 252(d)(1) which provides that a state commission's determination of the just and reasonable rate for network elements....:

(A) shall be—

 (i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the ... network element ... and

 (ii) nondiscriminatory, and

(B) may include a reasonable profit.

Bell submits that the PUC reduction of UNE rates by between 10 and 16.5 percent took them below the cost-based rates the PUC had set in *MFS III*[262] and therefore violated the above-quoted provision of the federal TA 96.

The PUC responds by relying upon 47 U.S.C. § 251(c)(3), detailing a local exchange carrier's duty to provide nondiscriminatory access to UNEs for any requesting telecommunications carrier on terms that are just, reasonable and nondiscriminatory, as required by the act. The PUC's position is that, when it first established rates for Bell's UNEs in the MFS proceeding in August of 1997, the PUC announced that it would institute a further proceeding a year later to reexamine and ascertain the viability of those rates.[263] Following the public meeting of July 9, 1998, the renewed investigation of the UNE rates was included within the Global proceedings and disposed of by the Global Order, and the MFS proceeding, then treated as MFS-Phase IV, was closed and deemed completed.[264]

 Bell responds by citing 66 Pa.C.S. § 316, providing that PUC determinations are conclusive upon all parties affected

---

**262.** Application of MFS Intelenet of Pa. Inc., Final Opinion and Order; R.R. 8754a–8770a, Vol. 26.

**263.** R.R. 8763a, Vol. 26.

**264.** R.R. 45a–46a, 322a, Vol. 1.

thereby unless set aside, annulled or modified on judicial review, but that passage, relating to each decision in a specific proceeding, clearly does not bar the making of a revised price determination in a subsequent and separate proceeding, as here.

### Unbundled Access to Switching and DSLAMS

■ Finally, Bell submits [265] that the PUC requirements that Bell provide CLECs with unbundled access to switching throughout Pennsylvania without regard to population density, and also provide them unbundled access to digital subscriber line access multiplexers (DSLAMs), violate the federal law at 47 U.S.C. § 251(d)(2), because there is no evidence to show that such network elements are *"necessary"* for a competitor to provide service and that the failure to provide access to such network elements would *impair* the ability of the competitor to provide service (emphasis by Bell). Bell's claim thus is that the PUC did not pursue the so-called necessary and impair analysis expressed by the statute.[266]

In findings stated in the Opinion and Order,[267] the PUC found that the adoption of broadband technologies sought by Pennsylvania's Chapter 30 can be accomplished by involving CLECs as well as incumbents such as Bell. Digital subscriber line technologies (DSL) may enable plain telephone lines to carry high-speed, high-content transmissions, holding the promise of adapting existing loop facilities to broadband capability less expensively and more rapidly that was sought to be implemented by Chapter 30.

Therefore, on this record noting the importance of network switching facilities, and the key role of digital subscriber line access multiplexers in today's rising importance of digital communication, the necessity of those elements has become apparent.

The PUC quotes the FCC statement that:

> The ability of all Americans to access these high-speed, packet-switched networks will likely spur growth and development as a nation.[268]

Bell relies upon another FCC Order, Third Report and Order, FCC 99–238, CC Docket No. 96–98, ¶¶ 281, 299,[269] to submit that the FCC has declined to require unbundling of DSLAMS at all and required unbundling of switching only in certain geographic areas. However, the very same FCC Third Report and Order is cited by the PUC as indicating that the basic rule is that ILECs shall unbundle local switching elements, subject to certain exceptions not shown by Bell to be applicable here. In the cited FCC ¶ 281, the FCC states that, based on its record:

> [W]e conclude that exempting incumbent LECs from unbundling local circuit switching *in certain circumstances* in the top 50 MSAs *is reasonable* because nearly all of the top 50 MSAs contain a significant number of competitive switches. (emphasis added).

In its ¶ 299, the FCC adds that its decision to relieve incumbent LECs from their unbundling obligations in the circumstances described above will not require medium and large businesses to wait unnecessarily for competitive alternatives. Thus the FCC indicates its view that not requiring

---

**265.** Bell Main Brief at 74.

**266.** Although the PUC contends that Bell has failed to raise this matter in its Statement of Questions Involved, Bell's Question 10, which raises the matter of the PUC setting rates for network elements in violation of federal law, can be said to include switching and DSLAMS as network elements.

**267.** R.R. 148–149, Vol. 1.

**268.** First Report and Order, FCC 99–48, CC Docket No. 98–147, ¶ 5, 1999 WL 176601.

**269.** This FCC Third Report bears a release date of Nov. 5, 1999, more than a month after the September 30, 1999 date of the Global Order under review here. AT & T Intervenor Brief at 93 and Bell Main Brief at 74.

LECs to make these facilities available unbundled is reasonable in certain circumstances. The federal regulation indicates no requirement pre-empting the PUC's decision here.

Moreover, as the PUC points out, 47 U.S.C. § 251(d)(2), setting the standards for making access available as when access is necessary and when refusal of access would impair the ability of a carrier to provides services, also, in the same subsection, at § 251(d)(3), provides that a state commission is not precluded from enforcing any regulation, order or policy that:

(A) establishes access and interconnection obligations of local exchange carriers;

(B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

Thus the federal law and regulation does not bar the PUC from concluding that its requirement that Bell sell access to these elements is necessary with respect to proprietary elements and that barring CLECs from unbundled access to such elements would, in the context of this state's development, impair (as distinguished from negate) CLEC participation in the Chapter 30 goals of our law.

With availability of the network elements as the general rule, and no record or statutory basis for making an exception, the PUC's action as to these elements here is clearly in accordance with the federal requirements as well as state law.

### ORDER

AND NOW, October 25, 2000 the Order of the Public Utility Commission of the Commonwealth of Pennsylvania entered September 30, 1999, including the provisions expressly incorporated therein from the immediately preceding Global Opinion and Order, is affirmed as to the appeals herein, namely docketed at Nos. 2790, 2793, 2812, 2896, 2916 C.D.1999.

### APPENDIX A—GLOSSARY OF TELECOMMUNICATIONS ACRONYMS

ADR Abbreviated Dispute Resolution

BRI–ISDN Basic Integrated Services Digital Network

BSF Basic Service Function

CCLC Common Carrier Line Charge

CLEC Competitive Local Exchange Carrier

CMRS Commercial Mobile Radio Service

CPCD Coin Paid Customer Dialed Surcharge

DSLAM Digital Subscriber Line Access Multiplexer

EEL Enhanced Extended Loop

ILEC Incumbent Local Exchange Carrier

InterLATA Toll service terminating in LATA different from start

IntraLATA Toll service starting and terminating in same LATA

ISP Internet Service Provider

IXC Inter–Exchange Carrier

LATA Local Access and Transport Area

LETC Local Exchange Telecommunications Carrier

LNP Local Number Portability

MOU Minutes Of Use

MSA Metropolitan Statistical Area

NTS Non–Traffic Sensitive

OSS Operations Support System

PCO Price Change Opportunity

POTS Plain Old Telephone Service

PRI–ISDN Primary Integrated Services Digital Network

TA96 Telecommunications Act of 1996

TELRIC Total Element Long Run Incremental Cost

TS Traffic Sensitive

TSLRIC Total Service Long Run Incremental Cost

UNE Unbundled Network Element

USF Universal Service Fund

## APPENDIX B

### APPENDIX B - RECORD EVIDENCE

| Witness | Party | Direct or Cross Exam | Live or Submitted | Subject |
|---|---|---|---|---|
| Sherry Lightenberg | MCI | Direct | Submitted | Examples of Bell wrongful behavior. |
| Daniel J. Whelan | Bell | Direct | Submitted | Description of Bell's proposal. |
| Michael R. Baranowski | AT&T | Direct | Submitted | Review of proposed Unbundled Network Element rates. |
| Richard H. Silkman | Senators | Direct | Submitted | Structural/functional separation of ILEC business operations |
| Don A. Laub | MCI | Direct | Submitted | Policy considerations of PUC, unbundling of Unbundled Network Elements, UNE pricing, consider competition proposal as a whole. |
| Merwin Sands | MCI | Direct | Submitted | Internet/Reciprocal Compensation. |
| Emeric W. Kapka | United and Sprint | Direct | Submitted | Sprint's recommendation on Unbundled Network Elements,Collocation,Digital Tariffs, calling areas, resale, Internet/Reciprocal Compensation, OSS, structural/functional separation of ILEC business operations and other issues. |
| E. Christopher Nurse | AT&T | Direct | Submitted | UNE Platform, Interconnection and Alternatives including Collocation, Digital Tariffs and high speed technology, Internet/Reciprocal Compensation. |
| Donald C. Davis | Intermedia | Direct | Submitted | ISP Traffic |
| Mark C. Cooper | Office of Consumer Advocate | Direct | Submitted | Rates and services in the consumer parties' proposal. |
| Mark S. Calnon | GTE North | Direct | Submitted | Access Charge Reform, Universal Service, rate caps, wholesale discounts. |
| Emily E. Binder | United and Sprint | Direct | Submitted | Access charges, Universal Service, Lifeline, Consumer Education, Telecommunications Economic Development Fund, Network Modernization, Rate Cap, Regulatory Parity, Dispute Resolution. |
| John Langhauser | AT&T | Direct | Submitted | Overview of AT&T's position. |
| G. Blaine Darrah, III | AT&T | Direct | Submitted | Access Charges, Resale, USF/Carrier Charge Pool, Lifeline, Consumer Education, Telecommunications Economic Development Fund, Rate Cap and Ceiling, Competitive Service Designation, Regulatory Filing Requirements, Abbreviated Dispute Resolution Process, Costs of |

## APPENDIX B - RECORD EVIDENCE

| Witness | Party | Direct or Cross Exam | Live or Submitted | Subject |
|---|---|---|---|---|
| | | | | services. |
| Michael R. Baranowski | AT&T | Direct | Submitted | Review-UNE rates proposed. |
| Peter Bradford and Richard H. Silkman | Senators | Direct | Submitted | Competitive Service Designation, 271 Approval |
| Stanford L. Levin | Office of Small Business Advocate | Direct | Submitted | Competitive Service Designation, business service. |
| John P. Blanchard | GTE | Direct | Submitted | Network Modernization, Lifeline, Consumer Education, Telecommunications Economic Development Fund, Internet/Reciprocal Compensation, Structural/Functional Separation of ILEC Business Operations. |
| Daniel J. Whelan | Bell | Direct | Submitted | Supplemental Direct Testimony regarding the 2 petitions. |
| John C. Klick | MCI | Direct | Submitted | UNE's Testimony describing HAI Model Version 5.1 and results running HAI for Bell. |
| Joseph J. Laffey | Rural Telephone Company Coalition | Rebuttal | Submitted | Universal Service Fund, Residential Rate Cap, network modernization requirements, Internet traffic. |
| Mark N. Cooper | Office of Consumer Advocate | Rebuttal | Submitted | Access charges, Universal Service, Lifeline, Rate Cap Ceiling. |
| Catherine A. Eichenlaub | Bell | Rebuttal | Submitted | Lifeline Plan. |
| Timothy J. Tardiff | Bell | Rebuttal | Submitted | Respond to Klick's testimony regarding Hatfield/HAI cost model for assessing costs and prices of basic Universal Service, interconnection services, Unbundled Network Elements. |
| Stanford L. Levin | Office of Small Business Advocate | Rebuttal | Submitted | Rebuttal for competitive designation for certain business services. |
| Mark DeFalco | CTSI | Rebuttal | Submitted | Respond to Whelan and Calnon, UNE price levels, Reciprocal Compensation for ISP traffic, Competitive Services Designation for Bell Business Services, DSL Services. |
| Melvin Sands | MCI | Rebuttal | Submitted | Reciprocal compensation. |
| Don A. Laub | MCI | Rebuttal | Submitted | Rebuttal to Whelan, UNE's and Digital Subscriber Line Services. |
| Richard H. Silkman | Senators | Responsive | Submitted | Respond to Bell and GTE, whether PUC can impose any element of the Senators/CLEC petition on Bell and GTE without their explicit |

## APPENDIX B - RECORD EVIDENCE

| Witness | Party | Direct or Cross Exam | Live or Submitted | Subject |
|---|---|---|---|---|
| Emily E. Binder | United/Sprint | Responsive | Submitted | Responsive testimony concerning access charges, Universal Service Fund, Lifeline, Rate Cap and Rate Ceiling. |
| Emeric K. Kafka | United/Sprint | Responsive | Submitted | Responsive testimony concerning 271 entry, ISP traffic, business services pricing flexibility, UNE. |
| E. Christopher Nurse | AT&T | Responsive | Submitted | Responsive testimony concerning UNE Platform and Internet/Reciprocal Compensation. |
| Richard Stannard | Senators | Responsive | Submitted | Responsive testimony to Blanchard and Whelan's claim that provisions of the ILEC petition will serve the public interest, refer to New York experience. |
| John P. Blanchard | GTE North | Rebuttal | Submitted | Responsive testimony concerning Internet/Reciprocal Compensation, Structural/Functional Separation of ILEC business operations. |
| Mark Calnon | GTE North | Rebuttal | Submitted | Rebuttal testimony, access charge, rate cap, resale discount, USF carrier charge. |
| Mark Calnon | GTE | Cross | Hearing | Senators' CLEC position. |
| Emily E. Binder | United and Sprint | Cross | Hearing | Rates. |
| G. Blaine Darrah, III | AT&T | Cross | Hearing | Rate cap-difficult to tell who is testifying 2693a-2694a. |
| Joseph J. Laffey | RTC | Cross | Hearing | Rate cap-difficult to tell who is testifying 2693a-2694a. |
| Mark Calnon | GTE | Cross | Hearing | Universal Service Fund. |
| G. Blaine Darrah, III | AT&T | Cross | Hearing | Universal Service Fund. |
| Joseph J. Laffey | RTC | Cross | Hearing | RTCC's position on 1649 petition. |
| John P. Blanchard | GTE | Cross | Hearing | Internet access. |
| Mark Calnon | GTE | Cross | Hearing | Wholesale discount rates. |
| John P. Blanchard | GTE | Cross | Hearing | Consumer Education, Competition |
| Emily E. Binder | United and Sprint | Cross | Hearing | Sprint's Chapter 30 plan. |
| Mrs. Eichelaub | Bell | Cross | Hearing | Lifeline |
| Cheryl Ransom | - | Cross | Hearing | Lifeline |
| Joseph James | - | Cross | Hearing | Lifeline |
| Mark Cooper | Office of Consumer Affairs | Cross | Hearing | Lifeline |
| Roger Cotton | - | Cross | Hearing | Lifeline |
| Catherine A. Eichenlaub | Bell | Cross | Hearing | Lifeline |

## APPENDIX B - RECORD EVIDENCE

| Witness | Party | Direct or Cross Exam | Live or Submitted | Subject |
|---------|-------|---------------------|-------------------|---------|
| Timothy Tardiff | Bell | Cross, Redirect | Hearing | Hatfield Model. |
| Mark Cahron | GTE | Cross | Hearing | Loop Resale. |
| Don Laub | MCI | Cross | Hearing | Customers in N.Y. |
| John Klick | MCI | Cross | Hearing | Hatfield Model 5.1. |
| Michael R. Baranowski | AT&T | Direct | Hearing | UNE Costs. |
| E. Christopher Nurse | AT&T | Direct | Hearing | Unbundling Ports. |
| Michael R. Baranowski | AT&T | Direct? | Hearing | Working lines, non-working line. |
| Don Laub | MCI | Direct | Hearing | One question. |
| John Klick | MCI | Direct | Hearing | HAI Model. |
| Michael R. Baranowski | AT&T | Direct | Hearing | Proposed rates/model. |
| E. Christopher Nurse | AT&T | Direct | Hearing | Next Link. |
| Donald Davis | - | Cross | Hearing | Switching equipment. |
| Michael Maloney | Next Link | Cross | Hearing | Next Link equipment. |
| Stanford L. Levin | Office of Small Business Advocate | Cross | Hearing | ICB |
| Donald Davis | - | Cross | Hearing | 271 |
| John Langhauser | AT&T | Cross | Hearing | New York service. |
| John Woodhauser | - | Cross | Hearing | Bell Atlantic compliance |
| John Langhauser | AT&T | Cross | Hearing | New York |
| John P. Blanchard | GTE | Cross | Hearing | Structural separation. |
| Sherry Likenberg | MCI | Cross | Hearing | Bell New York 271. |
| John Langhauser | AT&T | Cross | Hearing | Electric restructuring. |
| Richard Silkman | Senators | Cross | Hearing | Separation between retail and wholesale. |
| Daniel J. Whelan | Bell | Cross, Redirect | Hearing | Structural separation, code of conduct, other issues. |
| Dr. Marvin H. Kahn | OCA | Rebuttal | Submitted | Issues related to pricing, proposals and competition. |
| Dr. Marvin H. Kahn | OCA | Direct | Submitted | Access charge, related issues. |
| Nancy Brockway | OCA | Direct | Submitted | Universal Service. |
| Don A. Laub | MCI | Rebuttal | Submitted | Proprietary. |
| Amy Stern | Bell | Rebuttal | Submitted | XDSL, UNESs, EEL, DSLAM, Loop Qualification, Collocation, Digital Tariffs, high speed technology. |
| Michael Maloney | Next Link | Direct | Submitted | Competition. |
| Daniel J. Whelan | Bell | Direct | Submitted | Bell's proposal. |

## APPENDIX B - RECORD EVIDENCE

| Witness | Party | Direct or Cross Exam | Live or Submitted | Subject |
|---|---|---|---|---|
| Daniel J. Whelan | Bell | Supplemental Direct | Submitted | Both petitions. |
| Catherine A. Eichenlaub | Bell | Rebuttal | Submitted | Lifeline. |
| Catherine A. Eichenlaub | Bell | Direct | Submitted | Intralata in PA is highly competitive. |
| Catherine A. Eichenlaub | Bell | Rebuttal | Submitted | Response concerning Intralata in PA. |
| Marsha S. Prosini | Bell | Direct | Submitted | Cross-subsidy analysis demonstrating Bell's Intralata revenues exceed TSLRIC and Intralata is not being subsidized by any other service. |
| Dr. William E. Taylor | Bell | Rebuttal | Submitted | Rebut economic assertions made by AT&T and MCI regarding imputation test. |
| Possibly Darrah | - | Cross | Hearing | LEC, Intralata. |
| Don A. Laub | MCI | Direct, Cross | Hearing | Economic costs, opportunity costs. |
| Catherine A. Eichenlaub | Bell | Direct, Rebuttal, Surrebuttal | Submitted | Just part of testimony, intrastate revenues, access rates, intrastate market is competitive, classification, business telecommunications service. |
| Harry M. Shooshan, III | Bell | Direct, Rebuttal | Submitted | Business service competition, respond to claims made by Darrah, OSBA, OCA. |
| William E. Taylor | Bell | Direct, Rebuttal | Submitted | Competition for business services, competition in Bell's territory, imputation test. |
| Donald Albert | Bell | Rebuttal also Cross, Redirect | Submitted Hearing | Overview of OSS system, rebuttal of criticisms of OSS, respond to misleading claims by AT&T and MCI addressing claims of CLEC concerning UNE. |
| Catherine A. Eichenlaub | Bell | Surrebuttal | Hearing | Unbundled network loop rates. |
| Dr. Mayo (p. 5095) | AT&T- | Direct, Cross | Hearing | Competition, rural services. |
| Ms. Sommi | - | | Hearing | Bundling of long distance service. |
| Darrah | AT&T | Direct, Cross? | Hearing | Intralata, Interlata. |
| Don A. Laub | MCI | Direct | Hearing | Interexchange Industry. |
| Robert Kitchberger | AT&T | Direct | Hearing | Whether AT&T is a facilities based carrier in PA. |
| Mr. Dobe | CTSI | Direct, Cross | Hearing | Bell Atlantic directory problems. |
| Catherine A. Eichenlaub | Bell | Direct | Submitted | No reason to reduce Bell's rates through regulatory mandates. |
| William E. Taylor | Bell | Surrebuttal | Submitted | Competitiveness |
| Marsha Prosini | Bell | Rebuttal | Submitted | Issues regarding Bell's request for competitive classification of its business telecommunicationsservices. |

## APPENDIX B - RECORD EVIDENCE

| Witness | Party | Direct or Cross Exam | Live or Submitted | Subject |
|---|---|---|---|---|
| Catherine A. Eichenlaub | Bell | Rebuttal | Submitted | Bell's request for competitive classification of its business telecommunications services. |
| Catherine A. Eichenlaub | Bell | Direct | Submitted | Market for intrastate telecommunications services to business customers in PA is competitive. |
| Edward Beauvais | GTE North | Direct | Submitted | Access charges. |
| Mark S. Calnon | GTE – Listed in Vol. 23 but not really there except for one chart. | | | |
| Theodore B. Morrison | GTE North | Direct | Submitted | GTE's incremental costs in provisioning intrastate access elements, common costs in pricing of access elements. |
| Don A. Laub | MCI | Direct | Submitted | Rate structure for switched access. |
| William E. Taylor | Bell | Direct | Submitted | Economic framework for intrastate carrier switched access rates. |
| Dr. John Mayo | AT&T | Direct | Submitted | Pricing. |
| Randy G. Farrar | United and Sprint | Direct | Submitted | Investment categories in switching. |
| Mark Daniels | AT&T | Direct | Submitted | (Proprietary) |
| Dr. John Mayo | AT&T | Rebuttal | Submitted | Prices deviating from incremental cost. |
| G. Blaine Darrah, III | AT&T | Rebuttal | Submitted | Bell's CCLC. |
| Emily E. Binder | United and Sprint | Rebuttal | Submitted | CCLC. |
| William E. Taylor | Bell | Rebuttal | Submitted | Economic testimony recording the appropriate framework for intrastate access charge reform in PA. |
| Gary E. Sanford | Bell | Rebuttal | Submitted | Bell's current forward looking incremental costs for the local switching element of intrastate switched access. |
| Catherine A. Eichenlaub | Bell | Rebuttal | Submitted | Bell's access rates. |
| G. Blaine Darrah, III | AT&T | Surrebuttal | Submitted | Price for carrier access. |
| Emily E. Binder | United and Sprint | Surrebuttal | Submitted | Access reductions. |
| William E. Taylor | Bell | Surrebuttal | Submitted | Rebuttal to rebuttal concerning access charges. |
| Joseph J. Laffey | Pennsylvania Telephone Assoc. | Direct | Submitted | Intrastate access charge |
| Joseph J. Laffey | Pennsylvania Telephone Assoc. | Surrebuttal | Submitted | Access charges. |
| Gary E. Sanford | Bell | Surrebuttal | Submitted | Address statements regarding Bell's basic residential local service and |

## APPENDIX B - RECORD EVIDENCE

| Witness | Party | Direct or Cross Exam | Live or Submitted | Subject |
|---|---|---|---|---|
| Catherine A. Eichenlaub | Bell | Surrebuttal | Submitted | Bell's pay phone subsidy analysis. |
| Catherine A. Eichenlaub | Bell | Cross | Hearing | Intrastate access charges. |
| William E. Taylor | Bell | Cross | Hearing | Bell's access rates. |
| Emily E. Binder | United and Sprint | Cross | Hearing | Economic theories concerning access charges. |
| Edward C. Beauvais | GTE North | Cross | Hearing | Access charges. |
| Mark S. Calnon | GTE North | Direct, Cross | Hearing | Access charges. |
| Miss Murray | AT&T and MCI | Cross | Hearing | Intrastate Intralata and Interlata CCL rates. |
| G. Blaine Darrah, III | AT&T | Cross, Redirect | Hearing | Demand simulation. |
| Dr. Mayo | AT&T | Direct, Cross | Hearing | Different types of costs. |
| Don A. Laub | MCI | Cross | Hearing | Economic analysis of telecommunications services. |
| Mr. Siwek (Stephen) | MCI | Cross | Hearing | Access charge reductions. |
| E. Christopher Nurse | AT&T | Cross | Hearing | Rates of return. |
| Mr. Ball | - | Cross | Hearing | Access charges. |
| Bradford Cornell | AT&T and MCI | Rebuttal | Submitted | Costs. Estimate forward looking costs of capital and of Unbundling Network Elements for Bell. |
| Joseph P. Riolo | AT&T and MCI | Rebuttal | Submitted | Fiber cables. |
| Terry L. Murray | AT&T and MCI | Rebuttal | Submitted | Telric appropriate measure of cost. |
| Michael R. Baranowski | AT&T and MCI | Rebuttal | Submitted | Cost models. |
| Stephen E. Siwek | AT&T and MCI | Direct | Submitted | What costs should be used. |
| Michael R Baranowski | AT&T and MCI | Surrebuttal | Submitted | Criticism of Sanford's conclusion. |
| Terry L. Murray | AT&T and MCI | Surrebuttal | Submitted | Inclusion of costs. |
| Joseph P. Riolo | AT&T and MCI | Surrebuttal | Submitted | CLEC access to broadband capable facilities, respond to criticisms of Bell witnesses. |
| Bradford Cornell | AT&T and MCI | Surrebuttal | Submitted | Respond to Bell testimony. |
| Chet Kudtarkar | MCImetro Access Transmission Services | Direct | Submitted | Reason for lack of widespread local competition in PA pricing. |